# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| LEAH BITAR, Individually and on behalf of all others similarly situated, | Case No. 2:18-cv-1268-LA |
| Plaintiff, | |
| vs. | |
| REV GROUP, INC., TIMOTHY W. SULLIVAN, DEAN J. NOLDEN, THOMAS B. PHILLIPS, PAUL BAMATTER, JEAN MARIE CANAN, DINO CUSUMANO, CHARLES DUTIL, JUSTIN FISH, KIM MARVIN, and JOEL ROTROFF, | |
| Defendants. | |
| SETH MARINOFF, Individually and on behalf of all others similarly situated, | Case No. 2:18-cv-1269-LA |
| Plaintiff, | |
| vs. | |
| REV GROUP, INC., TIM SULLIVAN, and DEAN NOLDEN, | |
| Defendants. | |

00499199;V2

RAMANITHARAN RAJARAM, Individually
and on behalf of all others similarly situated,

     Plaintiff,

vs.

REV GROUP, INC., TIMOTHY W.
SULLIVAN, DEAN J. NOLDEN, THOMAS B.
PHILLIPS, PAUL BAMATTER, JEAN MARIE
CANAN, DINO CUSUMANO, CHARLES
DUTIL, JUSTIN FISH, KIM MARVIN, JOEL
ROTROFF, GOLDMAN SACHS & CO. LLC,
BMO CAPITAL MARKETS CORP.,
JEFFERIES LLC, STIFEL, NICOLAUS &
COMPANY, INCORPORATED, MORGAN
STANLEY & CO. LLC, ROBERT W. BAIRD
& CO. INCORPORATED, CREDIT SUISSE
SECURITIES (USA) LLC, DEUTSCHE BANK
SECURITIES INC., and WELLS FARGO
SECURITIES, LLC,

     Defendants.

Case No. 2:18-cv-1270-LA

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1. Lead Plaintiff Houston Municipal Employees Pension System ("Lead Plaintiff" or "Plaintiff"), by and through its undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon, among other things, Lead Counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, court filings, and interviews with former REV Group, Inc. ("REVG" or the "Company") employees. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      Lead Plaintiff seeks to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act").

3.      This is a securities class action on behalf of persons who purchased REVG securities between October 10, 2017 and June 7, 2018, inclusive (the "Class Period") and those who purchased REVG common stock pursuant and/or traceable to the Company's January 27, 2017 initial public offering (the "IPO") or its secondary public offering on October 13, 2017 (the "SPO" together with the IPO, the "Offerings") (the "Class").

4.      REVG designs, manufactures, and distributes specialty vehicles. The Company operates three segments:  1) Commercial, which manufactures transit and shuttle buses, Type A school buses, mobility vans, sweepers, and terminal trucks; 2) Recreation, which manufactures motorized RV products; and 3) Fire & Emergency ("F&E"), which manufactures fire trucks and ambulance-related products.

5.      Since the IPO, REVG advised investors that they should expect continued margin growth. For example, in the Offerings' Prospectuses, REVG stated that "[o]ur business model utilizes our unique scale to drive profitable organic and acquisitive growth" and "our focus on product innovation, life-cycle value leadership and operational improvement has strengthened our brands and market position while driving growth and expanding margins."

6.      Defendants told investors that the efficiency of REVG's manufacturing facilities would support margin growth, characterizing "[REVG] factories [as] among some of the most efficient and lowest cost production facilities in each of our markets" in the Offerings' Prospectuses.

7.      In late September/early October of 2017, REVG's CEO Timothy Sullivan and CFO Dean Nolden had a meeting with the heads of all three REVG reporting segments to discuss the upcoming guidance for FY2018.  At the meeting, Sullivan and Nolan issued targets for FY2018 Adjusted EBITDA.[1]

8.      The heads of REVG's Commercial (CW1)[2] and Recreation segments (Jim Jacobs) – two of REVG's three reporting segments – told Sullivan and Nolden that REVG could not achieve the proposed FY2018 Adjusted EBITDA guidance.

9.      CW1 objected because there was no plan to support the further growth necessary to meet the mandated guidance.  After discussion, Sullivan informed CW1 that if CW1 was not going to go along with the plan, CW1's further employment at REVG was not going to work.

10.     On October 10, 2017, the Company issued the FY2018 earnings guidance without any adjustment from the top-down mandate given at the earlier meeting.

11.     CW1 and Jacobs both resigned and left the Company on November 1, 2017 because Sullivan and Nolden had issued the false and misleading guidance to investors.  REVG's Chief Operating Officer Thomas Phillips resigned and left the Company on October 31, 2017.

12.     In addition to being told point blank by the presidents of two of REVG's three reporting segments that REVG would not make the FY2018 earnings guidance, Sullivan and Nolden also knew this from REVG's backlog.  Numerous former senior REVG employees reported that REVG's backlog tracked – on a monthly basis – vehicles sold, time in production, and financial metrics.  The backlog was analyzed at REVG's headquarters and gave Sullivan and Nolan visibility into what vehicles would be finished during each quarter and fiscal year.  As

---

[1] "EBITDA" is earnings before interest, taxation, depreciation and amortization.
[2] CW1 was the president of REVG's Bus Division, which comprised 80% of REVG's Commercial segment.  As such, CW1 was the head of the Commercial segment.

CW1 and other former senior REVG employees explained, REVG's backlog made it clear that the sales mix as of October 2017 had significant amounts of low margin vehicles, which would cause growth to contract in 1Q2018 (the quarter beginning in November 2018),[3] 2Q2018, and prevent the mandated earnings growth for FY2018.

13.     Sullivan and Nolden also knew that tariffs on aluminum and steel (from which chassis for all REVG's vehicles are made) would materially undermine REVG's FY2018 earnings guidance. Yet, Sullivan assured investors that in the "second quarter, [REVG was] fine" with steel chassis availability and costs.

14.     On March 7, 2018, only five months after the Company's SPO – when insiders reaped over $300 million by selling REVG stock – REVG announced 1Q18 financial results. REVG surprised the market by revealing that its margins and growth rates had contracted for the first time since its IPO five quarters prior. REVG stated that the margin contraction was a result of poor product mix in its Commercial and F&E segments, and poor timing of shipments. By this disclosure, REVG began to reveal that its prior growth assertions were coming undone. After the March 7, 2018 announcement, REVG stock fell on March 8, 2018 by 12%.

15.     On June 6, 2018, after market close, REVG substantially cut the FY2018 earnings guidance and reported 2Q18 earnings well below analysts' consensus. The Company reported Adjusted EBITDA for 2Q18 of $34.1 million – about 25% below analysts' estimates of approximately $45 million. The Company also reduced FY2018 net income by about 20% to $72 million to $87 million (from $90 to $110 million) and adjusted EBITDA by about 15% to $175 to $185 million (from $200 to $220 million).

16.     REVG reported that it missed its 2Q18 earnings and cut its FY2018 earnings guidance because (i) REVG's Commercial, Recreational, and F&E segments had lower profit

_____

[3] REVG's fiscal year runs from November 1st to October 31st ("FY").

margins from "lower-than-expected sales of certain higher-content product categories including custom fire apparatus, large commercial buses, and Class A RVs"; (ii) REVG had accrued higher costs resulting from the tariffs; and (iii) REVG had problems procuring chassis.

17.    The Commercial and Recreation segments were identified as main causes of the slashed FY2018 guidance – the same guidance CW1 and Jacobs told Sullivan and Nolden was unachievable prior to October 10, 2017.

18.    On June 7, 2018, REVG shares fell $3.39 per share or nearly 20% to close at $14.52 per share.

19.    After going public at $22 per share and conducting a secondary offering at $27.25 per share – raising over $500 million from investors in these Offerings – REVG shares now trade around $11 per share.  Thus, the Company has lost half its market capitalization since its IPO.

## JURISDICTION AND VENUE

20.    The claims asserted herein arise under Sections 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Securities Act. Substantial acts in furtherance of the alleged federal securities violations have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

23.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

24.     Lead Plaintiff, as set forth in the certification submitted with its motion for appointment as lead plaintiff, incorporated by reference herein, purchased REV securities during the Class Period.

25.     Defendant REVG is incorporated in Delaware and its principal executive offices are in Milwaukee, Wisconsin.  REVG's common stock trades on the New York Stock Exchange under the symbol REVG.

26.     Defendant Timothy W. Sullivan served as the Chief Executive Officer of REVG at all relevant times.

27.     Defendant Dean J. Nolden served as the Chief Financial Officer of REVG at all relevant times.

28.     Defendants Sullivan and Nolden are collectively referred to as the "Exchange Act Individual Defendants".

29.     REVG and the Individual Exchange Act Defendants are referred to as the "Exchange Act Defendants."

30.     Defendant Paul Bamatter signed or authorized the signing of the Company's Registration Statements filed with the SEC in connection with the Offerings (the "Registration Statements") as a Director of REVG.

31.     Defendant Jean Marie Canan signed or authorized the signing of the Company's Registration Statements filed with the SEC as a Director of REVG.

32.    Defendant Dino Cusumano signed or authorized the signing of the Company's Registration Statements filed with the SEC as a Director of REVG.

33.    Defendant Charles Dutil signed or authorized the signing of the Company's Registration Statements filed with the SEC as a Director of REVG.

34.    Defendant Justin Fish signed or authorized the signing of the Company's Registration Statements filed with the SEC as a Director of REVG.

35.    Defendant Joel Rotroff signed or authorized the signing of the Company's Registration Statements filed with the SEC as a Director of REVG.

36.    Defendant Donn J. Viola signed or authorized the signing of the Company's Registration Statements filed with the SEC as a Director of REVG.

37.    Defendants Sullivan, Nolden, Bamatter, Canan, Cusumano, Dutil, Fish, Marvin, Rotroff, and Viola are collectively referred to hereinafter as the "Securities Act Individual Defendants."

38.    Defendant American Industrial Partners (together with its investment vehicles and funds, "AIP"), is a New York City-based private equity firm specializing in the industrial sector. AIP purchases companies, then hopes to sell them for a profit either in a public offering or otherwise.  AIP was the private equity sponsor of REVG and its controlling shareholder at the time of the Offerings.

39.    As detailed in the Registration Statements, AIP continued to control a majority of the voting power of REVG's outstanding common stock.  The SPO Registration Statement states that "[a]fter completion of this offering, certain funds affiliated with AIP will continue to control more than a majority of the voting power of [REVG] common stock eligible to vote in the

election of directors," and "[a]s a result, [REVG] will continue to be be a 'controlled company' within the meaning of the corporate governance standards of the NYSE."

40. AIP owned REVG prior to the IPO and exerted control over REVG before, during and after the Offerings. Prior to the IPO, AIP owned approximately 90% of REVG's voting common stock. Immediately following the IPO, AIP owned at least 70% of the Company's outstanding common stock. Following the SPO, AIP continued to own and control a majority of REVG's voting stock.

