## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

IN RE REV GROUP, INC. SECURITIES
LITIGATION

Lead Case No. 2:18-cv-1268-LA

### SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1.      Lead Plaintiff Houston Municipal Employees Pension System ("Lead Plaintiff" or "Plaintiff"), by and through its undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon, among other things, Lead Counsel's investigation, which includes without limitation, review and analysis of filings with the United States Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, court filings, and interviews with a former REV Group, Inc. ("REVG" or the "Company") employee. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      Lead Plaintiff seeks to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      This is a class action on behalf of persons (the "Class") who purchased REVG securities between October 10, 2017 and June 7, 2018, inclusive (the "Class Period").

4.      REVG designs, manufactures, and distributes specialty vehicles. The Company operates three segments:  1) Commercial, which manufactures transit and shuttle buses, Type A school buses, mobility vans, sweepers, and terminal trucks; 2) Recreation, which manufactures

motorized RV products; and 3) Fire & Emergency ("F&E"), which manufactures fire trucks and ambulance-related products.

5. Prior to the Class Period, from fiscal year ("FY") 2015 through FY2017, REVG had meteoric growth. REVG's Adjusted Net Income was $34 million, $53 million and $76 million for fiscal years 2015, 2016, and 2017, respectively – which the market noted represented a compound annual growth rate ("CAGR") of 49%. The Company's Adjusted EBITDA for the same periods was $90 million, $123 million, and $163 million, which represented a CAGR of 34%.

6. On the first day of the Class Period, October 10, 2017, Defendants issued Net Income and Adjusted EBITDA guidance that told the market REVG's growth would continue its upward trajectory. REVG's FY2018 earnings guidance advised that investors should expect Net Income in the range of $85 million to $100 million and Adjusted EBITDA in the range of $200 million to $220 million.

7. Defendants later confirmed REVG's FY2018 Adjusted EBITDA guidance and even increased REVG's FY2018 Net Income guidance. On December 19, 2017, REVG told investors that "we are well positioned for continued growth in fiscal 2018 and we will continue to make progress towards our enterprise-wide EBITDA margin goal of 10 percent."

8. Analysts viewed REVG's growth as a reason for investors to invest in REVG stock. A December 19, 2017, Wells Fargo report ranked REVG "outperform" and stated that the "company realized significant growth yr/yr. Looking forward, management expects growth to continue…" A December 21, 2017 Credit Suisse report, which also gave REVG an outperform rating, stated that "[f]actoring in guidance for next year, which assumes sales growth and margin

expansion across all three segments, REVG has put up three 3 years in a row of revenue growth >15% and adj. EBITDA growth >30%."

9.    Unbeknownst to investors, however, was that Defendants knew REVG's Net Income and Adjusted EBITDA guidance was materially false and misleading.

10.    Defendants knew REVG's Net Income and Adjusted EBITDA guidance had no reasonable basis because the Company's backlog informed them that REVG would not deliver – and thus could not recognize revenue on – enough high-margin vehicles in time to justify the FY2018 forecasts.

11.    Defendants tracked REVG's future revenues and earnings at individual REVG manufacturing facilities by recording a vehicle's sale price in what the Company called its "backlog" at the date of sale.  As the vehicle moves through the production line, the backlog period for that vehicle decreases to a period of zero days on the date the vehicle is shipped.  The value of the vehicle's sale price is only recognized on the date the customer takes possession of the vehicle.

12.    A former senior REVG employee reported that REVG's backlog tracked – on a monthly basis – vehicles sold, time in production, and financial metrics.  The backlog was analyzed at REVG's headquarters and gave Defendants understanding as to what vehicles would be finished during each quarter and fiscal year.

13.    Defendants were aware that REVG's large and customized vehicles, such as large commercial buses, custom fire apparatus and certain RVs (such as Class A vehicles), bus and ambulance products, which were the Company's high-margin products ("High-Margin Vehicles"), had long backlog periods because they required months to build before delivery to the customer. For example, in March 2017, Sullivan stated that two F&E facilities had a backlog of almost 12 months; in January 2018, Sullivan stated that "[o]ur backlogs are all out about 9 to 10 months now

on all of Fire" and that one of REVG's Recreation facilities had a 12 month backlog; and in June 2018, Sullivan stated that REVG had lead times of 17-19 months for buses.

14.     By October 10, 2017, Defendants knew the backlog showed that REVG would not complete and deliver enough High-Margin Vehicles to meet FY2018 Net Income and Adjusted EBITDA guidance.

15.     Defendants also knew at the latest by March 1, 2018 that steel tariffs would cause REVG to miss its FY2018 earnings guidance further.

16.     Chassis, which are made of steel, are a key component of REVG's vehicles.  On March 1, 2018, the press reported that President Trump would be increasing steel and aluminum tariffs.

17.     On March 7, 2018, the steel tariffs were officially announced.  That same day, Defendant Sullivan falsely assured analysts that REVG was "fine" for 2Q18 on chassis issues.  Yet the tariffs predictably increased steel prices, leading to increased costs for REVG, as well as caused a run on available chassis.  Indeed, on June 7, 2018, Defendant Sullivan admitted that he was aware of chassis problems "as soon as" the tariffs were "suggested."  *See* ¶ 106.

18.     On March 7, 2018, REVG announced 1Q18 financial results.  REVG surprised the market by revealing that its margins and growth rates had contracted for the first time since its IPO five quarters prior.  REVG stated that the margin contraction was a result of poor product mix in its Commercial and F&E segments, and poor timing of shipments.  By this disclosure, REVG began to reveal that its growth was slowing.  After the March 7, 2018 announcement, REVG stock fell on March 8, 2018 by 12%.

19.     On June 6, 2018, after market close, REVG revealed that investors should not rely on its prior guidance.  REVG substantially cut the FY2018 earnings guidance and reported 2Q18

earnings well below analysts' consensus. The Company reduced Adjusted EBITDA guidance for 2Q18 to $34.1 million – about 25% below analysts' estimates of approximately $45 million. The Company also reduced FY2018 Net Income guidance by about 20% to $72 million to $87 million (from $90 to $110 million) and Adjusted EBITDA guidance by about 15% to $175 to $185 million (from $200 to $220 million).

20.     REVG reported that it missed its 2Q18 earnings and cut its FY2018 guidance because (i) REVG's Commercial, Recreational, and F&E segments had lower profit margins from "lower-than-expected sales of certain higher-content product categories including custom fire apparatus, large commercial buses, and Class A RVs"; (ii) REVG had accrued higher costs resulting from the tariffs; and (iii) REVG had problems procuring chassis.