41. In addition, AIP was party to a shareholders agreement that provided it with outsized influence and control over REVG even if its economic interest in and ownership of the Company decreased. The shareholders agreement gave AIP the ability to exercise control over all corporate actions of the Company so long as the parties to the agreement owned at least a majority of REVG outstanding common stock. These actions included: (i) the election and removal of directors; (ii) the size of REVG's Board of Directors (the "Board"); (iii) amendments to REVG's bylaws and articles of incorporation; and (iv) approval of mergers and other significant corporate transactions. In addition, so long as AIP owned at least 15% of the Company's outstanding common stock, under the shareholders agreement it had the right to, inter alia: (i) nominate the greater of five members of the Board or a majority of directors; (ii) designate the Chairman of the Board; (iii) approve any special dividend greater than $10 million; (iv) approve any merger involving assets in excess of 15% of the consolidated assets or revenues of the Company and its subsidiaries; and (v) approve bankruptcy or any wind up of the Company or any material subsidiary.

42.     Despite AIP's significant interest in and control over the Company, it could take actions that were not in the best interests of REVG's other shareholders.  For example, according to REVG's Registration Statement for the SPO:

> AIP's interests as an equity holder may not be aligned in all cases with those of other equity investors, or of our lenders as creditors. In addition, AIP may have an interest in pursuing or not pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might be contrary to the wishes of other equity investors or involve risks to our lenders. Furthermore, AIP may in the future own businesses that directly or indirectly compete with us. AIP may also pursue acquisition opportunities that may be complementary to our business separately from us and, as a result, those acquisition opportunities may not be available to us.

43.     Defendant Goldman Sachs & Co. served as an underwriter in the Company's Offerings.  In the IPO, Goldman Sachs agreed to purchase 3,060,888 shares, exclusive of its over-allotment option.   In the SPO, Goldman Sachs agreed to purchase 2,200,000 shares, exclusive of its over-allotment option.

44.     Defendant Morgan Stanley & Co. LLC served as an underwriter in the Company's Offerings.   In the IPO, Morgan Stanley agreed to purchase 3,060,888 shares, exclusive of its over-allotment option.   In the SPO, Morgan Stanley agreed to purchase 2,200,000 shares, exclusive of its over-allotment option.  Morgan Stanley was the lender on a margin loan to AIP at the time of the SPO, allowing it to receive additional proceeds from that offering.

45.     Defendant Robert W. Baird & Co. Incorporated served as an underwriter in the Company's Offerings.  In the IPO, Robert Baird agreed to purchase 1,596,988 shares, exclusive of its over-allotment option.   In the SPO, Robert Baird agreed to purchase 1,200,000 shares, exclusive of its over-allotment option.

46.     Defendant Credit Suisse Securities (USA) LLC served as an underwriter in the Company's Offerings.  In the IPO, Credit Suisse agreed to purchase 910,712 shares, exclusive of its over-allotment option.  In the SPO, Credit Suisse agreed to purchase 1,200,000 shares, exclusive of its over-allotment option.

47.     Defendant Deutsche Bank Securities Inc. served as an underwriter in the Company's IPO.  In the IPO, Deutsche Bank agreed to purchase 910,712 shares, exclusive of its over-allotment option.  In the SPO, Deutsche Bank agreed to purchase 700,000 shares, exclusive of its over-allotment option.

48.     Defendant Jefferies LLC served as an underwriter in the Company's Offerings. In the IPO, Jefferies agreed to purchase 910,712 shares, exclusive of its over-allotment option. In the SPO, Jefferies agreed to purchase 700,000 shares, exclusive of its over-allotment option.

49.     Defendant Wells Fargo Securities, LLC served as an underwriter in the Company's Offerings.  In the IPO, Wells Fargo agreed to purchase 910,712 shares, exclusive of its over-allotment option.  In the SPO, Wells Fargo agreed to purchase 700,000 shares, exclusive of its over-allotment option.

50.     Defendant BMO Capital Markets Corp. served as an underwriter in the Company's Offerings.  In the IPO, BMO agreed to purchase 796,875 shares, exclusive of its over-allotment option.  In the SPO, BMO agreed to purchase 700,000 shares, exclusive of its over-allotment option.

51.     Defendant Stifel, Nicolaus & Company, Incorporated served as an underwriter in the Company's Offerings.  In the IPO, Stifel agreed to purchase 341,513 shares, exclusive of its over-allotment option.  In the SPO, Stifel agreed to purchase 200,000 shares, exclusive of its over-allotment option.

52.     Defendants Goldman Sachs, Morgan Stanley, Robert Baird, Credit Suisse, Deutsche Bank, Jefferies, Wells Fargo, BMO and Stifel are collectively referred to hereinafter as the "Underwriter Defendants."

53.     The Company, the Securities Act Individual Defendants, AIP, and the Underwriter Defendants are collectively referred to hereinafter as the "Securities Act Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.     REVG CONDUCTS PUBLIC OFFERINGS TO RAISE MONEY FROM INVESTORS

54.     On October 24, 2016, REVG filed a Registration Statement in connection with the Company's IPO, which was subsequently amended on January 17, 2017 and incorporated a prospectus (together with the Registration Statement, the "IPO Prospectus").

55.     On or about January 27, 2017, REVG completed its IPO and raised net proceeds of approximately $256.7 million.  Through its IPO, REVG offered 12,500,000 shares to the public at $22 per share, exclusive of the underwriters' option to purchase 1,875,000 additional shares.

56.     On or about October 10, 2017, the Company filed a Form S-1 registration statement for the SPO with the SEC (the "SPO Registration Statement"), which was declared effective on October 12, 2017.

57.     On October 13, 2017, the Company filed the prospectus for the SPO on Form 424B4, which incorporated and formed part of the Registration Statement (together with the SPO Registration Statement, the "SPO Prospectus").[4]  REVG priced the SPO at $27.25 per share.

---

[4] The IPO Prospectus and SPO Prospectus are collectively referred to as the "Prospectuses."

58.     In total, Company insiders and their affiliates, including defendants AIP, Marvin, Fish, Cusamano, and Rotroff, ultimately sold approximately $300 million worth of REVG stock (11.5 million shares at $27.25 per share) in the SPO.  REVG received none of the sale proceeds.

59.     Defendant AIP was the largest seller of stock in the SPO, selling over 10.8 million shares of REVG common stock to the public at $27.25 per share for over $294 million in gross proceeds.

**B.     REVG'S FINANCIAL REPORTING SEGMENTS**

60.     REVG designs, manufactures, and distributes specialty vehicles and related aftermarket parts and services.  REVG operates and reports its financial results from three segments:  Commercial, Recreation, and F&E.

61.     REVG's Commercial segment offers small- and medium-sized buses, Type A school buses, transit buses, terminal trucks and street sweepers in the United States.  REVG's Commercial products include cut-away buses (customized body built on various types and sizes of commercial chassis), transit buses (large municipal buses where it builds its own chassis and body), luxury buses (bus-style limo or high-end luxury conversions), street sweepers (three- and four-wheel versions used in road construction activities), terminal trucks (specialized vehicle which moves freight in warehouses or intermodal yards and ports), Type A school buses (small school bus built on commercial chassis), and mobility vans (mini-van converted to be utilized by wheelchair passengers).  Commercial products are sold to municipalities, schools, and commercial and industrial customers.

62.     REVG's Commercial segment provided approximately 27% of the Company's revenues in 2017.

63.     REVG's Commercial segment is comprised of four smaller units: Commercial Bus (8%), Transit Bus (7%), Type A School Bus (6%), and Specialty (6%).  *See* 2017 Form 10-K at 3.  Thus, buses account for approximately 80% of the Commercial segment in FY 2017.

64.     REVG's Recreation segment manufactures various types and configurations of both motorized and towable RVs, including sell Class A (diesel and gas), Class B, and Class C motorized RVs.  Motorized RVs are self-contained units built on motor vehicle chassis with their own lighting, plumbing, heating, cooking, refrigeration, sewage holding and water storage facilities.  Class A RVs are generally constructed on medium-duty chassis which are supplied complete with engine and drivetrain components by major motor vehicle manufacturers. REVG designs, fabricates and installs the living area and driver's compartment of these motorized RVs. Class B RVs are built on a consumer van chassis with the entire living area contained within the existing van frame. Class C RVs are built on consumer truck or van chassis, which include an engine, drivetrain and a finished cab section. In Class Cs, REVG designs, fabricates and installs the living area to connect to the driver's compartment and the cab section.  Super Class C RVs are motorhomes built on a commercial truck or van chassis.

65.     The Company's Recreation segment provided approximately 29% of the Company's revenues in 2017.

66.     REVG's F&E segment manufactures a range of fire apparatus and ambulance products.  The F&E segment sells fire apparatus equipment under the Emergency One (E-ONE) and Kovatch Mobile Equipment (KME) brands, and ambulances under the American Emergency Vehicles (AEV), Horton Emergency Vehicles (Horton), Leader Emergency Vehicles (Leader), Marque, McCoy Miller, Road Rescue, Wheeled Coach and Frontline brands.  F&E products are sold to municipal fire departments and private fleets, typically purchasing through dealers.

67.     F&E provided approximately 44% of the Company's revenues in 2017.

C.     **EARNINGS GROWTH WAS CENTRAL TO REVG'S VALUE**

68.     From FY 2015 through FY 2017, REVG had meteoric growth.  REVG's Adjusted Net Income was $34 million, $53 million and $76 million for fiscal years 2015, 2016 and 2017, respectively – representing a compound annual growth rate ("CAGR") of 49%.  The Company's Adjusted EBITDA for the same periods was $90 million, $123 million and $163 million, which represents a CAGR of 34%.

69.     Analysts viewed REVG as a growth story.  Thus, they paid close attention to REVG's strong growth.  For example, a December 19, 2017 Wells Fargo report stated that the "company realized significant growth yr/yr. Looking forward, management expects growth to continue…"  A December 20, 2017 Deutsche Bank report stated that "F&E organic growth accelerated to +14% Y/Y on tougher comps, 2) Recreation organic growth also accelerated to +19% Y/Y, and 3) Recreation margins improved 420bps Y/Y; this level of improvement seems sustainable into 2018."

70.     On October 10, 2017, REVG issued a press release providing a full-year outlook for FY2018.  In the press release, REVG stated that FY2018 net income would be in the range of $85 million to $100 million and FY2018 adjusted EBITDA would be in the range of $200 million to $220 million.

71.     The October 10, 2017 release also stated that:  "REV group is forecasting growth in all three of its reportable segments [Commercial, Recreation, and F&E] in fiscal 2018 …."