21.     On June 7, 2018, REVG shares fell $3.39 per share or nearly 20% to close at $14.52 per share. REVG stock has not recovered and currently trades around $8.90 per share.

22.     REVG investors lost tens of millions of dollars as a result of Defendants' fraud.

### JURISDICTION AND VENUE

23.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

25.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c). Substantial acts in furtherance of the alleged federal securities violations have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

26.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

27.     Lead Plaintiff, as set forth in the certification submitted with its motion for appointment as lead plaintiff, incorporated by reference herein, purchased REV securities during the Class Period.

28.     Defendant REVG is incorporated in Delaware and its principal executive offices are in Milwaukee, Wisconsin.  REVG's common stock trades on the New York Stock Exchange under the symbol REVG.

29.     Defendant Timothy W. Sullivan served as the Chief Executive Officer of REVG at all relevant times.

30.     Defendant Dean J. Nolden served as the Chief Financial Officer of REVG at all relevant times.

31.     Defendants Sullivan and Nolden are collectively referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## A.     REVG'S FINANCIAL REPORTING SEGMENTS

32.     REVG designs, manufactures, and distributes specialty vehicles and related aftermarket parts and services.  REVG operates and reports its financial results from three segments:  Commercial, Recreation, and F&E.

33.     REVG's Commercial segment offers small- and medium-sized buses, Type A school buses, transit buses, terminal trucks and street sweepers in the United States.  REVG's

Commercial products include cut-away buses (customized body built on various types and sizes of commercial chassis), transit buses (large municipal buses where it builds its own chassis and body), luxury buses (bus-style limo or high-end luxury conversions), street sweepers (three- and four-wheel versions used in road construction activities), terminal trucks (specialized vehicle which moves freight in warehouses or intermodal yards and ports), Type A school buses (small school bus built on commercial chassis), and mobility vans (mini-van converted to be utilized by wheelchair passengers). Commercial products are sold to municipalities, schools, and commercial and industrial customers.

34. REVG's Commercial segment provided approximately 27% of the Company's revenues in 2017.

35. REVG's Commercial segment is comprised of four smaller units: Commercial Bus (8%), Transit Bus (7%), Type A School Bus (6%), and Specialty (6%). *See* 2017 Form 10-K at 3. Thus, buses account for approximately 80% of the Commercial segment in FY2017.

36. REVG's Recreation segment manufactures various types and configurations of both motorized and towable RVs, including sell Class A (diesel and gas), Class B, and Class C motorized RVs. Motorized RVs are self-contained units built on motor vehicle chassis with their own lighting, plumbing, heating, cooking, refrigeration, sewage holding and water storage facilities. Class A RVs are generally constructed on medium-duty chassis, which are supplied complete with engine and drivetrain components by major motor vehicle manufacturers. REVG designs, fabricates and installs the living area and driver's compartment of these motorized RVs. Class B RVs are built on a consumer van chassis with the entire living area contained within the existing van frame. Class C RVs are built on consumer truck or van chassis, which include an engine, drivetrain and a finished cab section. In Class Cs, REVG designs, fabricates and installs

the living area to connect to the driver's compartment and the cab section. Super Class C RVs are motorhomes built on a commercial truck or van chassis.

37. The Company's Recreation segment provided approximately 29% of the Company's revenues in 2017.

38. REVG's F&E segment manufactures a range of fire apparatus and ambulance products. The F&E segment sells fire apparatus equipment under the Emergency One (E-ONE) and Kovatch Mobile Equipment (KME) brands, and ambulances under the American Emergency Vehicles (AEV), Horton Emergency Vehicles (Horton), Leader Emergency Vehicles (Leader), Marque, McCoy Miller, Road Rescue, Wheeled Coach and Frontline brands. F&E products are sold to municipal fire departments and private fleets, typically purchasing through dealers.

39. F&E provided approximately 44% of the Company's revenues in 2017.

## B. EARNINGS GROWTH WAS CENTRAL TO REVG'S VALUE

40. From FY2015 through FY2017, REVG grew by leaps and bounds. REVG's Adjusted Net Income was $34 million, $53 million and $76 million for fiscal years 2015, 2016 and 2017, respectively – representing a CAGR of 49%. The Company's Adjusted EBITDA for the same periods was $90 million, $123 million and $163 million, which represents a CAGR of 34%.

41. On October 10, 2017, REVG issued a press release providing a full-year outlook for FY2018. In the press release, REVG stated that FY2018 net income would be in the range of $85 million to $100 million and FY2018 adjusted EBITDA would be in the range of $200 million to $220 million.

42. The October 10, 2017 release also stated that: "REV group is *forecasting growth* in all three of its reportable segments [Commercial, Recreation, and F&E] in fiscal 2018 …." (Emphasis added).

43. On December 19, 2017, Sullivan reaffirmed the FY2018 guidance and told investors that he was "pleased to report that all three of our segments [Commercial, Recreation, and F&E] continue to have strong outlooks. We plan to continue this trajectory of earnings growth in excess of sales growth into next year. In summary, it was a strong quarter and year, *we are well positioned for continued growth in fiscal 2018* and we will continue to make progress towards our enterprise-wide EBITDA margin goal of 10 percent." (Emphasis added).

44. Analysts paid close attention to REVG's strong growth. For example, a December 19, 2017 Wells Fargo report stated that the "company realized significant growth yr/yr. Looking forward, management expects growth to continue…" Likewise, a December 21, 2017 Credit Suisse report stated that "[f]actoring in guidance for next year, which assumes sales growth and margin expansion across all three segments, REVG has put up three 3 years in a row of revenue growth >15% and adj. EBITDA growth >30%."

## C. DEFENDANTS KNEW THE BACKLOG DID NOT SUPPORT THE FY2018 EARNINGS GUIDANCE

### 1. REVG'S Backlog Provided Clear Visibility Into FY2018 Net Income and Adjusted EBITDA

45. REVG manufacturing facilities record the vehicle's sale price in backlog at the date of sale. As the vehicle moves through the production line, the backlog period for that vehicle decreases to a period of zero days on the date the vehicle is shipped.

46. All of REVG's vehicles have substantial lead times. REVG continually claimed that these long lead times gave the Company strong visibility into future financial results.