72.     On December 19, 2017, Sullivan reaffirmed the FY2018 guidance and told investors that he was "pleased to report that all three of our segments [Commercial, Recreation, and F&E] continue to have strong outlooks.  We plan to continue this trajectory of earnings growth in excess of sales growth into next year.  In summary, it was a strong quarter and year,

we are well positioned for continued growth in fiscal 2018 and we will continue to make progress towards our enterprise-wide EBITDA margin goal of 10 percent."

## D.    THE HEADS OF REVG'S COMMERCIAL AND RECREATION SEGMENTS TOLD DEFENDANTS SULLIVAN AND NOLDEN IN OCTOBER 2017 THAT THE PROPOSED FY2018 GUIDANCE WAS UNACHIEVABLE

73.    CW1 was President of REVG's Bus division from June 2015 through November 1, 2017.  REVG Bus created product for several bus brands, including Collins Bus, Goshen Coach, ENC, ElDorado National, Krystal Coach, Federal Coach, Champion, and World Trans. REVG Bus made buses that ranged from small vehicles built off truck chassis to large city buses built on custom chassis manufactured by REVG.

74.    Each month, REVG's nine-person management team met at the Company's headquarters in Milwaukee, Wisconsin and discussed REVG's financial guidance (the "Monthly Financial Meetings").

75.    The five executives who attended the Monthly Financial Meetings were:  Tim Sullivan, Chief Executive Officer; Dean Nolden, Chief Financial Officer; Marcus Berto, Executive Vice President and Chief Commercial Officer; Tom Phillips, Chief Operating Officer (from July 2015 to November 2017); and Pamela Krop, REVG's General Counsel (from January 2016 to June 2018).

76.    The four non-executive members of the senior management team who attended the Monthly Financial Meetings were:  Dan Peters, REVG Fire Group President; Robert Collins, REVG Ambulance Group President (Peters and Collins represented the Company's F&E Segment); CW1, who was President of the REV Bus division (Commercial Segment); and Jim Jacobs, REVG RV Group's President (Recreational Segment) (collectively, the "Segment Heads").

77.     At the Monthly Financial Meetings, the Segment Heads and the executives discussed REVG's 18-month rolling forecast. "We'd say here's what next 12 months look like," CW1 said. CW1 stated that the group discussed rolling forecasts during the Monthly Financial Meetings.

78.     CW1 stated that CW1 attended a Monthly Financial Meeting in late September or early October 2017. At this meeting, the Segment Heads were presented with a forecast for FY2018 Adjusted EBITDA in the range of $200 to $220 million.

79.     At the September or early October 2017 Monthly Financial Meeting, the group was told that "all the numbers rolled up to this, where for 2018, bus you do this X amount, RV you do this amount." CW1 was told that REVG's Bus division had to hit an unreachable EBITDA target for FY2018. CW1 advised that REVG Bus was on track to hit a lower target, but Sullivan and Nolden wanted CW1 to commit to a materially higher figure.

80.     At the September or early October 2017 Monthly Financial Meeting, CW1 told the group that there was no plan to support the FY2018 earnings guidance (which was the same as that ultimately issued on October 10, 2017).

81.     CW1 stated that REVG's executive leadership set EBITDA (or profit) margin goals of 10 percent for each of the Company's divisions.[5]

82.     CW1 stated that the FY2018 earnings guidance given at the September or early October 2017 Monthly Financial Meeting was unobtainable as REVG Bus could not reach a 10% EBITDA margin because, among other reasons:

> (i) A five-year contract for 350 buses a year for the next five years with one of REVG Bus' brands, Collins Bus, fell through in 2017 (well before the late September/early October 2017 Monthly Financial Meeting), adversely affecting the FY2018 earnings guidance. CW1 personally worked on the Collins contract.

---

[5] EBITDA margin measures a company's earnings before interest, tax, depreciation and amortization as a percentage of the company's total revenue.

(ii) Collins Bus could barely expand its market share because it already had such a large share of the school bus market. CW1 stated that in the 7,000-unit short school bus market, 6,000 of which are sold in North America each year, Collins was already delivering 2,800 units annually.

83. CW1 also stated that the FY2018 earnings guidance given at the September or early October 2017 Monthly Financial Meeting was unobtainable because (i) some of REVG's plants were already operating at capacity; and (ii) REVG's growth was limited because it had acquired so many other companies, particularly in the Ambulance division, that it was often competing with itself, something CW1 learned at Monthly Financial Meetings where the budgets and targets for each segment were discussed.

84. CW1 stated that at the late September/early October Monthly Financial Meeting, CW1 told Sullivan and the other corporate executives that REVG's proposed FY2018 earnings guidance was not achievable. CW1 said, "I was not in agreement with what they wanted to do, and I told them."

85. As with CW1, Jim Jacobs, REVG's RV Group President (Recreation Segment), told the group at the late September/early October Monthly Financial Meeting that his portion of the earnings guidance was unreachable. CW1 said Jacobs' point of contention hinged on corporate's expectations of the Decatur plant, which made Jacobs' target impossible based on Jacobs' experience at the Company. CW1 stated that REVG's Decatur facility (in its RV division) had been performing poorly.

86. CW1 stated that both CW1 and Jacobs strongly argued that the Commercial and Recreational segments' share of the FY2018 earnings guidance was unobtainable.

87. After the meeting, CW1 received an email from Defendant Sullivan that said, "let's meet at 7." At that meeting, Sullivan informed CW1 that if CW1 was not going to go along with the plan, CW1's further employment at REVG was not going to work.

88. CW1 explained that the Segment Heads who did not go along with the FY2018 earnings guidance were driven out of the Company by Sullivan.

89. CW1 would not support the unachievable FY2018 earnings forecast and instead left the Company on November 1, 2017.

90. CW1 stated that Jacobs left REVG for the same reason on November 1, 2017.

91. On June 6, 2018, REVG announced that it would reduce its FY2018 Adjusted EBITDA guidance because of shortfalls in the Commercial and Recreation Segment.

92. REVG specifically called investors' attention to the Commercial Segment's shortfall in the press release's headline.

## E. REVG'S BACKLOG INFORMED DEFENDANTS THAT THE FY2018 EARNINGS GUIDANCE WAS UNACHIEVABLE

### 1. REVG Touted the Visibility Provided By Its Lengthy Backlog

93. REVG records the income for each vehicle it sells on a cash accounting basis, meaning that it does not recognize revenue or earnings until an ordered vehicle is completed and shipped. In order to track its future earnings, individual REVG manufacturing facilities record the vehicle's sale price in what the Company called its "backlog" at the date of sale. As the vehicle moves through the production line, the backlog period for that vehicle decreases to a period of zero days on the date the vehicle is shipped.

94. The amount of time that a REVG vehicle remained in backlog was a function of the size and complexity of the vehicle. Large and customized vehicles, such as large commercial buses, custom fire apparatus and certain RVs (such as Class A vehicles), bus and ambulance products, take longer to build and, thus, remain in backlog for a longer period of time.

95. REVG stated that "value-added" vehicles (which had long lead times) – such as large Commercial buses and Class A RVs – were high margin sales and generated the most net

income and earnings for the Company. REVG's December 21, 2017 Form 10-K stated that "[o]ur units represent a wide range of products at various price points, with higher value-added units at higher price points typically resulting in higher gross margins. Additionally, large orders of similar units typically provide operational efficiencies that contribute to higher gross margins."

96.     REVG's vehicles have substantial lead times ranging from two to twelve months. After a customer orders a vehicle, REVG cannot recognize revenue until the vehicle is finished and shipped two to twelve months later. REVG continually claimed that these long lead times gave the Company strong visibility into future financial results.

97.     In the IPO Prospectus, Defendants stated that "our business carries a high-quality backlog which enables strong visibility into future net sales which ranges from two to nine months depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business."[6]

98.     Similarly, the October 12, 2017, SPO Prospectus stated that "[REVG's] business carries a high-quality backlog which enables strong visibility into future net sales which ranges from two to twelve months depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business."

99.     In the December 21, 2017, FY2017 Form 10-K, REVG repeated that "[o]ur business carries a high-quality backlog which enables strong visibility into future net sales which ranges from two to twelve months depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business."

---

[6] Net sales is total revenue, less the cost of sales returns, allowances, and discounts.

100.    By touting visibility from "two to twelve months" in the SPO Prospectus and thereafter, Defendants represented they had clear visibility into revenues and, by extension, earnings to October 2018.

101.    By touting visibility from "two to twelve months" in the Form 10-K, Defendants represented they had clear visibility into revenues and, by extension, earnings to December 2018.

### 2.      Former Senior REVG Employees Report That REVG Carefully Tracked Backlog

102.    Three former REVG employees stated that the Company had a centrally managed system to accurately track backlog.

103.    CW1 reported that REVG had a system, which was Company-wide and used at the Milwaukee corporate headquarters, to track backlog called OneStream. CW1 reported that OneStream was similar to Microsoft Excel and provided data about REVG's production schedule.

104.    CW1 stated that REVG's backlog not only informed the Company about revenues, but gave Defendants enough information to determine sales mix. CW1 also stated that REVG executives were well aware of the profit margins on Company vehicles.

105.    CW1 stated that REVG's senior management were well aware of what vehicles were in the Company's backlog through its use of OneStream. CW1 stated that all hard backlog was entered into OneStream, allowing the Milwaukee corporate management team clear visibility as to what products were in the pipeline and when they would be completed. Hard backlog was the term used for the orders that were taken, signed off on, and ready for production. According to CW1, "[i]n OneStream we could see in an Excel sheet, it showed what the backlog was, and what production was for each plant."

106. CW2 worked as a finance manager at REVG's ElDorado Bus and Mobility subsidiary from May 2017 to mid-November 2017. ElDorado is one of REVG's eight brands in its Recreation segment. CW2 was based at REVG's Salina, Kansas production plant. CW2 ran the business department at ElDorado and supervised the controller, two accounts payable clerks, one accounts receivable clerk, one cost accountant, and the Information Technology department.

107. CW2 corroborated CW1's statements about OneStream. CW2 stated that at REVG's ElDorado subsidiary, backlog was tracked on a monthly basis through OneStream. Like CW1, CW2 described OneStream as similar to Microsoft Excel, with various fields in which to enter data. CW2 inputted data each month into OneStream, including into fields such as "work in progress," "backlog," "finished goods," and "inventory." CW2 had to input such data by the 10th of every month. When a vehicle was finished, it would go from "work in progress" to "finished goods." "Work in progress" provided a total showing how far along towards completion the vehicles in the manufacturing facility were. Senior management could tell what vehicles were being built, and how far along they were, because each manufacturing facility built only certain vehicles. In other words, when OneStream listed a certain number of vehicles from one REVG manufacturing facility, it was clear that those vehicles were of a certain kind, *e.g.*, buses, ambulances, etc.