47. The amount of time that a REVG vehicle remained in backlog was a function of the size and complexity of the vehicle. Large and customized vehicles, such as large commercial buses, custom fire apparatus and certain RVs (such as Class A vehicles), bus and ambulance products, take longer to build and, thus, remain in backlog for a longer period of time.

00517650;V1

9

48.     In a March 8, 2017 conference call, Sullivan stated that "[i]f you look at our backlog on fire right now, both KME and E1 [2 of REVG's fire companies] are out almost 12 months."

49.     In a prospectus filed in connection with the Company's October 12, 2017 secondary public offering (the "SPO Prospectus"), Defendants stated that "[REVG's] business carries a high-quality backlog which enables strong visibility into future net sales which ranges from two to twelve months depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business." [1]

50.     In a December 20, 2017 conference call, Sullivan stated:

> We're really managing that well, because, as you know, there is a lot of pent-up demand in Fire, and we don't like our backlogs out that far. When we're running backlogs out to August, September [i.e., 8-9 months], that's not healthy, and they got to be less than that.

51.     In a December 21, 2017, FY 2017 Form 10-K, REVG repeated that "[o]ur business carries a high-quality backlog which enables strong visibility into future net sales which ranges from two to twelve months depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business."

52.     By touting visibility from "two to twelve months" in the SPO Prospectus and the FY 2017 Form 10-K, Defendants represented they had clear visibility into revenues and, by extension, earnings to October 2018 and December 2018, respectively.

53.     During a January 16, 2018 REVG Investor Day, Sullivan stated that "[o]ur backlogs are all out about 9 to 10 months now on all of Fire,…"

54.     Later during the same presentation, Sullivan stated that "[w]e just completed the acquisition of Lance [Lance Camper Manufacturing Corporation, which became part of REVG's

---

[1] Net sales is total revenue, less the cost of sales returns, allowances, and discounts.

RV Recreation segment] on Friday…. They flew out back to California yesterday afternoon to work off their 12-month backlog,… They have an adjacent building. I think it's over 100,000 square feet. So we can double the capacity of what we're building, start whittling down that 12-month backlog."

55.    On a June 7, 2018 conference call, Defendant Sullivan stated that REVG had "long[] lead times" on fire and bus vehicles – 8 months for fire and 17-19[2] for buses:

> Fire is actually sold out through the end of the calendar year into – literally, we're starting to sell into the first part of the second quarter of fiscal 2019 [February 2019]. So Fire is set. We know very well what we have in Fire for the rest of the year. It's locked and loaded. As crazy as this sounds, because the transit buses have been a challenge for us this year, we already know what our backlog in transit buses looks like for '19 and the latter part of this year. So where we've got the longer lead times, we've got great visibility,…

56.    REVG stated that "value-added units" (which had long lead times) – the High-Margin Vehicles – were high margin sales and generated the most net income and earnings for the Company. REVG's December 21, 2017 Form 10-K stated that "[o]ur units represent a wide range of products at various price points, with higher value-added units at higher price points typically resulting in higher gross margins. Additionally, large orders of similar units typically provide operational efficiencies that contribute to higher gross margins."

### 2.    A Former Senior REVG Employee Reports That REVG Carefully Tracked Backlog

57.    CW1 worked as a finance manager at REVG's ElDorado Bus and Mobility subsidiary from May 2017 to mid-November 2017. ElDorado is one of REVG's eight brands in its Recreation segment. CW1 was based at REVG's Salina, Kansas production plant. CW1 ran

---

[2] Sullivan made his statement in June 2018. REVG's fiscal year ends October 31st. If Sullivan was referring to REVG's fiscal year, then he stated that the lead time for buses was 17 months. If Sullivan was referring to a calendar year, then he stated that the lead time for buses was 19 months.

the business department at ElDorado and supervised the controller, two accounts payable clerks, one accounts receivable clerk, one cost accountant, and the Information Technology department.

58.     CW1 stated that at REVG's ElDorado subsidiary, backlog was tracked on a monthly basis through a program called OneStream. CW1 described OneStream as similar to Microsoft Excel, with various fields in which to enter data. CW1 inputted data each month into OneStream, including into fields such as "work in progress," "backlog," "finished goods," and "inventory." CW1 had to input such data by the 10th of every month. When a vehicle was finished, it would go from "work in progress" to "finished goods." "Work in progress" provided a total showing how far along towards completion the vehicles in the manufacturing facility were. Senior management could tell what vehicles were being built, and how far along they were, because each manufacturing facility built only certain vehicles. In other words, when OneStream listed a certain number of vehicles from one REVG manufacturing facility, it was clear that those vehicles were of a certain kind, *e.g.*, buses, ambulances, etc.

59.     CW1 stated that senior management in Milwaukee used the OneStream data from the various REVG manufacturing facilities when making projections. Every three months, senior REVG management would give specific projections to each of REVG's manufacturing facilities.

60.     CW1 stated that, after receiving these projections from CW1's general manager Colby Bertrand, it was CW1's responsibility to update the projections by adding three months to the existing, rolling 12-month projections. CW1 would also have to show how CW1's facility would meet the projection.

61.     CW1 stated that the projections which CW1's facility received from corporate headquarters in Milwaukee were regularly unreachable. For example, CW1 stated that senior management's FY2018 projections for CW1's manufacturing facility demanded that it grow its

production by 5-10% while reducing its costs by the same amount. CW1 stated that this was impossible because CW1's facility was already operating at maximum production level – and with serious inefficiencies, including large amounts of overtime and resulting mushrooming costs. Because REVG carefully tracked backlog through OneStream at its corporate headquarters in Milwaukee, Defendants knew the sales mix for REVG's vehicles in production.

## D. BY MARCH 2018, DEFENDANTS KNEW THAT STEEL TARIFFS WOULD FURTHER HURT REVG'S EARNINGS GROWTH

62. On March 1, 2018 – one month into REVG's second quarter – *The New York Times* reported that President Trump would impose tariffs of 25% on steel and 10% on aluminum under Section 232 of the Trade Expansion Act of 1962. On March 8, 2018, President Trump signed proclamations for the new steel and aluminum tariffs.

63. Many news outlets reported that, in addition to causing an increase in foreign steel, the tariffs would also cause an increase in demand for U.S. steel (and thus, U.S. steel prices) because U.S. steelmakers would – very predictably and acting in an economically rational manner – seize the pricing opportunity created by foreign steel makers' prices rising because of the 25% steel tariff. For example, on March 1, 2018, the day President Trump announced the tariff increase, *American Metal Market* published an article by Millicent Dent entitled "Steel mixed on 232 [referring to the law concerning the tariffs, *see* ¶ 62], prices seen rising". That article provided, in pertinent part:

> Steel industry participants had mixed reactions to President Donald Trump's announcement that the United States will impose tariffs of 25% on steel product imports next week, **with many anticipating higher prices as a result**….