108. CW2 stated that senior management in Milwaukee used the OneStream data from the various REVG manufacturing facilities when making projections. Every three months, senior REVG management would give specific projections to each of REVG's manufacturing facilities.

109. CW2 stated that, after receiving these projections from CW2's general manager Colby Bertrand, it was CW2's responsibility to update the projections by adding three months to

the existing, rolling 12-month projections. CW2 would also have to show how CW2's facility would meet the projection.

110. CW2 stated that the projections which CW2's facility received from corporate headquarters in Milwaukee were regularly unreachable. For example, CW2 stated that senior management's FY2018 projections for CW2's manufacturing facility demanded that it grow its production by 5-10% while reducing its costs by the same amount. CW2 stated that this was impossible because CW2's facility was already operating at maximum production level – and with serious inefficiencies, including large amounts of overtime and resulting mushrooming costs.

111. Because REVG carefully tracked backlog through OneStream at its corporate headquarters in Milwaukee, Defendants knew the sales mix for REVG's vehicles in production.

**F.   FORMER SENIOR REVG EMPLOYEES REPORTED THAT REVG FACILITIES WERE INEFFICIENT AND SULLIVAN WAS WELL AWARE OF THE CHAOTIC STATE OF REVG'S MANUFACTURING FACILITIES**

112. Several former senior REVG employees stated that the Company's facilities had serious efficiency problems.

113. CW 3 worked as a brand manager for REVG's Wheeled Coach Industries from December 2015 to April 2017. Wheeled Coach is one of the eight ambulance brands within REVG's F&E segment. CW3 was based at REVG's Winter Park, Florida facility. CW3 reported to the Senior Vice President of Sales for the REV Ambulance Group. CW3's role as a brand manager for REV Ambulance Group Orlando's Wheeled Coach line was primarily focused on sales. CW3 served as an account manager for several Wheeled Coach dealerships.

114. CW3 reported many inefficiencies at the Winter Park facility. For example, CW3 stated that information was often not accurately transferred from sales to engineering to production. As a result, workers would regularly not build vehicles to specification. This caused

delays in production because workers would have to go back and re-build. CW3 also stated that CW3 would sometimes have to ask customers if they would accept the vehicle with specifications different than they had ordered for a discounted price.

115. CW3 also stated that, to keep the production line fed, Wheeled Coach opted to pre-build ambulances that had not yet been ordered to specification. CW3 stated that this way of working frequently led to costly rework when the detailed requirements were received. CW3 also stated (corroborating CW1's statement) that REVG's Ambulance lines often competed with each other on deals.

116. CW3 reported other inefficiencies at the Winter Park facility. CW3 stated that there was a constant "burn and churn" of both skilled workers and returned ambulances at the ambulance production facility in the Winter Park facility.

117. CW3 also reported that ongoing labor problems increased chassis costs significantly per unit due to repainting. CW3 stated that paint quality was always off. "We were trying to keep up [with] painting and paint rework," CW3 said. "But it was not a new problem, not an event. It's abnormal there, if you look at the production line and the paint facility." CW3 said the workers at the paint facility were asked to do too much in too little time, resulting in frequent and costly errors. "You can tell the workers to work harder, then you have tired workers who make mistakes," CW3 said. "You continually require rework." "I don't think there was a labor shortage in the area, there was a lack of willingness to hire." "It was a burn and churn environment: hire, fire."

118. CW4 worked as a design engineer for the REVG's Specialty Products division, part of the REVG's Commercial segment, from March 2017 to October 2017. CW4 was

recruited to work for REVG by Defendant AIP. Based in Longview, Texas, CW4 reported to Director of Engineering Specialty Products, Andrew Cooper.

119. CW4 directed one senior designer, as well as other designers and drafters. It was CW4's responsibility to interpret the project's design goals and set design objectives for each project. CW4 provided initial design layouts and follow-up, and helped prepare renderings of products. CW4 conferred regularly with his colleagues on the shop floor to ensure his design concepts made sense from a manufacturing perspective. CW4 was designing products for the specialty product division, which was part of REVG's Commercial segment.

120. Like CW3, CW4 described profound inefficiencies at REVG. CW4 stated that "the whole thing was inefficient, from getting the parts to putting the parts in." Even after desperately needed items arrived at the plant, no one ever seemed to know where the deliveries were located, CW4 recalled. "We had the parts arrive, but no one could attack because the inventory system was so bad."

121. CW4 reported other serious problems. When CW4 started work for REVG, CW4 reported to an engineering manager who was suddenly either fired or laid off a couple months into his tenure. After the manager left the company, CW4 was simply instructed to report to the director of engineering instead. After moving to a new location, CW4 was dismayed to find that the work environment was miserable, with high turnover and low employee morale. "It was a bad work environment," CW4 recalled. "Low pay, high stress, and lots of responsibility, but no authority to make anything happen."

122. CW4 said that after CW4 left REVG, the Company never issued his final paycheck or the balance of his remaining vacation time. After giving the Company the requisite two weeks notice, CW4 never received any additional compensation.

123. The same thing happened to a few of CW4's engineer colleagues, CW4 said. Like CW4, the colleagues had relocated to work at the REV Group facility in Longview, Texas after being recruited, but gave notice within months after the work environment became increasingly difficult to tolerate.

124. CW4 stated that CEO Timothy Sullivan was a hands-on chief executive who made occasional stealthy stops to observe the Longview manufacturing operation first-hand. CW4 stated that Sullivan was involved in the day-to-day operations of its REVG facilities. CW4 was told by supervisors on occasion that Sullivan had stopped by. CW4 stated that Sullivan "visited unannounced a couple times." "Management knew he was coming, but no one said anything."

## G. SULLIVAN AND NOLDEN KNEW THAT STEEL TARIFFS WERE HURTING REVG'S EARNINGS GROWTH BY THE MIDDLE OF 2Q2018

125. On March 1, 2018 – one month into REVG's second quarter – *The New York Times* reported that President Trump would impose tariffs of 25% on steel and 10% on aluminum under Section 232 of the Trade Expansion Act of 1962. On March 8, 2018, President Trump signed proclamations for the new steel and aluminum tariffs.

126. Many news outlets reported that, in addition to causing an increase in foreign steel, the tariffs would also cause an increase in demand for U.S. steel (and thus, U.S. steel prices) because U.S. steelmakers would – very predictably and acting in an economically rational manner – seize the pricing opportunity created by foreign steel makers' prices rising because of the 25% steel tariff. For example, on March 1, 2018, the day President Trump announced the tariff increase, *American Metal Market* published an article by Millicent Dent entitled "Steel mixed on 232 [referring to the law concerning the tariffs, *see supra* ¶125], prices seen rising". That article provided, in pertinent part:

Steel industry participants had mixed reactions to President Donald Trump's announcement that the United States will impose tariffs of 25% on steel product imports next week, **with many anticipating higher prices as a result**….

Assuming a 25% tariff on all or almost all steel imports, "**US steel prices should continue to** rally until imports are again cost competitive as consumers scramble to secure volumes not produced domestically at present," Seth Rosenfeld, an equity analyst at New York-based Jefferies, said in a March 1 research note.

"The tariffs will lead to the US once again becoming an island of **high steel prices**, resulting in our customers simply importing the finished part," Roy Hardy, president of the Precision Metalforming Association, and Dave Tilstone, president of the National Tooling and Machining Association, said in a joint statement, adding that "thousands of jobs" will be threatened. (Emphasis added).

127. Indeed, shares of U.S. steel companies rose on news of the tariffs. A March 1, 2018 *Reuters* article entitled "U.S. Steel, Aluminum Stocks Up On Trump's Tariffs, But Other Industries Fear Price Rises" reported:

Last week, Caterpillar's director of investor relations, Amy Campbell, said the majority of the steel that CAT uses for manufacturing comes from the United States. *Yet, she expects the tariffs to pose a challenge as they would cause domestic steel prices to rise along with prices of imported steel, because the tariffs would give U.S. makers pricing power*, putting Caterpillar at a competitive disadvantage vis-à-vis their non-U.S. competitors.

The industrial metal companies, the domestically focused ones, are probably going to benefit from this, said Art Hogan, chief market strategist at B. Riley FBR in Boston, who saw the broad impact as negative, with a possible impact on the ongoing renegotiations of the North American Free Trade Agreement. (Emphasis added).

128. A March 6, 2018 *metalbullein.com* article entitled "U.S. Section 232 Tariffs Could Send HRC Prices to $1,000/t, hurt buyers" by Michael Cowden also reported that U.S. domestic steel prices would increase:

Tariffs would increase the price of foreign hot-rolled coil by $150 per ton ($7.50 per hundredweight) - *enabling US mills to raise prices by the same amount or more when they open May order books*,…. (Emphasis added).

129.    A March 6, 2018 article in the *Australian Advertiser* entitled "Producers Steeled For Trump's Tariffs" by Edward Boyd agreed:

> In the short term, you are going to see steel prices go up because US producers will not be able to meet the greater demand for steel, Mr [CommSec chief economist Craig James] James said.
>
> In contrast, iron ore prices fell 2.4 per cent yesterday to $US77.65 a tonne on concerns the US tariffs could weigh on global steel demand.  While the tariffs are expected to be formalised this week or next week at the latest, we don't expect the impact to be that disruptive to steel and iron ore markets," Commonwealth Bank associate director of mining and energy commodities Vivek Dhar said in a research note. "We expect US steel prices to increase as a result of the tariffs, but the rest of the world should be able to absorb the excess steel, particularly in south East Asia."

130.    Thus, REVG knew that the steel tariff would cause both foreign and domestic steel prices to rise because the tariffs gave U.S. steel companies pricing power to raise their prices to match the newly-raised foreign steel prices.  REVG also knew that it would be harmed by the tariffs because the Company needed steel chassis to build its vehicles and increased steel prices would increase REVG's steel costs, cause delays in REVG's procuring chassis, and negatively affect earnings.

131.    News outlets also reported that the tariffs would cause an increase in prices for other commodities.  For example, an article on March 3, 2018 (four days before REVG's 1Q18 conference call) in the *San Diego Union-Tribune* entitled "Tariffs Spark Reprisal Threat – U.S. Trading Partners Vow To Retaliate Against Trump Plan With Levies on American-made Products" quoted Robert Shanks, Ford Motor's Chief Financial Officer, as stating that "commodities markets had already started to price in increases for steel and aluminum on the expectation that Trump would impose the tariffs."

132.    A March 1, 2018 article by Nikhil Kurian Nainan in *Reuters Australia* entitled "Aussie Shares Weaken On Trump's tariff Plans; NZ Down", stated that "President Donald

Trump's plans to impose tariffs on steel and aluminum imports hit commodity prices and sparked fears of a trade war."