> Assuming a 25% tariff on all or almost all steel imports, "**US steel prices should continue to** rally until imports are again cost competitive as consumers scramble to secure volumes not produced domestically at present," Seth Rosenfeld, an equity analyst at New York-based Jefferies, said in a March 1 research note.

"The tariffs will lead to the US once again becoming an island of **high steel prices**, resulting in our customers simply importing the finished part," Roy Hardy, president of the Precision Metalforming Association, and Dave Tilstone, president of the National Tooling and Machining Association, said in a joint statement, adding that "thousands of jobs" will be threatened. (Emphasis added).

64. Indeed, shares of U.S. steel companies rose on news of the tariffs. A March 1, 2018 *Reuters* article entitled "U.S. Steel, Aluminum Stocks Up On Trump's Tariffs, But Other Industries Fear Price Rises" reported:

Last week, Caterpillar's director of investor relations, Amy Campbell, said the majority of the steel that CAT uses for manufacturing comes from the United States. ***Yet, she expects the tariffs to pose a challenge as they would cause domestic steel prices to rise along with prices of imported steel, because the tariffs would give U.S. makers pricing power***, putting Caterpillar at a competitive disadvantage vis-à-vis their non-U.S. competitors.

The industrial metal companies, the domestically focused ones, are probably going to benefit from this, said Art Hogan, chief market strategist at B. Riley FBR in Boston, who saw the broad impact as negative, with a possible impact on the ongoing renegotiations of the North American Free Trade Agreement. (Emphasis added).

65. A March 6, 2018 *metalbulletin.com* article entitled "U.S. Section 232 Tariffs Could Send HRC Prices to $1,000/t, hurt buyers" by Michael Cowden also reported that U.S. domestic steel prices would increase:

Tariffs would increase the price of foreign hot-rolled coil by $150 per ton ($7.50 per hundredweight) - ***enabling US mills to raise prices by the same amount or more when they open May order books***,…. (Emphasis added).

66. A March 6, 2018 article in the *Australian Advertiser* entitled "Producers Steeled For Trump's Tariffs" by Edward Boyd agreed:

In the short term, you are going to see steel prices go up because US producers will not be able to meet the greater demand for steel, Mr [CommSec chief economist Craig James] James said.

In contrast, iron ore prices fell 2.4 per cent yesterday to $US77.65 a tonne on concerns the US tariffs could weigh on global steel demand. While the tariffs are expected to be formalised this week or next week at the latest, we don't expect the impact to be that disruptive to steel and iron ore markets," Commonwealth Bank

associate director of mining and energy commodities Vivek Dhar said in a research note. "We expect US steel prices to increase as a result of the tariffs, but the rest of the world should be able to absorb the excess steel, particularly in south East Asia."

67.     Thus, Defendants knew that the steel tariff would cause both foreign and domestic steel prices to rise because the tariffs gave U.S. steel companies pricing power to raise their prices to match the newly-raised foreign steel prices.  Defendants also knew that REVG would be harmed by the tariffs because the Company needed steel chassis to build its vehicles and increased steel prices would increase REVG's steel costs, cause delays in REVG's procuring chassis, and negatively affect earnings.

68.     News outlets also reported that the tariffs would cause an increase in prices for other commodities.  For example, an article on March 3, 2018 (four days before REVG's 1Q18 conference call) in the *San Diego Union-Tribune* entitled "Tariffs Spark Reprisal Threat – U.S. Trading Partners Vow To Retaliate Against Trump Plan With Levies on American-made Products" quoted Robert Shanks, Ford Motor's Chief Financial Officer, as stating that "commodities markets had already started to price in increases for steel and aluminum on the expectation that Trump would impose the tariffs."

69.     A March 1, 2018 article by Nikhil Kurian Nainan in *Reuters Australia* entitled "Aussie Shares Weaken On Trump's tariff Plans; NZ Down", stated that "President Donald Trump's plans to impose tariffs on steel and aluminum imports hit commodity prices and sparked fears of a trade war."

70.     Similarly, a March 2, 2018 *Reuters* article by David Shepardson entitled "More Automakers Warn Trump Metal Tariffs Would Boost Car Prices" stated that "[m]ore automakers on Friday warned that U.S. President Donald Trump's announced steel and aluminum tariffs would boost car prices by hiking commodities costs for manufacturers."

71.     A March 2, 2018 *Plus Company Updates* entitled "Auto & Transport Roundup", likewise, quoted UBS analysts as stating that "tariffs would 'add more commodity risk,' for auto makers and suppliers."

72.     Defendant Sullivan later admitted on a June 7, 2018 conference call that "[a]s soon as tariffs were suggested [at least by March 1, 2018], there was a run on many of the commercial chassis we purchase and convert. We are paying extra freight charges to get the chassis we need for the second half shipments. Over the 60 day – the last 60 days alone, this has resulted in approximately a $1 million additional cost. We now need to get certain chassis shipped via truck due to railcar shortages based on what we believe to be abnormal and artificial demand."

## E.     THE MARKET LEARNS THAT REVG'S FY2018 NET INCOME AND ADJUSTED EBITDA FORECASTS WERE FALSE AND MISLEADING

73.     On March 7, 2018, REVG announced 1Q18 financial results.  Although REVG hit its expected revenue figures (*see* March 7, 2018 Credit Suisse report, stating that "[t]he top line was in line with expectations at $515M vs the street at $513M"), REVG surprised the market by revealing that, for the first time since its IPO five quarters prior, its margins and growth rates had contracted.  REVG stated that the margin contraction was a result of poor product mix in its Commercial and F&E segments, and poor timing of shipments.  By this disclosure, REVG began to reveal that its prior growth assertions were coming undone.

74.     Though REVG increased its net income guidance and assured the market that it would not be affected by the steel tariffs or chassis shortages in 2Q18, analysts penalized the stock price because REVG's year over year earnings growth did not appear to be materializing.  As a result, the stock price of REVG dropped 12% on March 8, 2018 to $23.85 per share.

75.     Finally, on June 6, 2018, REVG admitted that it could not meet its FY2018 Net Income and Adjusted EBITDA guidance.