133.    Similarly, a March 2, 2018 *Reuters* article by David Shepardson entitled "More Automakers Warn Trump Metal Tariffs Would Boost Car Prices" stated that "[m]ore automakers on Friday warned that U.S. President Donald Trump's announced steel and aluminum tariffs would boost car prices by hiking commodities costs for manufacturers."

134.    A March 2, 2018 *Plus Company Updates* entitled "Auto & Transport Roundup", likewise, quoted UBS analysts as stating that "tariffs would 'add more commodity risk,' for auto makers and suppliers."

135.    Defendant Sullivan later admitted on the June 7, 2018 call that "[a]s soon as tariffs were suggested [at least by March 1, 2018], there was a run on many of the commercial chassis we purchase and convert. We are paying extra freight charges to get the chassis we need for the second half shipments. Over the 60 day – the last 60 days alone, this has resulted in approximately a $1 million additional cost. We now need to get certain chassis shipped via truck due to railcar shortages based on what we believe to be abnormal and artificial demand."

## H.    THE MARKET LEARNS THAT REVG'S FY2018 NET INCOME AND ADJUSTED EBITDA FORECASTS WERE FALSE AND MISLEADING

136.    On March 7, 2018, REVG announced 1Q18 financial results.  Although REVG hit its expected revenue figures (*see* March 7, 2018 Credit Suisse report, stating that "[t]he top line was in line with expectations at $515M vs the street at $513M"), REVG surprised the market by revealing that, for the first time since its IPO five quarters prior, its margins and growth rates had contracted.  REVG stated that the margin contraction was a result of poor product mix in its Commercial and F&E segments, and poor timing of shipments.  By this disclosure, REVG began to reveal that its prior growth assertions were coming undone.

137.    Though REVG increased its net income guidance and assured the market that it would not be affected by the steel tariffs or chassis shortages in 2Q18, analysts penalized the stock price because REVG's year over year earnings growth did not appear to be materializing. As a result, the stock price of REVG dropped 12% on March 8, 2018 to $23.85 per share.

138.    Finally, on June 6, 2018, REVG admitted that it could not meet its FY2018 Net Income and Adjusted EBITDA guidance.

139.    REVG reduced guidance and advised investors that among the main reasons for the revision were expected shortfalls in earnings at the Commercial and Recreation segments. On a June 7, 2018 conference call following the earnings release, Defendant Sullivan admitted that the 10% EBITDA margin guidance forecasted earlier – the one Sullivan demanded of CW1 and Jacobs – was impossible to reach in FY2018.

140.    On this news, the price of REVG stock fell $3.39 per share or nearly 20% to close at $14.52 per share.

I.    **DEFENDANTS' MISLEADING STATEMENTS**

141.    In the January 26, 2017 IPO Prospectus, Defendants touted the Company's production efficiencies, stating that "[w]e believe that our factories are among some of the most efficient and lowest cost production facilities in each of our markets due to the production processes that we employ, our purchasing scale and the high unit volume throughput relative to most of our competitors."

142.    The statements in ¶141 were materially false and misleading when made because REVG's factories had materially inefficient production processes (*see* ¶¶112-124).    These inefficiencies were part of the reason why (i) the Company's growth began to stall in 1Q18; and (ii) REVG could not reach its FY2018 guidance.

143.    On October 10, 2017, REVG issued a press release providing a full-year outlook for its FY2018.  In the press release, REVG stated that FY2018 net income would be in the range of $85 million to $100 million and FY2018 Adjusted EBITDA would be in the range of $200 million to $220 million.

144.    The October 10, 2017 release also stated that:  "REV Group is forecasting growth in all three of its reportable segments [Commercial, Recreation, and F&E] in fiscal 2018, and it remains comfortable with achieving the midpoint of its previously announced net income and Adjusted EBITDA guidance ranges for full-year fiscal 2017…."

145.    The statements in ¶¶143-144 were materially false and misleading when made because (i) REVG's FY2018 earnings guidance was, as CW1 and Jacobs reported to Defendants Sullivan and Nolden, insupportable (*see ¶¶*73-92); (ii) REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered November 2017 through January 2018, a period starting just one month after these statements), and would continue to do so in 2Q18 (*see ¶¶*93-111); (iii) just five months after these statements (on March 7, 2018, and also on June 6, 2018), REVG admitted that poor sales mixes and lower profit margins had caused a growth contraction – something Sullivan and Nolden knew of in October 2017 because of REVG's "high quality" backlog, which gave the Company two to twelve months of visibility into revenues (*see ¶¶*93-111, 136); and (iv) since the Company met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance was unachievable (*see* ¶¶107, 136; *see also ¶¶*93-111).

146.    On October 13, 2017, in the SPO Prospectus, Defendants touted the Company's production efficiencies, stating that "[w]e believe that our factories are among some of the most efficient and lowest cost production facilities in each of our markets due to the production

processes that we employ, our purchasing scale and the high unit volume throughput relative to most of our competitors."

147.     The statements in ¶146 were materially false and misleading when made because REVG's factories had materially inefficient production processes (*see* ¶¶112-124).  These inefficiencies were part of the reason why (i) the Company's growth began to stall in 1Q18; and (ii) REVG could not reach its FY2018 guidance.

148.     The SPO Prospectus also stated:

**Our Growth Strategies**

We plan to pursue several strategies to grow our earnings, expand our market share and further diversify our revenue stream, including:

***Drive Margin Expansion Through Controllable Operational Initiatives—Our focus on driving operational improvement initiatives across the organization has enabled the increase of our net income and Adjusted EBITDA margins by 148 basis points and 280 basis points, respectively, from fiscal year 2014 to fiscal year 2016.***

* * *

Commercial Markets

REV's Commercial segment addresses a broad variety of products and end markets. The transit and shuttle bus market includes applications such as airport car rental and hotel/motel shuttles, paramedical transit vehicles for hospitals and nursing homes, tour and charter operations, daycare and student transportation, mobility vans for wheelchair users, and numerous other applications. According to industry sources, shipments of cutaway buses (those buses that are up to 35 feet in length) were approximately 14,400 units in 2016. ***We believe the commercial bus markets we serve will sustain positive long-term growth*** supported by growing levels of urbanization which will require increasing commercial bus usage, increased government transportation spending as shown in the chart below, an aging and growing U.S. population driving demand for shuttle buses and mobility vans, a necessary replacement cycle of public and private bus customers and the introduction of new bus products."  (Emphasis added).

149.     The statements in ¶148 were materially false and misleading when made because (i) REVG's growth strategy – which was reflected in its FY2018 guidance – was, as CW1 and

Jacobs reported to Defendants Sullivan and Nolden, insupportable (*see ¶¶*73-92); (ii) REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered November 2017 through January 2018, a period starting just one month after these statements), and would continue to do so in 2Q18 (*see ¶¶*93-111); (iii) just five months after these statements (on March 7, 2018 and also on June 6, 2018), REVG admitted that poor sales mixes and lower profit margins had caused a growth contraction – something Sullivan and Nolden knew of in October 2017 because of REVG's "high quality" backlog, which gave the Company two to twelve months of visibility into revenues (¶¶93-111, 136); and (iv) since the Company met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance was unachievable (*see* ¶¶107, 136; *see also ¶¶*93-111).

150.    On December 19, 2017, the Company issued a press release that reported FY 2017 Fourth Quarter and Full Year Results.  The release stated:

> We are reaffirming our REV Group full-year fiscal 2018 outlook that was released in early October. We expect full-year 2018 revenues of $2.4 to $2.7 billion and Adjusted EBITDA of $200 to $220 million. We are also reaffirming our expectation for full year 2018 net income to be in the range of $85 to $100 million, said Sullivan. "This outlook does not include any impact from potential changes in U.S. tax policy and rates, which we believe will be beneficial.

151.    The December 19, 2017 release quotes Sullivan as stating:

> I am proud to report 18 percent sales growth and 32 percent growth in Adjusted EBITDA in 2017, but even more importantly, I am pleased to report that all three of our segments [Commercial, Recreation, and F&E] continue to have strong outlooks. We plan to continue this trajectory of earnings growth in excess of sales growth into next year. In summary, it was a strong quarter and year, we are well positioned for continued growth in fiscal 2018 and we will continue to make progress towards our enterprise-wide EBITDA margin goal of 10 percent.

152.    On December 20, 2017, REVG held its 4Q17 conference call.  In the call, Defendant Sullivan reiterated the FY2018 earnings guidance:

> First and foremost, we are reiterating, today, guidance that we presented in October during our follow-on, which is net sales of $2.4 billion to $2.7 billion and

adjusted EBITDA of $200 million to $220 million for full year fiscal 2018. This is now 3 years in a row of revenue growth exceeding 15% and adjusted EBITDA growth exceeding 30%.

153.    The statements in ¶¶150-152 were materially false and misleading when made because (i) REVG's FY2018 earnings guidance was, as CW1 and Jacobs reported to Defendants Sullivan and Nolden, insupportable (*see* ¶¶73-92); (ii) REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered November 2017 through January 2018, a period starting almost two months before this statement), and would continue to do so in 2Q18 (*see* ¶¶93-111); (iii) less than three months after these statements (on March 7, 2018 and also on June 6, 2018), REVG admitted that poor sales mixes and lower profit margins had caused a growth contraction – something Sullivan and Nolden knew of in October 2017 because of REVG's "high quality" backlog, which gave the Company two to twelve months of visibility into revenues (*see*   ¶¶93-111, 136); and (iv) since the Company met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance was unachievable (*see* ¶¶107, 136; *see also* ¶¶93-111).

154.    On the call, the first question from an analyst was about the Company's guidance, growth and margins:

> Mircea Dobre - Robert W. Baird & Co. Incorporated, Research Division - Senior Research Analyst:
>
> My first question is really surrounding guidance. I – I'm wondering if maybe you can help us refine our assumptions a little bit at segment level.  I'm curious as to how you're thinking of segment level growth versus your 12.5% overall growth guidance. And also some color by segment on margin progression.
>
> Defendant Sullivan responded:
>
> I think we're going to have more the same, obviously, in 2018. We had a very strong Fire & Emergency performance in '17. That's going to continue.  As a matter of fact, our Fire backlog is significantly higher at this time than it was last year even at this time. ***I think all other segments [Commercial and RV], quite***

*frankly, are up, and they're going to be up, obviously, reflecting the type of guidance we gave.* (Emphasis added).

155.   The statements in ¶154 were materially false and misleading when made because (i) REVG's FY2018 earnings guidance was, as CW1 and Jacobs reported to Defendants Sullivan and Nolden, insupportable (*see* ¶¶73-92); (ii) REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered November 2017 through January 2018, a period starting almost two months before this statement), and would continue to do so in 2Q18 (*see* ¶¶93-111); (iii) less than three months after these statements (on March 7, 2018 and also on June 6, 2018), REVG admitted that poor sales mixes and lower profit margins had caused a growth contraction – something Sullivan and Nolden knew of in October 2017 because of REVG's "high quality" backlog, which gave the Company two to twelve months of visibility into revenues (*see* ¶¶93-111, 136); and (iv) since the Company met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance was unachievable (*see* ¶¶107, 136; *see also* ¶¶93-111).