76.     REVG reduced guidance and advised investors that among the main reasons for the revision were expected shortfalls in earnings at the Commercial and Recreation segments.

77.     On this news, the price of REVG stock fell $3.39 per share or nearly 20% to close at $14.52 per share.

78.     On December 19, 2018, REVG issued its FY2018 results, including Net Income of only $73 million – well below its initial October 2017 guidance of $85 million to $100 million; and Adjusted EBITDA of $148 million – over 30% below REVG's Class Period 2018 Adjusted EBITDA projection of $200 to $220 million.

79.     After reporting Net Income of $34 million, $53 million and $76 million for fiscal years 2015, 2016, and 2017, respectively, as well as Adjusted EBITDA of $90 million, $123 million, and $163 million for the same periods, REVG's Net Income and Adjusted EBITDA for FY 2018 were only $73 million and $148 million, respectively.  Thus, FY2018 was REVG's first year without growth in four years.

## F.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

80.     On October 10, 2017, REVG issued a press release providing a full-year outlook for its FY2018.  In the press release, REVG stated that FY2018 net income would be in the range of $85 million to $100 million and FY2018 Adjusted EBITDA would be in the range of $200 million to $220 million.

81.     The October 10, 2017 release also stated that:  "REV Group is forecasting growth in all three of its reportable segments [Commercial, Recreation, and F&E] in fiscal 2018, and it remains comfortable with achieving the midpoint of its previously announced net income and Adjusted EBITDA guidance ranges for full-year fiscal 2017…."

82. The statements in ¶¶ 80-81 were materially false and misleading when made because (i) REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered November 2017 through January 2018, a period starting just one month after these statements), and would continue to do so in 2Q18 (*see* ¶¶ 45-61) – all of which materially undermined the FY18 earnings guidance; (ii) just five months after these statements (on March 7, 2018, and also on June 6, 2018), REVG admitted that poor sales mixes and lower profit margins had caused a growth contraction – something Defendants knew when they made these statements because of REVG's "high quality" backlog, which gave the Company two to twelve months of visibility into revenues (*see* ¶¶ 73, 75-76, 49, 51); and (iii) since the Company met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance had no reasonable basis (*see* ¶¶ 73, 58).

83. On December 19, 2017, the Company issued a press release that reported FY 2017 Fourth Quarter and Full Year Results. The release stated:

> We are reaffirming our REV Group full-year fiscal 2018 outlook that was released in early October. We expect full-year 2018 revenues of $2.4 to $2.7 billion and Adjusted EBITDA of $200 to $220 million. We are also reaffirming our expectation for full year 2018 net income to be in the range of $85 to $100 million, said Sullivan. "This outlook does not include any impact from potential changes in U.S. tax policy and rates, which we believe will be beneficial.

84. The December 19, 2017 release quotes Sullivan as stating:

> I am proud to report 18 percent sales growth and 32 percent growth in Adjusted EBITDA in 2017, but even more importantly, I am pleased to report that all three of our segments [Commercial, Recreation, and F&E] continue to have strong outlooks. We plan to continue this trajectory of earnings growth in excess of sales growth into next year. In summary, it was a strong quarter and year, we are well positioned for continued growth in fiscal 2018 and we will continue to make progress towards our enterprise-wide EBITDA margin goal of 10 percent.

85. On December 20, 2017, REVG held its 4Q17 conference call. In the call, Defendant Sullivan reiterated the FY2018 earnings guidance:

First and foremost, we are reiterating, today, guidance that we presented in October during our follow-on, which is net sales of $2.4 billion to $2.7 billion and adjusted EBITDA of $200 million to $220 million for full year fiscal 2018. This is now 3 years in a row of revenue growth exceeding 15% and adjusted EBITDA growth exceeding 30%.

86.     The statements in ¶¶ 83-85 were materially false and misleading when made because (i) REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered November 2017 through January 2018, a period starting one month before these statements), and would continue to do so in 2Q18 (*see* ¶¶ 45-61) – all of which materially undermined the FY18 earnings guidance; (ii) just three months after these statements (on March 7, 2018, and also on June 6, 2018), REVG admitted that poor sales mixes and lower profit margins had caused a growth contraction – something Defendants knew when they made these statements because of REVG's "high quality" backlog, which gave the Company two to twelve months of visibility into revenues (*see* ¶¶ 73, 75-76, 49, 51); and (iii) since the Company met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance had no reasonable basis (*see* ¶¶ 73, 58).

87.     On the December 20, 2017 conference call, the first question from an analyst was about the Company's guidance, growth and margins:

Mircea Dobre - Robert W. Baird & Co. Incorporated, Research Division - Senior Research Analyst:

My first question is really surrounding guidance. I – I'm wondering if maybe you can help us refine our assumptions a little bit at segment level. I'm curious as to how you're thinking of segment level growth versus your 12.5% overall growth guidance. And also some color by segment on margin progression.

Defendant Sullivan responded:

I think we're going to have more the same, obviously, in 2018. We had a very strong Fire & Emergency performance in '17. That's going to continue. As a matter of fact, our Fire backlog is significantly higher at this time than it was last year even at this time. ***I think all other segments [Commercial and RV], quite frankly, are***

***up, and they're going to be up, obviously, reflecting the type of guidance we gave.***
(Emphasis added).

88.     The statement in ¶ 87 was materially false and misleading when made because (i)
REVG's backlog showed that the Company's growth would contract in 1Q18 (which covered
November 2017 through January 2018, a period starting one month before these statements), and
would continue to do so in 2Q18 (*see ¶¶* 45-61) – all of which materially undermined the FY18
earnings guidance; (ii) just three months after these statements (on March 7, 2018, and also on
June 6, 2018), REVG admitted that poor sales mixes and lower profit margins had caused a growth
contraction – something Defendants knew when they made these statements because of REVG's
"high quality" backlog, which gave the Company two to twelve months of visibility into revenues
(*see ¶¶* 73, 75-76, 49, 51); and (iii) since the Company met its 1Q18 revenue projections, it knew
what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings
guidance had no reasonable basis (*see ¶¶* 73, 58).