156.   On December 21, 2017, REVG filed its 2017 Annual Report on Form 10-K, which was signed by Sullivan, Nolden, and the Individual Securities Act Defendants.  In the 2017 Form 10-K, Defendants touted the Company's production efficiencies, stating that "[w]e believe that our factories are among some of the most efficient and lowest cost production facilities in each of our markets due to the production processes that we employ, our purchasing scale and the high unit volume throughput relative to most of our competitors."

157.   The statements in ¶156 were materially false and misleading when made because REVG's factories had materially inefficient production processes (*see* ¶¶112-124).   These inefficiencies were part of the reason why (i) the Company's growth began to stall in 1Q18; and (ii) REVG could not reach its FY2018 guidance.

158.    The 2017 Form 10-K reiterated REVG's growth strategy, which was based on continually expanding margins:

**Our Growth Strategies**

We plan to continue pursuing several strategies to grow our earnings, expand our market share and further diversify our revenue stream, including:

***Drive Margin Expansion Through Controllable Operational Initiatives— Our focus on driving operational improvement initiatives across the organization has enabled the increase of our net income, Adjusted Net Income and Adjusted EBITDA margins by 6 basis points, 139 basis points and 197 basis points, respectively, from fiscal year 2015 to fiscal year 2017***.

\* \* \*

Commercial Markets

REV's Commercial segment addresses a broad variety of products and end markets. The transit and shuttle bus market includes applications such as airport car rental and hotel/motel shuttles, paramedical transit vehicles for hospitals and nursing homes, tour and charter operations, daycare and student transportation, mobility vans for wheelchair users, and numerous other applications. According to industry sources, shipments of cutaway buses (those buses that are up to 35 feet in length) were approximately 14,400 units in 2016. ***We believe the commercial bus markets we serve will sustain positive long-term growth*** supported by growing levels of urbanization which will require increasing commercial bus usage, increased government transportation spending as shown in the chart below, an aging and growing U.S. population driving demand for shuttle buses and mobility vans, a necessary replacement cycle of public and private bus customers and the introduction of new bus products." **(Emphasis added).**

159.    The statements in ¶158 were materially false and misleading when made because (i) REVG's growth strategy – which was reflected in its FY2018 guidance was, as CW1 and Jacobs reported to Defendants Sullivan and Nolden, insupportable (*see* ¶¶73-92); (ii) REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered November 2017 through January 2018, a period starting almost two months before these statements), and would continue to do so in 2Q18 (*see*  ¶¶93-111); (iii) less than three months after these statements (on March 7, 2018 and also on June 6, 2018), REVG admitted that poor sales mixes

and lower profit margins had caused a growth contraction – something Sullivan and Nolden knew of in October 2017 because of REVG's "high quality" backlog, which gave the Company two to twelve months of visibility into revenues (*see* ¶¶93-111, 136); and (iv) since the Company met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance was unachievable (*see* ¶¶107, 136; *see also* ¶¶93-111).

## J.   DEFENDANTS BEGIN TO REVEAL THAT REVG'S GROWTH STORY WAS ENDING BUT MISLEADINGLY INCREASED NET INCOME GUIDANCE

160.    On March 7, 2018, the Company disclosed that its growth narrative was coming undone.  On that date, REVG announced its financial results for 1Q18, which ended on January 31, 2018.  These results offered the first year-over-year quarterly comparison with the quarter ended January 28, 2017, the quarter during which REVG conducted its IPO.  REVG surprised the market by revealing that rather than margin growth, the Company experienced – for the first time since the REVG's IPO five quarters prior – margin contraction in its F&E (REVG's segment with the longest backlog) and Commercial segments stemming from poor timing on shipments and a sales mix with low numbers of high margin vehicles.  Commercial posted an adjusted EBITDA margin of 3.4% of net sales in the first quarter of 2018, compared to 6.3% in the first quarter of 2017 – representing a 290-basis-point year-over-year decline.  F&E posted an adjusted EBITDA margin of 8.4% of net sales in the first quarter of 2018, compared to 9% in the first quarter of 2017, representing approximately a 60-basis-point year-over-year decline.

161.    Analysts understood the significance of the margin contraction REVG revealed on March 7, 2018 because the Company had made margins central in its growth narrative since the Company's IPO.  Deutsche Bank wrote in a March 8, 2018 report entitled "In the Penalty Box For 2H Hockey Stick: Margins deteriorated Y/Y...doesn't bode well for a margin story":

The clear problem here is that margins deteriorated 60bps Y/Y, which is a problem for a company that has been positioned as a margin expansion story. Although Recreation profitability showed impressive improvement (+270bps Y/Y), both F&E (8.4%, -60bps Y/Y) and Commercial (3.4%, -290bps Y/Y) margins declined Y/Y.

162. Similarly, a March 8, 2018 Jefferies report entitled "F1Q18 Model Update: Communication Breakdown" stated:

[C]learly the market was not expecting the significant margin weakness (offset by below the line items) and shares traded down 12% on the report. While management execution has been good, *communication has not, as investors were not prepared for the combination of seasonality and weak margins so soon after REVG's recent analyst day*. As a newly public company with a heavily seasonal business model, management needs to do a better job of helping investors understand the details of margin and revenue cadence. (Emphasis added).

163. On March 8, 2018, REVG stock fell to a closing price of $23.85 per share from a March 7, 2018 closing price of $27.15. The losses would have been greater but for Defendants' decision to continue to mislead investors.

164. On March 7, 2018, REVG reaffirmed its FY2018 Adjusted EBITDA guidance and increased REVG's FY2018 net income outlook to a range of $90 to $110 million (from a range of $85 million to $100 million).

165. The March 7, 2018 release stated:

Fiscal year 2018 is off to a good start as we saw continued growth across most of our product categories and we remain on track to meet our full year objectives, said Tim Sullivan, CEO REV Group, Inc. *We continue to remain highly focused on the execution of our commercial, product and operating strategies to improve profitability as we work towards our long-term goal of an enterprise-wide EBITDA margin in excess of 10 percent*. Additionally, we continued to execute on our disciplined capital allocation strategy with the acquisition of Lance Camper this quarter, which enables our entry into the large and fast growing towables RV market. With a strong backlog of $1.24 billion we expect to continue to see improving operating leverage in the business and thus expect earnings growth to exceed sales growth in fiscal year 2018.

166. The release further quoted Sullivan:

First quarter results were in-line with our expectations and our view of end market demand and macro conditions remains consistent with prior expectations. Therefore, we are reaffirming our prior guidance and are still expecting full fiscal year 2018 revenues of $2.4 to $2.7 billion and Adjusted EBITDA of $200 to $220 million. Based on first quarter results, we are updating our expectation of full fiscal year 2018 net income to be in the range of $90 to $110 million and Adjusted Net Income to be in the range of $110 to $125 million.

167.    The statements in ¶164-166 were materially false and misleading when made because (i) REVG's FY2018 earnings guidance was, as CW1 and Jacobs reported to Defendants Sullivan and Nolden, insupportable (*see* ¶¶73-92); (ii) REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered November 2017 through January 2018, a period starting over four months before these statements), and would continue to do so in 2Q18 (*see* ¶¶93-111); (iii) the day of this statement, REVG admitted that poor sales mixes and lower profit margins had caused a growth contraction – something Sullivan and Nolden knew of in October 2017 because of REVG's "high quality" backlog, which gave the Company two to twelve months of visibility into revenues (*see* ¶¶93-111, 136); and (iv) since the Company met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance was unachievable (*see* ¶¶107, 136; *see also* ¶¶93-111).

168.    REVG held its 1Q18 conference call on March 7, 2018. On the call, Wells Fargo analyst Andrew Casey asked Defendant Sullivan whether issues with chassis would affect REVG's FY2018 guidance (which the Company had just increased as to net income) and Sullivan stated that for the second quarter 2018, everything was "fine":

Andrew Millard Casey - Wells Fargo Securities, LLC, Research Division - Senior Machinery Analyst:

Kind of a question back in line with Jamie's question. We're starting to see some lengthening in order-to-delivery lead times from some of your chassis providers. First, are you seeing that? And then, if so, does that further impact the timing of how you expect to achieve the updated '18 goals?

Defendant Sullivan responded:

It's a current situation that we hope does not get worse. But for instance, Mercedes Sprinter chassis have not been EPA approved yet. So there's a bit of delay in receiving those. We do work off a backlog of chassis. *So in the near term, by near term I mean, our second quarter, we're fine*. But as you can imagine, with our backend-loaded plan, we need a lot of chassis in here in Q3 and Q4. So we have time to react to it. But there's noise with GM also. There's a little bit noise with Ford. It's something that we manage on a regular basis. But we've got some time to react, and we plan to. But right now, we don't see that that's going to negatively impact our fiscal year. (Emphasis added).

169. After Wells Fargo analyst Casey raised additional specific concerns over increased steel prices and their effects on chassis purchases, Defendant Sullivan dismissed his concerns, claiming that REVG had "warnings of any cost adjustments on chassis well in advance of what's happening":

Casey:

Okay, Tim. And then in the context of higher input costs that could affect some of the component purchases and even some of those chassis purchases, can you, kind of, remind us about how you price your products, and if you're expecting the – what appears to be a rising material cost environment to impact your ability to achieve the margin expectations not only this year but next year?

Defendant Sullivan responded:

Yes. This is a top question of everyone in the last few days. Steel and aluminum, which, obviously, are the topics of the day, are less than 5% of our direct spend. And the vast majority, I mean, a very high percentage of what we buy in both steel and aluminum, we get from U.S. suppliers. So our exposure to foreign suppliers of steel or aluminum is very low. And our actual percentage of our total material cost is very low as well. And the other plus that we do have is, we've got aluminum pricing locked in for the remainder of this year. And we've been doing that the last couple of years in aluminum, just because we wanted to make sure that we didn't succumb to some volatility there. The bigger issues is the one that you really addressed, and that's the chassis. We will be extremely diligent on chassis' costs as we move through fiscal 2018. That's where we're going to see the issues. The good news is, I think, is, we can stay ahead of those, we purchase far enough in advance. And if you understand how chassis work, it's kind of a – it's a pool effect that we buy into. *So we have warnings of any cost adjustments on chassis well in advance of what's happening*. (Emphasis added).