## G.     DEFENDANTS BEGIN TO REVEAL THAT REVG'S GROWTH STORY WAS ENDING BUT MISLEADINGLY INCREASED NET INCOME GUIDANCE

89.     On March 7, 2018, the Company disclosed that its growth narrative was coming
undone.  On that date, REVG announced its financial results for 1Q18, which ended on January
31, 2018.  These results offered the first year-over-year quarterly comparison with the quarter
ended January 28, 2017, the quarter during which REVG conducted its IPO.  REVG surprised the
market by revealing that rather than margin growth, the Company experienced – for the first time
since the REVG's IPO five quarters prior – margin contraction in its F&E (which had a particularly
long backlog in its Fire segment) and Commercial segments stemming from poor timing on
shipments and a sales mix with low numbers of high margin vehicles.  Commercial posted an
adjusted EBITDA margin of 3.4% of net sales in the first quarter of 2018, compared to 6.3% in

the first quarter of 2017 – representing a 290-basis-point year-over-year decline.  F&E posted an

adjusted EBITDA margin of 8.4% of net sales in the first quarter of 2018, compared to 9% in the

first quarter of 2017, representing approximately a 60-basis-point year-over-year decline.

90.     Analysts understood the significance of the margin contraction REVG revealed on

March 7, 2018 because the Company had made margins central in its growth narrative since the

Company's IPO.  Deutsche Bank wrote in a March 8, 2018 report entitled "In the Penalty Box For

2H Hockey Stick: Margins deteriorated Y/Y...doesn't bode well for a margin story":

> The clear problem here is that margins deteriorated 60bps Y/Y, which is a problem
> for a company that has been positioned as a margin expansion story. Although
> Recreation profitability showed impressive improvement (+270bps Y/Y), both
> F&E (8.4%, -60bps Y/Y) and Commercial (3.4%, -290bps Y/Y) margins declined
> Y/Y.

91.     Similarly, a March 8, 2018 Jefferies report entitled "F1Q18 Model Update:

Communication Breakdown" stated:

> [C]learly the market was not expecting the significant margin weakness (offset by
> below the line items) and shares traded down 12% on the report. While
> management execution has been good, ***communication has not, as investors were
> not prepared for the combination of seasonality and weak margins so soon after
> REVG's recent analyst day***.  As a newly public company with a heavily seasonal
> business model, management needs to do a better job of helping investors
> understand the details of margin and revenue cadence.  (Emphasis added).

92.     On March 8, 2018, REVG stock fell to a closing price of $23.85 per share from a

March 7, 2018 closing price of $27.15.  The losses would have been greater but for Defendants'

decision to continue to mislead investors.

93.     On March 7, 2018, REVG reaffirmed its FY2018 Adjusted EBITDA guidance and

increased REVG's FY2018 net income outlook to a range of $90 to $110 million (from a range of

$85 million to $100 million).

94.     The March 7, 2018 release also stated:

Fiscal year 2018 is off to a good start as we saw continued growth across most of our product categories *and we remain on track to meet our full year objectives, said Tim Sullivan, CEO REV Group, Inc.* We continue to remain highly focused on the execution of our commercial, product and operating strategies to improve profitability as we work towards our long-term goal of an enterprise-wide EBITDA margin in excess of 10 percent. Additionally, we continued to execute on our disciplined capital allocation strategy with the acquisition of Lance Camper this quarter, which enables our entry into the large and fast growing towables RV market. *With a strong backlog of $1.24 billion we expect to continue to see improving operating leverage in the business and thus expect earnings growth to exceed sales growth in fiscal year 2018.*

95.     The release further quoted Sullivan:

First quarter results were in-line with our expectations and our view of end market demand and macro conditions remains consistent with prior expectations. Therefore, we are reaffirming our prior guidance and are still expecting full fiscal year 2018 revenues of $2.4 to $2.7 billion and Adjusted EBITDA of $200 to $220 million. Based on first quarter results, we are updating our expectation of full fiscal year 2018 net income to be in the range of $90 to $110 million and Adjusted Net Income to be in the range of $110 to $125 million.

96.     The statements in ¶¶ 93-95 were materially false and misleading when made because (i) the Company's growth had contracted in 1Q18 and REVG's backlog showed it would continue to do so in 2Q18 (*see* ¶¶ 45-61); and (ii) since the Company had just met its 1Q18 revenue projections, it knew what vehicles were sold, knew the profit margins on those vehicles, and knew the FY2018 earnings guidance had no reasonable basis (*see* ¶¶ 73, 58).

97.     REVG held its 1Q18 conference call on March 7, 2018. On the call, Wells Fargo analyst Andrew Casey asked Defendant Sullivan whether issues with chassis would affect REVG's FY2018 guidance (which the Company had just increased as to net income) and Sullivan stated that for the second quarter 2018, everything was "fine":

Andrew Millard Casey - Wells Fargo Securities, LLC, Research Division - Senior Machinery Analyst:

Kind of a question back in line with Jamie's question. We're starting to see some lengthening in order-to-delivery lead times from some of your chassis providers. First, are you seeing that? And then, if so, does that further impact the timing of how you expect to achieve the updated '18 goals?

Defendant Sullivan responded:

It's a current situation that we hope does not get worse. But for instance, Mercedes Sprinter chassis have not been EPA approved yet. So there's a bit of delay in receiving those. We do work off a backlog of chassis. *So in the near term, by near term I mean, our second quarter, we're fine*. But as you can imagine, with our backend-loaded plan, we need a lot of chassis in here in Q3 and Q4. So we have time to react to it. But there's noise with GM also. There's a little bit noise with Ford. It's something that we manage on a regular basis. But we've got some time to react, and we plan to. But right now, we don't see that that's going to negatively impact our fiscal year. (Emphasis added).

98.     After Wells Fargo analyst Casey raised additional specific concerns over increased steel prices and their effects on chassis purchases, Defendant Sullivan dismissed his concerns, claiming that REVG had "warnings of any cost adjustments on chassis well in advance of what's happening":

Casey:

Okay, Tim. And then in the context of higher input costs that could affect some of the component purchases and even some of those chassis purchases, can you, kind of, remind us about how you price your products, and if you're expecting the – what appears to be a rising material cost environment to impact your ability to achieve the margin expectations not only this year but next year?

Defendant Sullivan responded:

Yes. This is a top question of everyone in the last few days. Steel and aluminum, which, obviously, are the topics of the day, are less than 5% of our direct spend. And the vast majority, I mean, a very high percentage of what we buy in both steel and aluminum, we get from U.S. suppliers. So our exposure to foreign suppliers of steel or aluminum is very low. And our actual percentage of our total material cost is very low as well. And the other plus that we do have is, we've got aluminum pricing locked in for the remainder of this year. And we've been doing that the last couple of years in aluminum, just because we wanted to make sure that we didn't succumb to some volatility there. The bigger issues is the one that you really addressed, and that's the chassis. We will be extremely diligent on chassis' costs as we move through fiscal 2018. That's where we're going to see the issues. The good news is, I think, is, we can stay ahead of those, we purchase far enough in advance. And if you understand how chassis work, it's kind of a – it's a pool effect that we buy into. *So we have warnings of any cost adjustments on chassis well in advance of what's happening*. (Emphasis added).