170.    The statements in ¶168-169 were materially false and misleading when made because Defendant Sullivan knew that steel tariffs had been announced on March 1, 2018 and that such tariffs would cause increased costs and chassis unavailability for the second quarter of 2018, which would cause REVG to miss analyst 2Q18 estimates and the Company's own FY2018 guidance.  *See* ¶¶125-135.  Indeed, Sullivan admitted on June 7, 2018 that **"[a]s soon as** tariffs were suggested [on March 1, 2018], there was a run on many of the commercial chassis we purchase and convert…"

## K.    REVG REVEALS THAT ITS FY2018 EARNINGS GUIDANCE WAS MATERIALLY FALSE AND MISLEADING

171.    On June 6, 2018, after market close, REVG announced its 2Q18 financial results and revised its FY2018 earnings guidance.  The Company reported adjusted net income of only $15.6 million for 2Q18, or $0.24 per diluted share, a decline of 17.9% from the second quarter of 2017.  Similarly, REVG reported adjusted EBITDA of only $34.1 million for the quarter, a decrease of 9.2% compared to the prior year quarter and about 25% below analysts' estimates of approximately $45 million.

172.    REVG significantly reduced its FY2018 earnings guidance.  The Company cut Adjusted EBITDA about 15% to $175 to $185 million (from $200 to $220 million) and cut net income about 20% to $72 to $87 million (from $85 to $100 million**).**

173.    The June 6, 2018 press release announcing the 2Q18 results stated that the causes of the substantial earnings miss and steep guidance reduction were "near term commodity price inflation, supply chain constraints, and shortfalls in our Commercial Segment."  The release also stated that the cost increases stemmed from the steel tariffs, related chassis unavailability, and an unfavorable sales mix caused by lower sales of high margin vehicles:

> Our fiscal second quarter results were below our expectations and were impacted by a number of factors….   In particular, cost inflation across many of the

commodities and services we buy was significant in the quarter and due to the length of our backlogs we were not able to mitigate these increases. We estimate the cost inflation will have an approximate $19 million impact on our current fiscal year. Additionally, production and sales at several of our business units were adversely impacted by the availability of chassis. Finally, margins were impacted by lower-than-expected sales of certain higher-content product categories including custom fire apparatus, large commercial buses, and Class A RVs.

174.    Thus, REVG admitted that a primary reason it missed its FY2018 earnings guidance related to problems with "large commercial buses and Class A RVs" – which relate to the REVG divisions of CW1 and Jacobs, who told Defendants Sullivan and Nolden at the late September/early October Monthly Financial Meeting that the FY2018 guidance was unobtainable.

175.    The June 6, 2018 release also elaborated on issues relating to REVG's bus business:

Commercial segment Adjusted EBITDA was $9.5 million in the second quarter 2018 compared to $14.7 million in the second quarter 2017. This decrease was due to reduced volumes of transit and school bus units sold compared to the prior year, and certain higher material and freight costs. Adjusted EBITDA margin was 6.0% of net sales in the second quarter 2018 compared to 9.2% in the second quarter 2017.

The decline in sales and profitability experienced during the second quarter were largely the result of a timing lag between two major contracts in our transit bus business...

176.    During a June 7, 2018 conference call (the day after the earnings release), Sullivan stated that part of the reason for the reduced FY2018 earnings guidance was a canceled contract with Collins Bus:

Now for the challenges. 2 of our higher-quality business units struggled in the first 2 quarters this year. In our Commercial segment, our Collins school bus business declined to participate in a very large pre-bid requested by one of our school bus contractors. This adversely affected our first half 2018 performance, but we believe this was ultimately the right decision for the business, and we believe we can recover and get close to plan by the end of fiscal 2018 with new traditional school bus and contractor sales opportunities.

177.    But as CW1 explained, the Collins contract fell apart *in 2017*. *See* ¶82. Thus, Defendant Sullivan knew it would undermine FY2018 earnings since at least October 2017, when such guidance was first issued.

178.    On the same call, Defendant Nolden made it clear that revenue from lower-margin vehicles – of which Defendants were well aware through REVG's backlog, which was updated monthly through the Company's OneStream program – was part of the reason for the slashed guidance:

> These circumstances have contributed to this volatility in mix such as the sales profile for our ambulance division in the second quarter was skewed towards lower-margin vehicles. In addition, the mix of fire apparatus sales in the quarter were skewed toward lower content fire apparatus in the form of more retail custom trucks versus larger custom pumpers and aerials.

179.    Defendant Sullivan also admitted on the June 7, 2018 call (*see supra* ¶135) that immediately after the tariffs were announced – which was March 1, 2018 – there was a run on chassis:

> The tariffs have also created unintended – unpredicted consequences. As soon as tariffs were suggested, there was a run on many of the commercial chassis we purchase and convert. We are paying extra freight charges to get the chassis we need for the second half shipments. Over the 60 day – the last 60 days alone, this has resulted in approximately a $1 million additional cost. We now need to get certain chassis shipped via truck due to railcar shortages based on what we believe to be abnormal and artificial demand.

180.    As alleged above, it was well-understood that higher U.S. – not just foreign – steel and commodity prices were imminent. *See* ¶¶125-135.

181.    Also during the June 7, 2018 call, Sullivan admitted that his 10% EBITDA margin goal for FY2019 was impossible to reach:

> Andrew Millard Casey- Wells Fargo Securities, LLC, Research Division - Senior Machinery Analyst:

> First, a couple of questions. First, your new adjusted EBITDA margin guide, 7.2% at the midpoint. In the past, and you kind of alluded to it earlier, you've

outlined fiscal '19 adjusted margin target of about 10% without a lot of market growth. The internal initiatives that you announced you had took in the second quarter seem to be likely to add about 100 basis points on a carryover basis. So it leaves about 200 to get to the 10%. Are the in-place initiatives still supportive to boost EBITDA margins to that 10% next year?

Defendant Sullivan responded:

***We're not going to get to 10% next year***. I think 2 things. Obviously, you're experiencing a pretty healthy speed bump that's slowed us down on that path to 10% here in the second quarter. But the other part, the other element to getting to the 10% is a meaningful contribution from spare parts, and we're lagging in spare parts. We plan to continue to move in the right direction. Our goal has not changed. But I can guarantee that we will not get to 10% in 2019, which was our initial goal 2 years ago – 2.5 years ago. But we will get there. And I don't – we'll have more visibility, I guess, on that come fiscal 2019, but it's a goal. We think we can get there. We need some things to happen in a positive way.  (Emphasis added).

182.    On June 7, 2018, REVG shares fell $3.39 per share or nearly 20% to close at $14.52 per share.

183.    Following the June 6, 2018 disclosures, numerous analysts slashed price targets and downgraded the stock.  A June 6, 2018 SunTrust Robinson report took REVG to task for misleading the market about chassis and steel issues in the 2Q18 conference call:

The cost inflation and chassis availability are somewhat surprisinggiven management's commentary on the 1Q18 earnings call in March where itwas noted that steel and aluminum are less than 5% of direct spend with "vast majority" purchased from US suppliers. Additionally, aluminum price wassaid to be locked in for the remainder of the year. With regards to chassis, whilecited as a potential issue, the commentary implied it was manageable and thatcost adjustments were telegraphed "well in advance".

184.    Morgan Stanley agreed, writing in a June 6, 2018 analyst report that "this [second quarter] commentary is particularly disappointing following management's commentary on the 1Q call that aluminum prices were locked in for the year and chassis cost inflation would be signaled well in advance."

185.     BMO Capital Markets published a report on June 6, 2018 calling the quarter a "Multiple-Alarm Fire".  That report stated:

> Bottom Line: REV Group reported diluted FY2Q18 EPS of $0.24 (adj.) versus $0.35 consensus. Adjusted EBITDA of $34 million (margin, 5.6%) was also well below the Street at $44 million (margin, 7.1%), as was total revenue at $609 million (+11.7% y/y) versus $628 million consensus. Meanwhile, management lowered its full-year guidance metrics across the board: sales, $2.4–2.6 bn from $2.4–2.7 bn; adjusted EBITDA, $175–185mn from $200–220 mn; and adjusted net income, $94.1–105.1 mn from $110–125 mnk.

## L.     ADDITIONAL SCIENTER/FALSITY ALLEGATIONS

186.     As alleged herein, the Exchange Act Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.

187.     The Exchange Act Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

188.     The Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding REVG's FY2018 guidance, backlog, chassis availability, margins, efficiency, and growth, their control over, and/or receipt and/or modification of REVG's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

189.     The Exchange Act Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Exchange Act Individual Defendants.

190.    The Exchange Act Individual Defendants, because of their positions with REVG, made and/or controlled the contents of the Company's public statements during the Class Period. Each Exchange Act Individual Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, these defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading.  As a result, each of these defendants is responsible for the accuracy of REVG's corporate statements and is therefore responsible and liable for the representations contained therein.

> **1.    CW1 And Jacobs Told Defendants Sullivan And Nolden Face-To-Face That The FY2018 Earnings Guidance Was Insupportable**

191.    As explained by CW1, at a meeting attended by nine people in late September/early October 2017, CW1 told Sullivan and Nolden that the proposed FY2018 earnings guidance was unachievable.  CW1 also stated that Jacobs, the head of the Recreation segment, told Sullivan and Nolden that the proposed FY2018 earnings guidance was unachievable.  Sullivan and Nolden could not have proceeded to issue the very earnings guidance CW1 and Jacobs stated was unachievable without the intent to deceive investors.

> **2.    REVG Carefully Tracked Backlog Every Month**

192.    As alleged above, REVG tracked the Company's backlog through its monthly updated OneStream program.  OneStream gave the Exchange Act Defendants the ability to see what vehicles were in REVG's backlog and how far along they were in the production schedule. Because the data contained in OneStream was reported from each individual REVG

manufacturing facility – which generally only manufactured one kind of vehicle with set margins – the Exchange Act Defendants knew the profit margins on the vehicles in backlog.

### 3. Insiders Unloaded Over $300 Million Dollars in REVG Stock

193.    While REVG's stock price was artificially inflated due to Defendants' false and misleading statements, REVG insiders sold large amounts of Company stock.

194.    On October 17, 2017 – just one week after REVG issued its unachievable FY2018 guidance (as well as in the over-allotment SPO shares sold on October 27, 2017) – REVG stockholders sold over 11,000,000 shares at $27.25 per share in the SPO.

195.    AIP sold over $294 million of REVG stock in connection with the SPO – about 25% of its REVG holdings.

196.    Five defendants are members of AIP – defendants Bamatter, Cusumano, Fish, Marvin, and Rotroff.

197.    Also on October 17, 2017, Defendants Cusumano and Marvin sold about 25% of their individual REVG holdings for proceeds of over $1.2 million each.

198.    In total, insiders sold over $300 million worth of Company stock while in possession of material, adverse, and nonpublic information.

### 4. Suspiciously-Time Resignations Are Probative of Sullivan and Nolden's Scienter

199.    In late September or early October, 2017, CW1 and Jacobs told Defendants Sullivan and Nolden that the FY2018 earnings guidance was unachievable.