99.     The statements in ¶¶ 97-98 were materially false and misleading when made because Defendant Sullivan knew that steel tariffs had been apparent at the latest by March 1, 2018 and that such tariffs would cause increased costs and chassis unavailability for the second quarter of 2018, which would cause REVG to miss analyst 2Q18 estimates and the Company's own FY2018 guidance. *See* ¶¶ 62-72. Indeed, Sullivan admitted on June 7, 2018 that **"[a]s soon as** tariffs were suggested [at the latest by March 1, 2018], there was a run on many of the commercial chassis we purchase and convert…" *See* ¶ 106 (emphasis added).

## H.     REVG REVEALS THAT ITS FY2018 EARNINGS GUIDANCE WAS MATERIALLY FALSE AND MISLEADING

100.    On June 6, 2018, after market close, REVG announced its 2Q18 financial results and revised its FY2018 earnings guidance. The Company reported adjusted net income of only $15.6 million for 2Q18, or $0.24 per diluted share, a decline of 17.9% from the second quarter of 2017. Similarly, REVG reported adjusted EBITDA of only $34.1 million for the quarter, a decrease of 9.2% compared to the prior year quarter and about 25% below analysts' estimates of approximately $45 million.

101.    REVG also significantly reduced its FY2018 earnings guidance. The Company cut Adjusted EBITDA about 15% to $175 to $185 million (from $200 to $220 million) and cut net income about 20% to $72 to $87 million (from $85 to $100 million**).**

102.    The June 6, 2018 press release announcing the 2Q18 results stated that the causes of the substantial earnings miss and steep guidance reduction were "near term commodity price inflation, supply chain constraints, and shortfalls in our Commercial Segment." The release also elaborated on the causes, discussing cost increases stemming from the steel tariffs, related chassis unavailability, and an unfavorable sales mix caused by lower sales of high margin vehicles:

> Our fiscal second quarter results were below our expectations and were impacted by a number of factors…. In particular, cost inflation across many of the

00517650;V1                          24

commodities and services we buy was significant in the quarter and due to the length of our backlogs we were not able to mitigate these increases. We estimate the cost inflation will have an approximate $19 million impact on our current fiscal year. Additionally, production and sales at several of our business units were adversely impacted by the availability of chassis. Finally, margins were impacted by lower-than-expected sales of certain higher-content product categories including custom fire apparatus, large commercial buses, and Class A RVs.

103.     During a June 7, 2018 conference call (the day after the earnings release), Defendant Nolden made it clear that a concentration of revenue from lower-margin vehicles – of which Defendants were well aware through REVG's backlog, which was updated monthly through the Company's OneStream program – was part of the reason for the slashed guidance:

These circumstances have contributed to this volatility in mix such as the sales profile for our ambulance division in the second quarter was skewed towards lower-margin vehicles. In addition, the mix of fire apparatus sales in the quarter were skewed toward lower content fire apparatus in the form of more retail custom trucks versus larger custom pumpers and aerials.

104.     On June 7, 2018, REVG shares fell $3.39 per share or nearly 20% to close at $14.52 per share.

105.     Because of REVG's backlog, long lead times for vehicle production, and the OneStream program that gave REVG management visibility into future revenues and earnings, Defendants knew their earlier statements were misleading when made and/or lacked a reasonable basis.

106.     Defendant Sullivan also admitted on the June 7, 2018 call that immediately after the tariffs were announced – which was March 1, 2018 – there was a run on chassis:

The tariffs have also created unintended – unpredicted consequences. ***As soon as tariffs were suggested***, there was a run on many of the commercial chassis we purchase and convert. We are paying extra freight charges to get the chassis we need for the second half shipments. Over the 60 day – the last 60 days alone, this has resulted in approximately a $1 million additional cost. We now need to get certain chassis shipped via truck due to railcar shortages based on what we believe to be abnormal and artificial demand. (Emphasis added).

107.    As alleged above, it was well-understood that higher U.S. – not just foreign – steel and commodity prices were imminent.  *See* ¶¶ 62-72.

108.    Thus, Defendants knew at the latest by March 1, 2018 that the tariff increase would materially undermine REVG's FY 2018 guidance.

109.    Following the June 6, 2018 disclosures, numerous analysts cut price targets and downgraded the stock.  A June 6, 2018 SunTrust Robinson report took REVG to task for misleading the market about chassis and steel issues in the 2Q18 conference call:

> The cost inflation and chassis availability are somewhat surprising given management's commentary on the 1Q18 earnings call in March where it was noted that steel and aluminum are less than 5% of direct spend with "vast majority" purchased from US suppliers. Additionally, aluminum price was said to be locked in for the remainder of the year. With regards to chassis, while cited as a potential issue, the commentary implied it was manageable and that cost adjustments were telegraphed "well in advance".

110.    Morgan Stanley agreed, writing in a June 6, 2018 analyst report that "this [second quarter] commentary is particularly disappointing following management's commentary on the 1Q call that aluminum prices were locked in for the year and chassis cost inflation would be signaled well in advance."

111.    BMO Capital Markets published a report on June 6, 2018 calling the quarter a "Multiple-Alarm Fire".  That report stated:

> Bottom Line: REV Group reported diluted FY2Q18 EPS of $0.24 (adj.) versus $0.35 consensus. Adjusted EBITDA of $34 million (margin, 5.6%) was also well below the Street at $44 million (margin, 7.1%), as was total revenue at $609 million (+11.7% y/y) versus $628 million consensus. Meanwhile, management lowered its full-year guidance metrics across the board: sales, $2.4–2.6 bn from $2.4–2.7 bn; adjusted EBITDA, $175–185mn from $200–220 mn; and adjusted net income, $94.1–105.1 mn from $110–125 mnk.

## I.    ADDITIONAL SCIENTER/FALSITY ALLEGATIONS

112.    As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements they issued and disseminated to the investing public in the name of the

00517650;V1                                        26

Company or in their own name during the Class Period were materially false and misleading, and/or had no reasonable basis.

113. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

114. As alleged above, REVG tracked the Company's backlog through its monthly updated OneStream program. OneStream gave Defendants the ability to see what vehicles were in REVG's backlog and how far along they were in the production schedule. Because the data contained in OneStream was reported from each individual REVG manufacturing facility – which generally only manufactured one kind of vehicle with set margins – Defendants knew the profit margins on the vehicles in backlog.

115. Defendants, by virtue of their receipt of information reflecting the true facts regarding backlog, chassis availability, margins, efficiency, and growth, their control over, and/or receipt and/or modification of REVG's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

116. Defendants knew the falsity and misleading nature of the information that they caused to be disseminated to the investing public and/or knew it had no reasonable basis. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of the personnel at the highest levels of the Company, including the Individual Defendants.

117. The Individual Defendants, because of their positions with REVG, made and/or controlled the contents of the Company's public statements during the Class Period. Each Individual Defendant was provided with or had access to the information alleged herein to be false

and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading and lacked a reasonable basis. As a result, each of these defendants is responsible for the accuracy of REVG's corporate statements and is therefore responsible and liable for the representations contained therein.

## J. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

118. At all relevant times, the market for REVG securities was efficient for the following reasons, among others: (1) the securities were listed and actively traded on the NYSE, a highly efficient market; (2) as an issuer of securities, REVG filed periodic public reports on Form 10-K and Form 10-Q with the SEC; (3) REVG regularly issued press releases that were carried by the national news wires, were publicly available and entered the public marketplace.

119. As a result, the market for the securities promptly digested current information regarding REVG from all publicly available sources and reflected such information in REVG's stock price.

120. Under these circumstances, all purchasers of the REVG securities during the Class Period suffered similar injury through their purchases at artificially inflated prices and a presumption of reliance applies.

## K. LOSS CAUSATION / ECONOMIC LOSS

121. During the Class Period, as detailed herein, REVG securities were artificially inflated due to Defendants' misleading public statements. When Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of REVG securities fell as the prior artificial inflation came out.

122.     As a result of their purchases of REVG securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

123.     The declines in the price of REVG securities after the corrective disclosures on March 7, 2018 and June 6, 2018 were a direct result of Defendants' misrepresentations being revealed to investors and the market.

124.     The declines in the price of REVG securities were also the result of the materialization of the concealed investment risks concerning REVG.

125.     Defendants' materially false and misleading statements relate to the Company's FY2018 earnings estimates, chassis availability, and growth.

126.     The corrective disclosure on March 7, 2018 revealed that REVG's margins – for the first time since the Company's IPO – had contracted as a result of poor shipment timing and an unfavorable sales mix.

127.     After the adverse March 7, 2018 announcement, REVG stock fell on March 8, 2018 to a closing price of $23.85 per share from a March 7, 2018 closing price of $27.15.

128.     After the March 7, 2018 partial disclosure, REVG stock remained artificially inflated because Defendants did not reveal that REVG's FY2018 guidance had no reasonable basis, nor that they were concealing problems relating to chassis unavailability, and increased costs.

129.     The corrective disclosure on June 6, 2018 revealed that (i) REVG's previously-issued FY2018 guidance had no reasonable basis; and (ii) contrary to Defendant Sullivan's claims, steel tariffs caused chassis availability problems and commodity, including steel, price hikes that materially undermined FY2018 guidance.

130.     After these disclosures, on June 7, 2018, REVG shares fell $3.39 per share or nearly 20% to close at $14.52 per share.

131.     These disclosures caused the rest of the concealed investment risk about REVG to materialize.

132.     The timing and magnitude of the price decline in REVG securities negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' statements. The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' misstatements and omissions and the subsequent significant decline in the value of REVG securities when Defendants' misrepresentations were revealed.

## CLASS ACTION ALLEGATIONS

133.     This is a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class of all persons who purchased REVG securities during the Class Period, and were damaged thereby. Excluded from the Class are (1) REVG, and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or are a parent; and (b) all Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

134.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, REVG securities traded on the NYSE under the ticker symbol "REVG." While the exact number of Class members is unknown to Plaintiff at this time and can only be obtained through appropriate discovery, Plaintiff believes that there are thousands of Class members located throughout the United States. Record owners and other members of the

Class may be identified from records maintained by REVG and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

135. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class include (1) whether Defendants violated the Exchange Act; (2) whether Defendants issued materially false or misleading statements; and (3) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

136. Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

137. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class and securities litigation. Plaintiff has no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members.

138. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

139. There will be no difficulty in management of this action as a class action.

## COUNT I

## VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST DEFENDANTS

140.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase REVG securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

142.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for REVG securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

143.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about REVG and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

144. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's periodic disclosures to investors; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team and internal financial information about REVG; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew was materially false and misleading or lacked a reasonable basis.

145. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein. Defendants' material misrepresentations and/or omissions were done knowingly and for the purpose and effect of concealing material problems with REVG's business and financial results from the investing public and supporting the artificially inflated price of its securities.

146. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of the securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to Defendants, but not disclosed in public statements by these defendants during the Class Period,

Plaintiff and the other members of the Class acquired the securities during the Class Period at artificially high prices and were damaged thereby.

147.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding REVG, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased the securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

148.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

149.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the securities during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

150.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

151.    The Individual Defendants acted as controlling persons of REVG within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making

of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

152. In addition, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the conduct giving rise to the securities violations as alleged herein, and exercised the same.

153. As set forth above, the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Exchange Act of 1934, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
       February 28, 2019

                              **ADEMI & O'REILLY, LLP**

                              /s/ John D. Blythin

                              John D. Blythin (jblythin@ademilaw.com)
                              3620 E. Layton Ave.
                              Cudahy, WI 53110
                              Tel: (414) 482-8000
                              Fax: (414) 482-8001

                              **Liaison Counsel for Lead Plaintiff and the**
                              **Proposed Class**

                              **BERNSTEIN LIEBHARD LLP**
                              Stanley D. Bernstein (bernstein@bernlieb.com)
                              Michael S. Bigin (bigin@bernlieb.com)
                              Stephanie M. Beige (beige@bernlieb.com)
                              Joseph R. Seidman, Jr. (seidman@bernlieb.com)
                              10 East 40th Street
                              New York, New York  10016
                              Tel:  (212) 779-1414
                              Fax:  (212) 779-3218

                              **Lead Counsel for Lead Plaintiff and the**
                              **Proposed Class**