200.    Sullivan informed CW1 that if CW1 was not going to go along with the plan, CW1's further employment at REVG was not going to work.

201.    On October 10, 2017, REVG issued the FY2018 earnings guidance that CW1 and Jacobs told Sullivan and Nolden was unachievable.

202.    On October 31, 2017, Phillips left the Company.

203.    On November 1, 2017, CW1 and Jacobs left the Company.

### 5. Defendant Sullivan Also Knew the Statements Were False and Misleading Because He Was a Hands-on CEO

204.    Defendant Sullivan was well aware of the material operational inefficiencies at REVG's facilities.

205.    CW3 stated that CEO Timothy Sullivan was a hands-on leader who made occasional stealthy stops to observe the Longview manufacturing operation first-hand.  CW3 stated that Sullivan was involved in the day-to-day operations of its subsidiaries.  CW3 was told by supervisors on occasion that Sullivan had stopped by.  CW3 stated that Sullivan "visited unannounced a couple times."  "Management knew he was coming, but no one said anything." *See* ¶124.

## M.    PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

206.    At all relevant times, the market for REVG securities was an efficient market for the following reasons, among others:  (1) the securities were listed and actively traded on the NYSE, a highly efficient market; (2) as an issuer of securities, REVG filed periodic public reports on Form 10-K and Form 10-Q with the SEC; (3) REVG regularly issued press releases that were carried by the national news wires, were publicly available and entered the public marketplace.

207.    As a result, the market for the securities promptly digested current information regarding REVG from all publicly available sources and reflected such information in REVG's stock price.

208.    Under these circumstances, all purchasers of the REVG securities during the Class Period suffered similar injury through their purchases at artificially inflated prices and a presumption of reliance applies.

## N.    LOSS CAUSATION / ECONOMIC LOSS

209.    During the Class Period, as detailed herein, REVG securities were artificially inflated due to Defendants' misleading public statements.    When Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of REVG securities fell as the prior artificial inflation came out.

210.    As a result of their purchases of REVG securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

211.    The declines in the price of REVG securities after the corrective disclosures on March 7, 2018 and June 6, 2018 were a direct result of Defendants' misrepresentations being revealed to investors and the market.

212.    The declines in the price of REVG securities were also the result of the materialization of the concealed investment risks concerning REVG.

213.    Defendants' materially false and misleading statements relate to the Company's margins, growth, FY2018 earnings estimates, and chassis availability.

214.    The corrective disclosure on March 7, 2018 revealed that REVG's growth narrative was coming to an end.  On that date, REVG disclosed that its margins – for the first time since the Company's IPO – had contracted as a result of poor shipment timing and an unfavorable sales mix.

215.    After the adverse March 7, 2018 announcement, REVG stock fell on March 8, 2018 to a closing price of $23.85 per share from a March 7, 2018 closing price of $27.15.

216. After the March 7, 2018 partial disclosure, REVG stock remained artificially inflated because Defendants did not reveal that REVG's FY2018 guidance was unachievable, nor that they were concealing problems relating to chassis unavailability, increased costs, and production inefficiencies.

217. The corrective disclosure on June 6, 2018 revealed that (i) REVG's previously-issued FY2018 guidance was unachievable; (ii) contrary to Defendant Sullivan's claims, steel tariffs caused chassis availability problems and commodity, including steel, price hikes that materially undermined FY2018 guidance; and (iii) REVG's growth story was fundamentally called into question.

218. After these disclosures, on June 7, 2018, REVG shares fell $3.39 per share or nearly 20% to close at $14.52 per share.

219. These disclosures caused the rest of the concealed investment risk about REVG to materialize.

220. The timing and magnitude of the price decline in REVG securities negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements. The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of REVG securities when Defendants' misrepresentations were revealed.

## CLASS ACTION ALLEGATIONS

221. This is a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class of all persons who purchased REVG securities during the Class Period, including pursuant to or traceable to the Prospectuses, and were damaged thereby.

Excluded from the Class are (1) REVG, and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or are a parent; and (b) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

222.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, REVG securities traded on the NYSE under the ticker symbol "REVG."  While the exact number of Class members is unknown to Plaintiff at this time and can only be obtained through appropriate discovery, Plaintiff believes that there are thousands of Class members located throughout the United States.  Record owners and other members of the Class may be identified from records maintained by REVG and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

223.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  The questions of law and fact common to the Class include (1) whether Defendants violated the Exchange Act; (2) whether Defendants violated the Securities Act; (3)  whether Defendants issued materially false or misleading statements; and (4) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

224.    Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

225. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class and securities litigation. Plaintiff has no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members.

226. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

227. There will be no difficulty in management of this action as a class action.

## COUNT I

## VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
## AGAINST ALL DEFENDANTS

228. Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiff or members of the Class.

229. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 11 claim.

230. This Count is asserted against all Defendants for violations of § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all Class members who purchased REVG's securities pursuant or traceable to either or both of the Prospectuses.

231. Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the Offerings pursuant to the Prospectuses, which contained misrepresentations of material fact.

232. The Prospectuses contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts as described above. The Securities Act Individual Defendants were executive officers and representatives of the Company who were responsible for the contents and dissemination of the Prospectuses. Further, the Securities Act Individual Defendants signed the Prospectuses in their official capacity with the Company.

233. The Underwriter Defendants were underwriters for one or both of the Offerings. As such, these Defendants issued, caused to be issued and participated in the issuance of the Prospectuses and are subject to liability for violations of § 11 of the Securities Act.

234. Class members who acquired the securities pursuant or traceable to the Prospectuses did not know of the false statements and omissions alleged herein and could not have reasonably discovered such facts or conduct.

235. Less than one year elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that the first complaint was filed asserting claims arising out of the falsity of the Prospectuses. Less than three years elapsed from the time that the securities upon which this Count is brought were offered to the public to the time that the first complaint was filed asserting claims arising out of the falsity of the Prospectuses.

236. Class members have sustained damages. The value of REVG securities have declined substantially subsequent to and due to Defendants' violations of § 11 of the Securities

Act.  By reason of the foregoing, Defendants are liable for violations of § 11 of the Securities Act to Class members who purchased REVG's securities pursuant or traceable to the Prospectuses.

**COUNT II**

**VIOLATIONS OF SECTION 12(a)(2) OF THE
SECURITIES ACT AGAINST REVG, THE UNDERWRITER
DEFENDANTS, AIP, MARVIN, FISH, CUSAMANO AND ROTROFF**

237.    Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiff or members of the Class.

238.    Defendants named in this Count violated § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

239.    Defendant REVG is named in this Count solely in connection with the IPO.

240.    Defendants AIP, Marvin, Fish, Cusamano, and Rotroff are named in this Count in connection with the IPO and SPO.

241.    The Underwriter Defendants are named in this Count in connection with the IPO and SPO.

242.    This Count is alleged on behalf of all Class members who purchased REVG common stock pursuant or traceable to the Offerings.

243.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count.  For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 12(a)(2) claim.

244.    Defendants named in this count were sellers, offerors and/or solicitors of sales of the securities offered pursuant to the Prospectuses.  These offering documents contained untrue

statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

245.     Class members who purchased common stock pursuant or traceable to the materially untrue and misleading offering documents did not know or, in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

246.     Defendants named in this count owed to Class members who purchased common stock pursuant or traceable to the materially false and misleading offering documents the duty to make a reasonable and diligent investigation of the statements contained in the offering documents, to ensure such statements were true and that there was no omission of material fact necessary to prevent the statements contained therein from being misleading.  Defendants named in this count did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the offering documents were true and without omissions of any material facts and were not misleading.  By virtue of the conduct alleged herein, Defendants named in this count violated § 12(a)(2) of the Securities Act.

## COUNT III

### VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
### AGAINST THE SECURITIES ACT INDIVIDUAL DEFENDANTS AND AIP

247.     Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, to the extent such allegations do not allege fraud or the intent to defraud Plaintiff or members of the Class.  This Count is asserted against the Individual Defendants for violations of § 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiff and the other Class members who purchased REVG's common stock pursuant or traceable to either or both of the Prospectuses.

248. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a § 15 claim.

249. At all relevant times, the Securities Act Individual Defendants were controlling persons of the Company within the meaning of § 15 of the Securities Act. Each of the Individual Defendants served as an executive officer, director, or controlling person of REVG prior to and at the time of the Offerings, as set forth above.

250. The Securities Act Individual Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of REVG's business affairs. As officers and directors of a publicly owned company listed on the NYSE and registered with the SEC, the Securities Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to REVG's financial condition and results of operations.

251. AIP participated in the operation and management of the Company as its controlling shareholder.

252. By reason of the aforementioned conduct, each of the Defendants named in this Count are liable under § 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under §§ 11 and 12(a)(2) of the Securities Act, to Class members who purchased securities pursuant or traceable to the Offerings.

## COUNT IV

## VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST THE EXCHANGE ACT DEFENDANTS

253. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

254. During the Class Period, the Exchange Act Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase REVG securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

255. The Exchange Act Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for REVG securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Exchange Act Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

256. The Exchange Act Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about REVG and its business

operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

257.    Each of the Exchange Act Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's periodic disclosures to investors; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team and internal financial information about REVG; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

258.    The Exchange Act Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with REVG's business and financial results from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the allegations above, these defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

259.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of the securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by these Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiff and the other members of the Class acquired the securities during the Class Period at artificially high prices and were damaged thereby.

260.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding REVG, which was not disclosed by these Defendants, Plaintiff and other members of the Class would not have purchased the securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

261.    By virtue of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

262.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the securities during the Class Period.

## COUNT V

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
## AGAINST THE INDIVIDUAL DEFENDANTS AND AIP

263.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

264.    The Exchange Act Individual Defendants and AIP acted as controlling persons of REVG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Exchange Act Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and misleading.  These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

265.    In addition, the Exchange Act Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the conduct giving rise to the securities violations as alleged herein, and exercised the same.

266.    As set forth above, the Exchange Act Individual Defendants and AIP violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Exchange Act Individual Defendants and AIP

are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Act of 1933 and the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

C.      Awarding rescission under Section 12(a)(2) of the Securities Act;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
November 20, 2018

**ADEMI & O'REILLY, LLP**

/s/ John D. Blythin

John D. Blythin (jblythin@ademilaw.com)
3620 E. Layton Ave.
Cudahy, WI 53110
Tel: (414) 482-8000
Fax: (414) 482-8001

**Liaison Counsel for Lead Plaintiff and the Proposed Class**

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein (bernstein@bernlieb.com)
Michael S. Bigin (bigin@bernlieb.com)
Stephanie M. Beige (beige@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
10 East 40th Street
New York, New York  10016
Tel:  (212) 779-1414
Fax:  (212) 779-3218

**Lead Counsel for Lead Plaintiff and the Proposed Class**