**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| IN RE REV GROUP, INC. SECURITIES LITIGATION |
|---|

Lead Case No. 2:18-cv-1268-LA

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

BACKGROUND .............................................................................................................. 3

    A.    REV GROUP'S BUSINESS AND ITS JANUARY 2017 IPO .................................. 3

    B.    THE COMPANY'S PERFORMANCE FOLLOWING THE IPO AND ITS
        FORWARD-LOOKING GUIDANCE ............................................................... 5

    C.    THE OCTOBER 2017 SECONDARY OFFERING AND THE COMPANY'S
        FY2017 RESULTS ....................................................................................... 6

    D.    THE U.S. GOVERNMENT'S TARIFFS AND THE COMPANY'S Q1 FY2018
        EARNINGS RELEASE IN MARCH 2018 ........................................................ 7

    E.    THE COMPANY'S Q2 FY2018 EARNINGS ANNOUNCEMENT ......................... 8

    F.    THE LITIGATION ...................................................................................... 10

ARGUMENT ............................................................................................................... 12

I.    THE AMENDED COMPLAINT DOES NOT ALLEGE A FALSE OR
    MISLEADING STATEMENT ............................................................................ 12

    A.    The Company's FY2018 Earnings Guidance Is Not Actionable .......................... 12

    B.    Mr. Sullivan's Earnings Call Statements Are Likewise Inactionable ................. 16

II.    THE AMENDED COMPLAINT DOES NOT SUPPORT A COGENT,
    COMPELLING INFERENCE OF SCIENTER .................................................. 20

    A.    Plaintiff Does Not Allege a Powerful, Cogent Inference that Defendants
        Had Actual Knowledge Their Forward-Looking Statements Were False
        When Made ............................................................................................... 20

        1.    No Inference That Messrs. Sullivan or Nolden Knew the FY2018
            Earnings Guidance Was False When Issued ............................................. 21

            a.    The Allegations Attributed to CW1 Do Not Create a Strong
                Inference of Actual Knowledge .................................................... 21

            b.    CW1's Backlog Allegations Do Not Create a Strong
                Inference of Actual Knowledge .................................................... 27

        2.    No Inference That Mr. Sullivan Knew His Statements on the Q1
            FY2018 Earnings Call Were False When Made ...................................... 31

        3.    Mr. Sullivan's Purchase of Shares During the Class Period Negates
            Any Inference of Actual Knowledge ...................................................... 33

    B.    The Competing Innocent Inference Is Far More Compelling .............................. 34

III.    PLAINTIFF DOES NOT STATE A CONTROL PERSON LIABILITY CLAIM
    UNDER THE 1934 ACT ................................................................................... 36

CONCLUSION ............................................................................................................ 37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abuhamdan v. Blyth, Inc.*,
9 F. Supp. 3d 175 (D. Conn. 2014) ........................................................................32

*Acito v. IMCERA Grp.*,
47 F.3d 47 (2d Cir. 1995) ......................................................................................31

*In re Allscripts, Inc. Sec. Litig.*,
No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ............................15, 16

*Bldg. Trades United Pension Trust Fund v. Kenexa Corp.*,
No. 09–2642, 2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) ...................................36

*Borsellino v. Goldman Sachs Grp., Inc.*,
477 F.3d 502 (7th Cir. 2007) .................................................................................12

*In re Brightpoint, Inc. Sec. Litig.*,
No. IP99-0870-C-H/G, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001)......................32

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009)...............................................................24, 32

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
388 F. Supp. 2d 932 (S.D. Ind. 2005) ...............................................................24, 25

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)...................................................................................4

*City of Livonia Emps. Ret. Sys. and Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ......................................................................21, 22, 34

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) .................................................................................28

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) .................................................................................36

*Edgenet, Inc. v. GS1 AISBL*,
742 F. Supp. 2d 997 (E.D. Wis. 2010).....................................................................37

*In re EveryWare Global, Inc. Securities Litigation*,
175 F. Supp. 3d 837 (S.D. Ohio 2016) ..............................................................26, 27

*Fannon v. Guidant Corp.*,
    583 F.3d 995 (7th Cir. 2009) ...................................................................................37

*In re Harley-Davidson, Inc. Sec. Litig.*,
    660 F. Supp. 2d 969 (E.D. Wis. 2009)........................................................... *passim*

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) .........................................................................18, 20

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ......................................................................3, 22, 34

*Higginbotham v. Baxter Int'l, Inc.*,
    No. 04 C 4909, 04 C 7096, 2005 WL 1272271 (N.D. Ill. May 25, 2005).............29

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
    No. 08-C-797, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) ..................19, 29, 31

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) .............................................................................29

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)..............................................................23, 26

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ...............................................................................22

*In re Newell Rubbermaid Inc. Sec. Litig.*,
    No. 99 C 6853, 2000 WL 1705279 (N.D. Ill. Nov. 14, 2000)...............................16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015).................................................................................. *passim*

*Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
    No. 16 C 5198, 2017 WL 6039926 (N.D. Ill. Dec. 6, 2017) ...........................25, 26

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
    266 F. Supp. 3d 1154 (E.D. Wis. 2017)..........................................................36, 37

*Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*,
    572 Fed. Appx. 713 (11th Cir. 2014)....................................................................32

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    673 F. Supp. 2d 718 (S.D. Ind. 2009) ..................................................................22

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) .........................................................................12, 36

*Ret. Sys. v. Anixter Int'l, Inc.*,
No. 09-CV-5641, 2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)..............................................12

*Ret. Sys. v. PrivateBankcorp, Inc.*,
No. 10 C 6826, 2011 WL 5374095 (N.D. Ill. Nov. 3, 2011)....................................................29

*Rossy v. Merge Healthcare Inc.*,
169 F. Supp. 3d 774 (N.D. Ill. 2015) ...................................................................................23

*S.E.C. v. Thielbar*,
No. CIV 06–4253, 2007 WL 2903948 (D.S.D. Sept. 28, 2007)................................................3

*Schultz v. Tomotherapy Inc.*,
No. 08-cv-314-slc, 2009 WL 2032372 (W.D. Wis. July 9, 2009).........................................29

*Searls v. Glasser*,
64 F.3d 1061 (7th Cir. 1995) ...............................................................................................16

*Sharbaugh v. First Am. Title Ins. Co.*,
No. 07 C 2628, 2007 WL 3307019 (N.D. Ill. Nov. 2, 2007)....................................................4

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010)................................................................................................13

*Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*,
No. 17 CV 1713, 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018)................................14, 17, 18

*In re Supreme Indus., Inc. Sec. Litig.*,
No. 3:17CV143PPS-MGG, 2018 WL 2364931 (N.D. Ind. May 23, 2018) ...............13, 21, 28

*In re Supreme Indus., Inc. Sec. Litig.*,
No. 3:17-cv-143-PPS/MGG, 2019 WL 1436022 (N.D. Ind. Mar. 29, 2019) .........................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ...................................................................................................... *passim*

*In re Trex Co., Inc. Sec. Litig.*,
454 F. Supp. 2d 560 (W.D. Va. 2006) ...................................................................................24

*Vallabhaneni v. Endocyte, Inc.*,
No. 1:14-CV-01048-TWP-MJD, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016)..........22, 23, 24, 28

*W. Pa. Elec. Emps. Pension Trust v. Plexus Corp.*,
No. 07C0582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009)....................................................23

*Weiss v. Amkor Tech., Inc.*,
527 F. Supp. 2d 938 (D. Ariz. 2007) ....................................................................................24

*Wielgos v. Commonwealth Edison Co.*,
   892 F.2d 509 (7th Cir. 1989) ................................................................17

*Yellen v. Hake*,
   437 F. Supp. 2d 941 (S.D. Iowa 2006) ....................................13, 19, 27

**Statutes**

15 U.S.C. § 78u-4(b)(1) ................................................................................12

15 U.S.C. § 78u-4(b)(2)(A) ...........................................................................2

15 U.S.C. § 78u-5(c) ..............................................................2, 13, 14, 20

Private Securities Litigation Reform Act of 1995 ............................... *passim*

**Other Authorities**

H.R. CONF. REP. 104–369 (1995) ...........................................................17, 20

Fed. R. Civ. P. 9(b) ......................................................................................12

REV Group, Inc. ("REV Group" or the "Company") is a Wisconsin-headquartered specialty vehicle manufacturer that had its initial public offering ("IPO") in January 2017 and a secondary offering of stock ("SPO") in October 2017. REV Group performed strongly in its first year and a half as a public company, growing both its revenues and earnings. However, on June 6, 2018, in the wake of newly announced tariffs, rising commodity prices, and a shortage of chassis (the Company's primary input into manufacturing specialty vehicles) and other components, the Company reported that its earnings for its second quarter of fiscal year 2018 had not grown as compared to the prior year. REV Group also lowered the forward-looking guidance that it had publicly issued eight months earlier for its projected future revenues and earnings for the full 2018 fiscal year.

The Second Consolidated Amended Complaint (the "Amended Complaint") attempts to convert these events—and the subsequent drop in REV Group's stock price—into a securities law claim alleging fraud. The Amended Complaint is premised entirely on forward-looking statements. Plaintiff claims that REV Group's earnings guidance never was achievable and that the Defendants knowingly lied about their full-year projections from the very outset. The Amended Complaint also suggests that the Company supposedly misled investors by failing to foresee—at the instant the tariffs were first announced—that REV Group would not attain its FY2018 earnings guidance. In doing so, Plaintiff asks this Court to treat opinions and forecasts as gospel, relies exclusively on hindsight and on vague allegations attributed to a single, unidentified "confidential witness" ("CW"), and utterly ignores the numerous warnings and risk factors that REV Group publicly issued to provide a comprehensive picture to investors when making its forward-looking statements.

The federal securities laws require far more than the mere fact of a missed projection to

state a claim for securities fraud. The Amended Complaint should be dismissed for two fundamental reasons. First, the challenged statements are not actionable. REV Group's statements to the public about its projected future performance, the possible impact of tariffs, and the supply market for chassis and other materials were expressly identified as forward-looking statements—*not guarantees*—and therefore cannot form the basis for a securities fraud action. In multiple SEC filings which were part of the IPO, the SPO, and beyond, REV Group repeatedly and explicitly warned investors that its future performance and its ability to achieve its forecasts could be adversely affected by volatility in commodity prices and chassis and component unavailability, among other factors. Given these meaningful cautionary warnings, the Company's statements are inactionable under the safe harbor afforded by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") for exactly such forward-looking statements. Moreover, Defendants' statements, expressed as beliefs (for example, about the possible impact the tariffs might have), are inactionable opinions, which, as the U.S. Supreme Court has made clear, "[r]easonable investors do not understand . . . as guarantees." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015).

Second, the Amended Complaint also fails because it does not raise a "strong inference" of scienter, which the Supreme Court has held not only must be plausible, but must be "cogent and compelling," and at least as compelling as any non-fraudulent inference. 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Importantly, where, as here, a claim is based on forward-looking statements, the PSLRA requires a strong inference that the speaker had *actual knowledge* that the statements were false when made. *See* 15 U.S.C. § 78u-5(c)(1). The Amended Complaint comes nowhere close to meeting this high pleading burden. Plaintiff's limited "confidential witness" allegations should be steeply

discounted for multiple reasons, not the least of which is that the lone CW on whom the Amended Complaint exclusively depends is a former lower-level employee who worked at a single plant for six months and is not alleged to have had any role or responsibility relating to the Company's external financial projections. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007). The Amended Complaint therefore retreats to allegations that the mere existence of an internal tracking system for vehicle orders somehow demonstrates that Defendants must have known earlier that REV Group would not meet its projections, but this theory (that sheer access to information somehow supports an inference of scienter) has been consistently rejected by numerous courts. In the end, the non-fraudulent inference—that REV Group adjusted its forward-looking guidance downward in June 2018 only after facing various industry-wide headwinds and economic changes resulting from the newly announced tariffs—is far more compelling than fraud. Under the Supreme Court's decision in *Tellabs*, 551 U.S. at 324, the Amended Complaint must therefore be dismissed. And because Plaintiff has failed to state a claim despite multiple pleading attempts, dismissal should be with prejudice.

## **BACKGROUND**

### A.     **REV GROUP'S BUSINESS AND ITS JANUARY 2017 IPO**

REV Group is a Milwaukee-headquartered manufacturer of fire and emergency, commercial, and recreational vehicles. (Amended Complaint, Dkt. 100 ¶¶ 4, 28, 32 (cited as "¶ _").) The Company has over thirty facilities in the United States and employs roughly 7,800 skilled workers. (IPO Registration Statement, Declaration of Susan E. Lovern ("Lovern Decl.") Ex. A, at 101; 12/21/17 Form 10-K, Lovern Decl. Ex. B, at 21, 38.)[1]

---

[1] The Company's SEC filings, including those referenced in the Amended Complaint—the authenticity of which are not in dispute—are properly before this Court as documents central to Plaintiff's claims. The Court may take judicial notice of the Company's financial statements filed with the SEC, "as they are public records and may be considered on a motion to dismiss." *S.E.C. v. Thielbar*, No. CIV 06–4253, 2007 WL 2903948, at *8 n.2 (D.S.D. Sept. 28, 2007) (judicially noticing reported revenue); *see City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 163 n.3 (3d Cir.

On January 27, 2017, the Company completed its IPO. (Dkt. 43 ¶¶ 3, 55.) As part of the IPO, the Company filed a registration statement and prospectus with the SEC (the "IPO Offering Documents"). The IPO Offering Documents warned of several risks that could adversely impact the Company's future performance and prospects after the IPO. The Company cautioned that its products contain large amounts of steel, aluminum, and other commodities, such that "[i]ncreases in the price of commodities . . . could impact our ability to sustain and grow earnings." (Lovern Decl. Ex. A at 30, 71.) The Company highlighted that "in past years, steel and aluminum prices have experienced volatility which has been unforeseen and unexpected." (*Id*. at 30.) REV Group added that it is "exposed to market risk based on fluctuations in commodity market prices for key raw material inputs," which "could cause fluctuations in the results of our operations and cash flows." (*Id*. at 70.)

REV Group also addressed its dependence on the availability of chassis, the Company's primary input for the manufacture of the majority of its specialty vehicles, and other critical components. It stated that its "manufacturing processes depend on the supply of manufactured vehicle chassis and other critical components . . . from major auto manufacturers" and that "capacity limitations, shortages of raw materials, or other problems could result in shortages or delays in the supply of vehicle chassis or components to us." (*Id*. at 26–27, 96.) The Company warned that a "disruption, termination or alteration of the supply of vehicle chassis or other critical components from third-party suppliers could materially adversely affect the sales of our products." (*Id*. at 26.) And it specifically disclosed that, while it believed the components necessary for its products were generally sufficiently available, that was not the case for chassis, and the Company could experience a business disruption if it encountered an interruption from one of its key chassis

2014) (judicially noticing SEC filings); *Sharbaugh v. First Am. Title Ins. Co.*, No. 07 C 2628, 2007 WL 3307019, at *2 (N.D. Ill. Nov. 2, 2007) (judicially noticing facts stated in Form 10-K on motion to dismiss).

suppliers.  (*Id.* at 97.)

## B.    THE COMPANY'S PERFORMANCE FOLLOWING THE IPO AND ITS FORWARD-LOOKING GUIDANCE

Following the IPO in January 2017, REV Group's revenues and profitability grew steadily. In *each quarter* of its 2017 fiscal year ("FY2017"), its Net Sales and Adjusted EBITDA both increased on a year-over-year basis.[2]  (Lovern Decl. Ex. B at 53.)  Adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization, adjusted for certain one-time or non-recurring costs) is a measure of the Company's profitability.

Periodically REV Group has provided forward-looking guidance, or estimates of its future financial performance, to investors for its full fiscal year, including for Net Sales and Adjusted EBITDA.  REV Group first issued such guidance for its FY2017 results on March 17, 2017, three months after its IPO.  Its final FY2017 guidance, after an increase on June 6, 2017, projected Net Sales of $2.3–2.4 billion and Adjusted EBITDA of $157–162 million.  (9/7/17 Form 8-K, Ex. 99.1, Lovern Decl. Ex. C, at 1; 6/6/17 Form 8-K, Ex. 99.1, Lovern Decl. Ex. D, at 1.)

On October 10, 2017, the Company first provided forward-looking guidance for its next fiscal year, FY2018, of Net Sales of $2.4–2.7 billion and Adjusted EBITDA of $200–220 million. (10/10/17 Form 8-K, Ex. 99.1, Lovern Decl. Ex. E, at 1.)  Its press release cautioned investors that these forward-looking projections were not guarantees and were subject to numerous risks and uncertainties that could cause REV Group not to meet its forecasts.  (*Id.* at 2.)  These disclosed risks included those which REV Group had detailed in the IPO Offering Documents—including specifically that interruptions in the supply of chassis and components, as well as price volatility for commodities like steel and aluminum, could dampen its projected results.  (*See id.*; Lovern

---

[2] REV Group's fiscal year does not follow the calendar year but instead ends on the last day of October.  Its fiscal quarters end on the last day of January (Q1), April (Q2), July (Q3), and October (Q4), respectively.

Decl. Ex. A at 26–27, 30, 70–71, 96–97.) REV Group also noted other specific risks, including that adverse economic developments could affect demand; that its demand estimates had not been verified by external sources; that its ability to meet customer delivery schedules depended on access to components and raw materials; that any cancellations, reductions, or delays in customer orders could harm its results; and that its backlog was comprised of vehicles to be sold at a fixed price, which could weaken the Company's profitability if the Company were to face rising input costs. (*See* Lovern Decl. Ex. E at 2; *id.* Ex. A at 25–27, 32–33, 44.) The Company also specifically cautioned investors that its backlog of vehicle orders was not a predictor of future results and that the Company's performance could fail to meet expectations if the orders in the backlog were not realized:

> [O]ur estimates of backlog for some of our contracts could be affected by variables beyond our control and may not be entirely realized, if at all. In addition, given the nature of our customers and our markets, there is a risk that some amount of our backlog may not be fully realized in the future. Failure to realize sales from our existing or future backlog would negatively impact our financial results.

(*Id.* Ex. A at 33.)

## C. THE OCTOBER 2017 SECONDARY OFFERING AND THE COMPANY'S FY2017 RESULTS

Given the Company's continued improving performance, it completed a secondary public offering of common stock at a price of $27.25 per share on October 27, 2017. REV Group filed a registration statement and prospectus with the SEC specific to the SPO (the "SPO Offering Documents"). These disclosures again described the Company's business and recounted its historical results, warning that they were "not necessarily indicative of the results to be expected for future periods." (SPO Registration Statement, Lovern Decl. Ex. F, at 19, 50.) In addition, the SPO Offering Documents continued to warn that the Company was dependent on the availability of chassis and certain other key components, such that a disruption in their availability could

materially and adversely affect its results. (*Id.* at 26–27, 101.) The Company likewise specifically reiterated that it was vulnerable to increases in commodity prices, including for steel and aluminum, and that several factors (including the availability of chassis) could negatively affect its future operating results and financial performance. (*Id.* at 26–27, 30, 33, 74, 101.) And the Company again specifically warned that its backlog was not an assurance of future results, and that those orders might not materialize into sales. (*Id.* at 33.)

REV Group reported the actual results for its entire FY2017 two months after the SPO, on December 19, 2017. Its actual Net Sales were $2.27 billion, a year-over-year increase of 17.7% and just shy of its most recent guidance of $2.3–2.4 billion; its actual Adjusted EBITDA was $162.5 million, a year-over-year increase of 32.3%, slightly exceeding its most recent guidance. (Lovern Decl. Ex. B at 47–8; *id.* Ex. C at 1.) In announcing its Q4 and full FY2017 results on December 19, 2017, and during the Company's earnings call on December 20, 2017, REV Group also reaffirmed the forward-looking guidance it had issued on October 10, 2017 for its projected FY2018 results. (12/19/17 Form 8-K, Ex. 99.1, Lovern Decl. Ex. G, at 1.) Yet again, REV Group warned investors that its guidance was subject to multiple risks that could prevent it from achieving its estimates, including specifically its dependence on chassis and component availability and potential volatility in commodity prices. (*Id.* at 4; Lovern Decl. Ex. A at 25–27, 30, 32–33, 70–71, 96–97; *id.* Ex. F at 26–27, 30, 33, 74, 101; Tr. of 12/20/17 Q4 FY2017 Earnings Call, Lovern Decl. Ex. H, at 1; ¶ 50.)

## D.     THE U.S. GOVERNMENT'S TARIFFS AND THE COMPANY'S Q1 FY2018 EARNINGS RELEASE IN MARCH 2018

On March 1, 2018, news outlets reported that the U.S. Government likely would impose tariffs on steel and aluminum imports. (¶ 62.) Six days later, REV Group reported positive Q1 FY2018 results. Its Net Sales for the quarter were $514.9 million, 16.2% greater than the prior

year's quarter, and its Adjusted EBITDA was $21.3 million, a growth of 0.9% year-over-year. (3/7/18 Form 8-K, Ex. 99.1, Lovern Decl. Ex. I, at 1.)  In announcing its results, the Company reaffirmed its FY2018 guidance, while again warning that its ability to achieve its projections for the fiscal year remained subject to a number of risks, including its dependence on chassis and component availability and potential volatility in commodity prices.  (*Id.* at 1, 4; Lovern Decl. Ex. A at 25–27, 30, 32–33, 70–71, 96–97; *id.* Ex. F at 26–27, 30, 33, 74, 101.)

The Company held its Q1 FY2018 earnings call on the morning of March 8, 2018.  (¶ 48; Lovern Decl. Ex. I at 3.)  Against the backdrop of threatened tariffs, an analyst asked REV Group CEO Timothy Sullivan whether REV Group was experiencing longer chassis-supply lead times, and whether rising material costs would impact its ability to achieve its projected profit margins. (Tr. of 3/8/18 Q1 FY2018 Earnings Call, Lovern Decl. Ex. J, at 4–5.)  In response, Mr. Sullivan specifically warned that, while the Company believed it had sufficient chassis for Q2 FY2018, it was already experiencing delays in receiving chassis from Mercedes and was starting to experience "noise" in deliveries from GM and Ford.  (*Id.* at 5; ¶ 97.)  Mr. Sullivan also cautioned that, while the Company's direct exposure to foreign steel and aluminum was very low, it was "going to see the issues" with chassis costs, though he expected that REV Group could work to "stay ahead." (Lovern Decl. Ex. J at 5; ¶ 98.)  Later that same day, President Trump instituted tariffs on imported steel and aluminum.[3]

**E.    THE COMPANY'S Q2 FY2018 EARNINGS ANNOUNCEMENT**

On June 6, 2018, eight months after it originally issued its FY2018 guidance, the Company announced its results for Q2 FY2018.  (6/6/18 Form 8-K, Ex. 99.1, Lovern Decl. Ex. L, at 1.)  Its Net Sales for Q2 FY2018 were $608.9 million, up 11.7% year-over-year.  (*Id.*)  Likewise, its

---

[3] David Jackson, *Trump announces steel and aluminum tariffs, but with 'flexible' exceptions*, USA Today, Mar. 8, 2018, Lovern Decl. Ex. K, at 2.

backlog of vehicle orders grew to $1.27 billion, 28.4% higher year-over-year. (*Compare id.* Ex. L at 1, *with id.* Ex. D at 12.)

But, for the first time in roughly eighteen months since the IPO, the Company's Adjusted EBITDA for Q2 FY2018 decreased year-over-year, by 9.2%. (Lovern Decl. Ex. L at 1.) REV Group attributed this fall-off in profitability to several challenges it had faced in the second quarter, including "near term commodity price inflation, supply chain constraints and shortfalls in [the] Commercial Segment." (*Id.*) Its press release stated:

> "Our fiscal second quarter results were below our expectations and were impacted by a number of factors," commented Tim Sullivan, CEO of REV Group. "In particular, cost inflation across many of the commodities and services we buy was significant in the quarter and due to the length of our backlogs we were not able to mitigate these increases. . . . Additionally, production and sales at several of our business units were adversely impacted by the availability of chassis."

(*Id.*; ¶ 102.) On the Company's June 7, 2018 earnings call for Q2 results, Mr. Sullivan explained that the newly announced tariffs had triggered opportunistic cost increases on raw materials and supplies well beyond the steel and aluminum actually subject to the tariffs, and had contributed to a shortage of chassis and other key components. Mr. Sullivan stated:

> **[T]he combination of the announced tariffs and the resulting turmoil has created pricing opportunity for our suppliers.** In the past two months alone, we have seen almost **$19 million in cost increases** on an annualized basis, which breaks down to $6 million in the first half of the year and $13 million in the back half of the year. Clearly, this is disturbing, particularly when **a large portion of the price increases are not related to steel and aluminum, which are the current targets of the tariffs. The tariffs have also created unpredicted consequences. As soon as tariffs were suggested, there was a run on many of the commercial chassis we purchase and convert. We are paying extra freight charges to get the chassis we need for the second half shipments.** Over the last 60 days alone, this has resulted in approximately $1 million additional cost. We now need to get certain chassis shipped via truck due to railcar shortages based on what we believe to be abnormal and artificial demand. . . .
>
> [Suppliers] **took advantage of a situation that had nothing to do with steel and aluminum price increases. But it also causes a run on things like chassis.** So as soon as these things were announced and everyone thought they were going to get steel and potentially aluminum increases as relate to chassis, **everyone started**

***buying up every chassis that was available in the United States, and it created a lot of noise in the channel.*** We're managing through it fairly well, and we thought that we were pretty much on top of it. And then the fire that affected every chassis manufacturer, with the exception of Mercedes-Benz in the United States, hit and it was kind of fuel to the fire. ***The minimum plant shutdown was Ford for two weeks, and GM has been shut – well, it was shut down for four weeks. So that, in addition to the turmoil of people grabbing chassis as quickly as they could, just exasperated the problem.*** And the whole situation with this kind of buying frenzy material has – ***the biggest issue, I think, we're managing through right now is the extension of lead times on almost everything. People have become hoarders.***[4]

(Tr. of 6/7/18 Q2 FY2018 Earnings Call, Lovern Decl. Ex. M, at 3, 8–9; ¶ 103.)

Faced with these new headwinds, REV Group adjusted its FY2018 guidance. It lowered its guidance for full-year Net Sales to $2.4–2.6 billion, compared to the $2.4–2.7 billion projected range of October 10, 2017. (Lovern Decl. Ex. L at 3; *id.* Ex. E at 1.) It also lowered its guidance for full-year Adjusted EBITDA to $175–185 million (down from $200–220 million). (Lovern Decl. Ex. L at 3; *id.* Ex. E at 1.) After the Q2 FY2018 announcement, REV Group's stock price dropped by $3.39 per share, closing at $14.52 per share on June 7, 2018. (¶ 104.)

## F.    THE LITIGATION

The first lawsuit against the Company was filed the next day. *See Marinoff v. REV Group, Inc., et al.*, Civ. No. 2:18-cv-1269 (E.D. Wis. June 8, 2018). Five related suits were ultimately commenced—three consolidated in this Court, and two consolidated in the Circuit Court for Waukesha County, Wisconsin, which are stayed.[5] Plaintiff filed its first consolidated amended complaint (the "First Complaint") on November 26, 2018. (Dkt. 43.) REV Group and the other Defendants moved to dismiss on January 11, 2019. (Dkt. 58.)

Rather than oppose Defendants' motions to dismiss, Plaintiff moved for leave to file the

---

[4] Throughout this brief, all subsequent history, internal citations, and quotations have been omitted, and all emphasis has been added (or removed), unless otherwise indicated.

[5] *See Yandoli v. REV Group, Inc., et al.*, No. 2018-cv-00163 (Wis. Cir. Ct. 2018). The state action is currently stayed by order of the Wisconsin Court of Appeals, pending resolution of Defendants' interlocutory appeal of the trial court's denial of Defendants' motion to stay the state proceeding in favor of this action.

Amended Complaint on February 28, 2019, abandoning its previously asserted claims challenging REV Group's IPO and SPO Offering Documents under the Securities Act of 1933. (*See* Dkt. 66.) And, far from expanding its allegations in support of its 1934 Act claim, Plaintiff abandoned virtually all of the confidential witness allegations that the First Complaint had advanced, including all allegations attributed to the First Complaint's principal confidential witness (then identified as "CW1"). The Amended Complaint abandons not only former CW1, but also two additional CWs who were featured in the First Complaint. (*Compare* ¶¶ 57–61, *with* Dkt. 43 ¶¶ 113–24.) The sole remaining CW, previously identified as "CW2," is now referred to as CW1 in the Amended Complaint. (*Compare* ¶¶ 57–61, *with* Dkt. 43 ¶¶ 106–10.)

On September 25, 2019, the Court granted Plaintiff leave to file the Amended Complaint. (Dkt. 99.) Beyond REV Group, the Amended Complaint names as defendants Mr. Sullivan and the Company's CFO, Dean Nolden (together, the "Individual Defendants"). (¶¶ 29–31.) The Amended Complaint's principal cause of action, brought against all Defendants on behalf of a putative class of purchasers of REV Group stock between October 10, 2017 and June 7, 2018, is for supposed violations of Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"). (¶¶ 2–3, 140–49; *see* ¶¶ 80–81, 83–85, 87, 93–95, 97–98.) The Amended Complaint also brings a claim under Section 20(a) of the 1934 Act against the Individual Defendants for purported secondary liability, on the theory that those Defendants are "control persons" of REV Group and liable for its alleged misstatements. (¶¶ 150–53.) Plaintiff's claims challenge two categories of forward-looking statements: (1) the guidance that REV Group first provided to investors for its projected FY2018 results on October 10, 2017, and that the Company later reaffirmed in December 2017 and March 2018 (¶¶ 80–81, 83–85, 93–95); and (2) certain statements that the Company's CEO, Mr. Sullivan, made during the Company's Q2 FY2018 earnings call on March 8, 2018, the

very day that President Trump, hours later, imposed tariffs on steel and aluminum imports (¶¶ 62, 97–98).

**ARGUMENT**

## I. THE AMENDED COMPLAINT DOES NOT ALLEGE A FALSE OR MISLEADING STATEMENT

### A. The Company's FY2018 Earnings Guidance Is Not Actionable

To state a claim under the 1934 Act, Plaintiff must allege, among other elements, that Defendants made material misrepresentations or omissions. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Rule 9(b), the PSLRA, and the Supreme Court's decision in *Tellabs* impose heightened pleading requirements for 1934 Act claims. *See, e.g.*, *In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 969, 982–83 (E.D. Wis. 2009). Under Rule 9(b), a plaintiff must "stat[e] with particularity" "the who, what, when, where, and how" of the fraud claim. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement . . . is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Amended Complaint challenges REV Group's FY2018 earnings guidance (both as originally issued and as subsequently reaffirmed) as false and misleading. But it is a straightforward principle of securities law that a failure to meet projections does not constitute fraud. *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *20 (N.D. Ill. Mar. 31, 2011) ("Plaintiffs cannot merely contrast relatively positive statements from" one period "with less positive statements from" a later period "and argue that" fraud "explains the difference"). Courts reject attempts, like Plaintiff's, to plead "fraud by hindsight"

and to engage in "Monday morning quarterbacking" through litigation. *In re Supreme Indus., Inc. Sec. Litig.*, No. 3:17CV143PPS-MGG, 2018 WL 2364931, at *8 (N.D. Ind. May 23, 2018). "Predictions are inherently uncertain, and no prediction has a 100 percent probability of being correct." *Id.*

The FY2018 guidance at issue in this case is not actionable because it is a forward-looking statement that falls squarely within and is protected by the PSLRA's safe harbor. The PSLRA establishes a safe harbor for forward-looking statements, which are not actionable if "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). The PSLRA defines forward-looking statements broadly and expressly includes "projection[s] of revenues, income . . . [or] earnings." 15 U.S.C. § 78u-5(i); *see Harley-Davidson*, 660 F. Supp. 2d at 990–93 (press releases and analyst calls conveying earnings guidance are forward-looking statements). To qualify under the PSLRA's safe harbor, cautionary language "need not include the particular factor that ultimately causes its projection not to come true." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010). Rather, the statements must only identify "important factors that could realistically cause results to differ materially." *Id*.

Here, when releasing its FY2018 earnings guidance on October 10, 2017, and when later re-affirming that guidance in December 2017 and March 2018, the Company cautioned that its guidance consisted of forward-looking statements subject to the risks detailed in its SEC disclosures.[6] (Lovern Decl. Ex. E at 2; *id.* Ex. G at 4; *id.* Ex. I at 4.) These public disclosures

---

[6] The press release providing the FY2018 guidance warned that its forward-looking statements were "subject to risks and uncertainties, including those highlighted . . . in REV Group's public filings with the SEC." (Lovern Decl. Ex. E at 2.) Cautionary language may be incorporated by reference where (as here) it is contained in a "readily available document" identified in the statement. *See Yellen v. Hake*, 437 F. Supp. 2d 941, 963–64 (S.D. Iowa 2006) (collecting cases and applying safe harbor based in part on cautionary language incorporated by reference).

thoroughly addressed the very risks that Plaintiff alleges eventually led the Company to miss its earnings expectations in Q2 FY2018. In particular, from its very beginning as a public company, REV Group warned that a "disruption . . . of the supply of vehicle chassis or other critical components from third-party suppliers" could harm sales; that "[d]isruptions in the supply of vehicle chassis" could limit its ability to successfully execute its strategy; and that "[i]ncreases in the price of commodities" could negatively impact earnings. (Lovern Decl. Ex. A at 26, 15, 30.) REV Group repeated these and similar warnings in numerous public filings throughout the alleged Class Period. (*Id.* Ex. F at 26–27, 30, 33, 74, 101; *id.* Ex. B at ii, 18–19, 22–23, 25, 65; 3/7/18 Form 10-Q, Lovern Decl. Ex. N, at 3; 6/6/18 Form 10-Q, Lovern Decl. Ex. O, at 3, 29–30.) This robust, on-point cautionary language brings the FY2018 guidance well within the PSLRA safe harbor. *See, e.g.*, *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, No. 17 CV 1713, 2018 WL 4616356, at *5–6 (N.D. Ill. Sept. 26, 2018).

The Court's analysis can (and should) stop here. Under the PSLRA's safe harbor, a forward-looking statement cannot give rise to liability *either* if there is meaningful cautionary language, *or* if the plaintiff fails to adequately allege that the "statement . . . was . . . made or approved by [an executive officer] with *actual knowledge* by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B); *Harley-Davidson*, 660 F. Supp. 2d at 994. The two prongs of the safe harbor are disjunctive, meaning that REV Group's cautionary warnings alone render the earnings guidance inactionable as a matter of law. *Harley-Davidson*, 660 F. Supp. 2d at 994.

That said, the PSLRA's safe harbor also protects the Company's earnings guidance because the Amended Complaint fails to survive the second, separate prong of the safe harbor, which requires factual allegations that the speaker had actual knowledge of the statement's falsity at the

time it was made. As addressed in the scienter section below (Part II.A.1 at pp. 21–31), the Amended Complaint does not plead any facts to demonstrate that Mr. Sullivan or Mr. Nolden *actually knew* that the FY2018 guidance was unachievable when first publicly issued on October 10, 2017, or when the guidance was later reaffirmed. Moreover, the Company's statements conveying its FY2018 guidance are opinions and are therefore also insulated from liability by the Supreme Court's ruling in *Omnicare*, for many of the same reasons. *Omnicare* confirmed that "[r]easonable investors do not understand" statements of opinion "as guarantees." 135 S. Ct. at 1328. Under *Omnicare*, an opinion statement is not actionable unless the plaintiff alleges facts satisfying one of three limited exceptions: (1) the speaker did not actually hold the stated opinion, *id.* at 1326; (2) the opinion contained false "embedded statements of fact," *id.* at 1327; or (3) the opinion omitted "material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and those facts "conflict[ed] with what a reasonable investor would take from the statement itself." *Id.* at 1329. As addressed further below (Part II.A.1 at pp. 21–31), the Amended Complaint does not invoke—let alone satisfy—any of these exceptions.

Finally, in addition to the earnings guidance itself, the Amended Complaint purports to attack a handful of statements made by Mr. Sullivan on earnings calls and in Company press releases that reaffirm what the Company had previously said in connection with its FY2018 guidance, or that express confidence in the Company's future growth prospects. (*See* ¶¶ 83–95.) Plaintiff's challenge to these statements fails for the same reasons its challenge to the Company's guidance fails. Moreover, many of these statements are not misleading as a matter of law because they are mere "puffery"—nebulous positive comments that "lack[] the requisite specificity to be considered anything but optimistic rhetoric." *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at \*6 (N.D. Ill. June 29, 2001). The Amended Complaint, for example, targets

statements such as that the Company's segments were "going to be up" (¶ 87), that the Company was "well positioned for continued growth" (¶ 84), and that the Company would be "highly focused on . . . improv[ing] profitability."  (¶ 94.)  Courts have routinely found that such vaguely optimistic statements are not actionable because they are "better described as puffery rather than as material statements of fact," *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995), and because they "could not possibly be material to an investor."  *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *7, 13 (N.D. Ill. Nov. 14, 2000).

### B.    Mr. Sullivan's Earnings Call Statements Are Likewise Inactionable

The Amended Complaint goes on to allege that Mr. Sullivan misled investors on the Company's Q1 FY2018 earnings call held on March 8, 2018—the same day that President Trump later signed proclamations introducing tariffs.  None of these forward-looking, opinion statements supports a securities claim; rather, each is protected by the Supreme Court's *Omnicare* decision and under the PSLRA's safe harbor.

Plaintiff attacks two statements by Mr. Sullivan.  First, in response to an analyst's question about whether increasing chassis lead times (lags between order and delivery) would impact the Company's ability to achieve its FY2018 guidance, Mr. Sullivan answered:

> [I]t's a current situation that we hope does not get worse.  ***But for instance, Mercedes Sprinter chassis have not been EPA approved yet.  So, there's a bit of delay in receiving those.***  We do work off a backlog of chassis, so in the near term, by near term I mean our second quarter, we're fine but as you can imagine with our back-end loaded plan, we need a lot of chassis in here in Q3 and Q4.  So, we got time to react to it.  ***But there's noise with GM also.  There's a little bit of noise with Ford.***  It's something that we manage on a regular basis, but we've got some time to react and we plan to.  But right now, we don't see that that's going to negatively impact our fiscal year.

(Lovern Decl. Ex. J at 5; ¶ 97.)  Second, Mr. Sullivan was asked whether a "rising material cost environment" would impact the Company's ability to meet profit expectations.  After noting that this was "a top question of every[one] in the last few days," Mr. Sullivan said:

***The bigger issue is the one that you really addressed. So, that's the chassis***. We will be extremely diligent on the chassis cost, as we move through fiscal 2018. ***That's where we're going to see the issues***. The good news is, I think is we can stay ahead of those. We purchase far enough in advance . . . . So, we have warnings of many cost adjustments on chassis well in advance of what's happening. But we're going to be diligent. That's where we're going to see it, if we see it anywhere. And we want to make sure that we stay ahead of that game.

(Lovern Decl. Ex. J at 5; ¶ 98.)

These statements by Mr. Sullivan simply do not provide the basis for a viable securities claim. The challenged statements are expressions of opinion about the possible future impact that increasing chassis lead times and rising costs might have on the Company and, as such, the statements are inactionable under *Omnicare*. Investors benefit when companies and their executives publicly share their opinions. *See Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 514 (7th Cir. 1989) ("When the issuer adds its information and analysis . . . the collective assessment will be more accurate . . . ."). The law thus protects speakers from liability for opinion statements, with only limited exceptions, none of which applies here. *Omnicare*, 135 S. Ct. at 1325–29. Specifically, the Amended Complaint points to no false factual statements "embedded" within Mr. Sullivan's opinions, and it identifies no undisclosed facts contradicting or otherwise undermining the basis for his opinions. *Id.* at 1327, 1329. Finally, as addressed in Part II.A.1 below, Plaintiff offers no allegations to show that Mr. Sullivan did not actually believe the opinions he gave. *Id.* at 1326.

Mr. Sullivan's statements are not only immunized opinions, but are also forward-looking statements squarely within and protected by the PSLRA's safe harbor. *See Société Générale*, 2018 WL 4616356, at *6. The safe harbor was designed "to make more information about a company's future plans available to investors," H.R. CONF. REP. 104–369, 45 (1995), and "to loosen the muzzling effect of potential liability" whenever predictions turn out to lack crystal-ball precision. *Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir. 1999). Mr. Sullivan's statements are

unquestionably forward-looking: he was addressing how longer chassis delivery times and rising material costs might impact REV Group in the future.

Again, both in connection with the March 2018 earnings call and repeatedly since the Company went public in January 2017, REV Group continually warned that its forward-looking statements were subject to numerous risks, including specifically that shortages of chassis and price volatility for commodities could negatively impact its performance. (*See* Lovern Decl. Ex. E at 2; *id.* Ex. G at 4; *id.* Ex. H at 1; *id.* Ex. I at 4; *id.* Ex. J at 1, 5–6; *id.* Ex. A at 25–27, 30, 32–33, 70–71, 96–97; *id.* Ex. F at 26–27, 30, 33, 74, 101.) For example, the Company warned that its "manufacturing processes depend on the supply of manufactured vehicle chassis and other critical components . . . from major auto manufacturers," and that "capacity limitations, shortages of raw materials, or other problems could result in shortages or delays in the supply of vehicle chassis or components to us." (*Id.* Ex. F at 26–27.) The Company also explicitly cautioned that a "disruption, termination or alteration of the supply of vehicle chassis or other critical components from third-party suppliers could materially adversely affect . . . sales." (*Id.* at 26.) Likewise, the Company repeatedly warned that its forward-looking statements were "neither predictions nor guarantees of future events or performance"; rather, it cautioned that such statements were "subject to risks and uncertainties . . . which may cause actual results to differ materially from those projected," such that investors should not "place undue reliance" on them. (*E.g.*, *id.* Ex. E at 2; *id.* Ex. I at 4; *accord id.* Ex. G at 4; *id.* Ex. J at 1.)

In view of this meaningful, directly applicable cautionary language, Mr. Sullivan's statements about the possible impact that tariffs could have on the Company are protected under the safe harbor. *See Société Générale*, 2018 WL 4616356, at *6. It is thus legally irrelevant if events did not pan out precisely as Mr. Sullivan expected, with longer chassis lead times affecting

the Company in *Q2 FY2018* instead of, as Mr. Sullivan predicted, in *Q3–Q4 FY2018*. (Lovern Decl. Ex. J at 5; ¶ 97); *see Yellen*, 437 F. Supp. 2d at 968 (applying safe harbor based on cautionary language that identified "steel, raw material, and fuel pricing as sources of continuing concern").

Further, Plaintiff's contention in challenging Mr. Sullivan's statements—that he unconditionally assured that everything was "fine" and that the tariffs would not present any problems—ignores what Mr. Sullivan actually said. In the very statements Plaintiff challenges, Mr. Sullivan warned that chassis would present "issues" for REV Group in FY2018. (¶ 98.) Indeed, Mr. Sullivan indicated that the Company was already experiencing delays in receiving chassis. (¶¶ 97–98.) He also stated that, while the Company believed it had the chassis it required for Q2 because it ordered chassis in advance, REV Group would need to "manage" and "react" to "stay ahead." (*Id.*) Context matters, and Plaintiff cannot allege a false or misleading statement by glossing over what Mr. Sullivan actually said. *See Yellen*, 437 F. Supp. at 967 (PSLRA safe harbor applied where challenged statement "was immediately tempered by a statement that [the defendant] expects material costs to be an ongoing challenge").

The PSLRA's protections are especially apt here, where Mr. Sullivan sought to provide his opinion about the potential future impacts of then-threatened tariffs upon REV Group's business *on the very day* those tariffs were put in place only hours later. Crystal-ball accuracy about such novel and immediate developments is hardly realistic and certainly is not required under the federal securities laws. A "lack of clairvoyance simply does not constitute securities fraud." *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, No. 08-C-797, 2010 WL 1287058, at *18 (E.D. Wis. Mar. 30, 2010). Indeed, the PSLRA's safe harbor expressly encourages companies and executives to provide such real-time guidance by protecting them from liability if events do not play out as predicted. *See* H.R. CONF. REP. 104-369 at 43 (1995) (safe harbor intended to combat

trend where "legions of lawyers scrub required filings to ensure that disclosures are as milquetoast as possible, so as to provide no grist for the litigation mill"); *Harris*, 182 F.3d at 806–07 (construing safe harbor broadly, because narrower application "would hamper the communication that Congress sought to foster").

Here too, as covered in Part II.A.1 below, the Amended Complaint also fails under the second prong of the PSLRA's safe harbor, because it alleges no facts showing Sullivan actually knew his statements about the future were false when he made them. *See* 15 U.S.C. § 78u–5(c)(1).

## II. THE AMENDED COMPLAINT DOES NOT SUPPORT A COGENT, COMPELLING INFERENCE OF SCIENTER

Plaintiff also fails—by a long shot—to satisfy the PSLRA's mandate that the Amended Complaint "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," *i.e.*, an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 314, 319. In *Tellabs*, the Supreme Court held that for an inference of scienter to qualify as "strong," as is required in order for a complaint to survive a motion to dismiss, the inference of scienter "must be more than merely plausible or reasonable—it must be cogent and *at least as compelling* as any opposing inference of nonfraudulent intent." *Id.* at 314. The strength of the inference "cannot be decided in a vacuum," and the court *must* weigh all "nonculpable explanations for the defendant's conduct" against the "inferences urged by the plaintiff." *Id.* at 314, 322–24. The Amended Complaint does not allege the strong, cogent, and compelling inference of scienter required by *Tellabs*, and the competing innocent inference is far more compelling.

### A. Plaintiff Does Not Allege a Powerful, Cogent Inference that Defendants Had Actual Knowledge Their Forward-Looking Statements Were False When Made

Under the safe harbor, where (as here) forward-looking statements are at issue, the

Amended Complaint must allege that the statement was "made or approved by [an] officer with *actual knowledge* by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). A plaintiff must plead facts establishing that it is "*at least as likely*" as not that defendants acted with "actual knowledge of falsity," not mere recklessness. *City of Livonia Emps. Ret. Sys. and Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 756–57 (7th Cir. 2013); *see also In re Supreme Indus.*, 2018 WL 2364931, at *4–5 ("[F]orward-looking statements are evaluated under an even stricter standard," which requires a "powerful or cogent" inference of "actual knowledge of falsity on the part of defendants, not merely reckless indifference."). The Amended Complaint does not meet this pleading burden either for the Company's FY2018 earnings guidance, or for Mr. Sullivan's challenged statements during the March 2018 earnings call.

### 1. No Inference That Messrs. Sullivan or Nolden Knew the FY2018 Earnings Guidance Was False When Issued

#### a. The Allegations Attributed to CW1 Do Not Create a Strong Inference of Actual Knowledge

The Amended Complaint now relies on allegations ascribed to a single, lower-level confidential witness—CW1—to claim that Mr. Sullivan and Mr. Nolden supposedly "knew" that the Company's FY2018 earnings guidance was unattainable when it was issued on October 10, 2017 and later re-affirmed. According to Plaintiff, CW1 worked as a finance manager for just one of the eight vehicle brands in the Company's Recreation segment (which is itself just one of the Company's three business segments) for six months between May and mid-November 2017. (¶¶ 3–4, 57.) As alleged, therefore, CW1 departed the Company after only a month into Plaintiff's alleged Class Period, which begins on October 10, 2017, and well before the other public statements the Amended Complaint challenges. According to the limited allegations in the Amended Complaint, CW1 supposedly worked as a "finance manager" and supervised certain other employees who dealt with accounts payable, accounts receivable, and cost accounting

functions isolated to a single facility in Salina, Kansas. (¶¶ 57, 60.) The vague statements attributed to CW1 are that "senior management in Milwaukee" allegedly used an internal system called OneStream that tracked the Company's backlog "when making projections," and that the "projections" that CW1's facility received from headquarters were "regularly unreachable." (¶¶ 59, 61.)

The Seventh Circuit has held that allegations attributed to unidentified CWs "must be discounted," and "[u]sually that discount will be steep." *Higginbotham*, 495 F.3d at 757. Confidential sources "may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent—a gimmick for obtaining discovery costly to the defendants and maybe forcing settlement or inducing more favorable settlement terms." *City of Livonia*, 711 F.3d at 759. Seventh Circuit law is also clear that to generate the requisite cogent and compelling inference of scienter, CW allegations must be set forth "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Vallabhaneni v. Endocyte, Inc.*, No. 1:14-CV-01048-TWP-MJD, 2016 WL 51260, at *8 (S.D. Ind. Jan. 4, 2016); *accord Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007). CW allegations, moreover, do not raise a strong inference where the source lacks any "first-hand actual knowledge" bearing on defendants' scienter. *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009).

Here, application of these well-settled standards requires dismissal, because Plaintiff's CW1 allegations fail on multiple levels.

<u>First</u>, the Amended Complaint does not allege that CW1 ever interacted in any way with Mr. Sullivan or Mr. Nolden. Courts routinely hold that CW allegations fail to raise an inference

of scienter where the CWs are not alleged to have had any contact with the company's senior officers. *E.g.*, *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (confidential witness allegations did not raise scienter inference where witnesses had "no contact with the Individual Defendants"). This principle applies with even more force here, because Plaintiff must allege a powerful and cogent inference of *actual knowledge* (not simply recklessness) to challenge REV Group's forward-looking earnings guidance. *See W. Pa. Elec. Emps. Pension Trust v. Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *4 (E.D. Wis. Mar. 6, 2009) (dismissal where CW vaguely alleged that one group of employees provided forward-looking forecasts to another group, "who in turn met with 'upper management'"); *see also Rossy v. Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 782 (N.D. Ill. 2015) (same where CWs did not indicate that alleged issues "were ever communicated to any individual defendant" or "that defendants were aware of" them).

Second, CW1 worked at REV Group for a total of only *six months* and was at the Company for, at most, *one month* of the Amended Complaint's alleged nine-month Class Period. (¶¶ 3, 57.) Given CW1's short tenure at REV Group, CW1 was not in a position to know much about the Company, much less to address the external financial guidance that REV Group issued during the Class Period—virtually all of which occurred after CW1 left the Company. This temporal disconnect alone undermines and merits disregarding the allegations ascribed to CW1, because the Amended Complaint fails to support a "probability that a person in the position occupied by [CW1] would possess the information alleged." *Vallabhaneni*, 2016 WL 51260, at *8. For example, having spent only six months at REV Group, CW1 was in no position to conclude that certain projections were supposedly "unreachable," let alone "regularly" so. (¶ 61.) And CW1 was no longer even present at REV Group when many of the public statements Plaintiff challenges were

made.  (*Compare* ¶ 57 (CW1 left Company in "mid-November 2017"), *with* ¶¶ 83–99 (alleging false statements in December 2017 and March 2018).)  As other courts have held, CW accounts challenging a company's forward-looking guidance are "substantially less meaningful" where the CWs were not present during the alleged class period.  *E.g.*, *In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 570 (W.D. Va. 2006); *see also Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335–36 (S.D.N.Y. 2009) (rejecting scienter allegations attributed to two confidential witnesses who departed the company prior to the class period).

Third, CW1 is not alleged to have occupied any position that would have made it even possible, let alone *probable*, for CW1 to have had insight into REV Group's enterprise-level financial projections as announced in its public statements to the market.  *See Vallabhaneni*, 2016 WL 51260, at *8 (requiring "probability" that CW "would possess the information alleged").  The Amended Complaint does not allege that CW1 had any involvement in developing the FY2018 earnings guidance—or, for that matter, any enterprise-wide financial projections at all, whether internal or external.  This fact alone eliminates both CW1 as an adequate source as well as the allegations attributed to CW1 as anything even approaching a basis for the cogent and compelling inference of scienter required by *Tellabs*.  *See Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 955 (D. Ariz. 2007) (dismissing complaint where plaintiffs "fail[ed] to allege facts showing . . . that the CWs were involved in [the company's] forecasting process or that the CWs were in a position to possess knowledge about the forecasting process"); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 942–45, 949 (S.D. Ind. 2005) (dismissal for failure to plead strong inference of scienter where complaint lacked necessary details to support probability that confidential witnesses had access to the information alleged).  This complaint—in which CW1 is not alleged to have had any role in or information regarding the Company's FY2018 earnings

guidance—is a textbook example of failing to support a compelling inference of scienter through allegations attributed to a confidential witness who lacks any alleged basis to possess the relevant knowledge.

The fact that CW1 is not alleged to have occupied any position that would have provided insight into REV Group's external financial guidance is only underscored by the limited allegations attributed to CW1. Plaintiff asserts that the quarterly "projections which CW1's facility received from corporate headquarters in Milwaukee were regularly unreachable," purportedly because the facility was asked to increase production while also reducing costs. (¶¶ 59, 61.) But the Amended Complaint does not provide any detail about the "projections" supposedly received by the manufacturing facility where CW1 worked for just six months. In particular, Plaintiff alleges no facts that would address how the projections for a single facility related to the Company's overall external financial guidance, including the guidance for REV Group's FY2018 Adjusted EBITDA that Plaintiff now claims was false (indeed, knowingly false) from the very beginning. Because the Amended Complaint includes nothing to explain how, as a limited tenure employee at one facility, CW1 would have had any knowledge regarding the Company's enterprise-wide external guidance, the allegations attributed to CW1 fail to give rise to any inference that Defendants knew the Company's guidance was false at the time it was provided or re-affirmed. *See City of Austin*, 388 F. Supp. 2d at 949 (allegations specific to "local institutes . . . do[] not support an inference of scienter on the part of senior management and the corporation itself"); *see also Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2017 WL 6039926, at *4, 13 (N.D. Ill. Dec. 6, 2017) (rejecting allegations from lower-level confidential witnesses who "vaguely allege[d] that they had the sense" that senior management possessed the relevant information); *Local No. 38*, 724 F. Supp. 2d at 460

(discrediting confidential witness allegations by "low-level employees" when the witnesses "had no access to aggregated data" and "no contact with the Individual Defendants").

Fourth, Plaintiff's contention—based on the alleged statement by CW1 that certain projections isolated to a single facility were "regularly unreachable"—that REV Group's external, Company-wide financial guidance was somehow flawed and that the Company was underperforming cannot be reconciled with the Company's reported financial results that the Amended Complaint nowhere disputes. In all six quarters between the IPO and the filing of this action—including in Q2 FY2018, the quarter giving rise to this case—REV Group's top-line revenues increased year-over-year. Likewise, the Company's bottom-line earnings increased consistently year-over-year in each of the five quarters before Q2 FY2018. (*See* Background Parts B, D–E, *supra*.)

Finally, applying the Supreme Court's decision in *Omnicare*, federal courts have rejected confidential witness allegations stronger than those present here when dismissing complaints that failed to create a strong inference that senior management did not actually believe or did not have a good-faith basis for their projections. In *In re EveryWare Global, Inc. Securities Litigation*, 175 F. Supp. 3d 837, 853 (S.D. Ohio 2016), for example, the court rejected CW allegations that were attributed to a senior vice president of sales. The complaint alleged that the CW was told by another employee that the CEO wanted a higher sales projection, and the CW did not think a higher number was realistic. 175 F. Supp. 3d at 852–53. The court dismissed on scienter grounds, because the complaint did not allege "actual knowledge that the [challenged] projections were false or misleading," including because the plaintiffs did not allege any facts about the process that the CEO used to craft the final projections. *Id.* at 853; *see also Yellen*, 437 F. Supp. 2d at 954 (fact that senior management discussed lower possible forecasts "does not amount to an allegation that

Defendants did not reasonably believe" the higher forecasts ultimately issued). Plaintiff's CW1 allegations here are far weaker.

Given the above—including the absence of any allegation that CW1 ever interacted with the Individual Defendants, CW1's short tenure, the fact that CW1 was not even at REV Group for most of the Class Period, and CW1's lower-level role isolated to one facility without any alleged basis for insight into the Company's external, enterprise-wide financial guidance—the allegations ascribed to CW1 cannot survive a motion to dismiss. Indeed, CW1's generic allegation of some "unreachable" projections cannot be squared with REV Group's reported (and undisputed) results. For all of these reasons, the CW1 allegations fall well short of pleading a strong, cogent, and compelling inference of actual knowledge on the part of the Individual Defendants—that they somehow knew their external projections for REV Group's corporate performance were false when issued or later re-affirmed.

### b. CW1's Backlog Allegations Do Not Create a Strong Inference of Actual Knowledge

Because CW1 is not in any position to address how REV Group actually developed its FY2018 earnings guidance, the Amended Complaint retreats to an even weaker theory based on CW1's account of an internal system, OneStream, that the Company supposedly used to track its backlog of vehicle orders. (¶ 58.) Without alleging how he would even know such information, the Amended Complaint attributes to CW1 the statement that "senior management in Milwaukee used the OneStream data from the various REVG manufacturing facilities when making projections." (¶ 59.) Based solely on this one allegation, the Amended Complaint asserts that Defendants "carefully tracked" the backlog, knew the "sales mix" of vehicles in production, and, accordingly, the Company must have known what its FY2018 results would be, but that Defendants nonetheless knowingly issued false guidance instead. (¶¶ 61, 80–88, 114–16.)

At the outset, the Amended Complaint's backlog allegations ascribed to CW1 fail for the same reasons discussed above. In particular, CW1 is not alleged to have had any contact with senior management generally or the Individual Defendants specifically; is not alleged to have had any role in or visibility into the development of any of the Company's enterprise-wide projections, including its external guidance; and worked at a single REV Group plant in Kansas for just six months (only one of which was during the alleged Class Period). (*See* Part II.A.1.a, *supra*.) Accordingly, the Amended Complaint does not allege any facts to even remotely suggest that CW1 was in a position to know how, if at all, "senior management in Milwaukee" used OneStream and, if so, what (if anything) they learned that had any bearing on REV Group's external guidance. *See Vallabhaneni*, 2016 WL 51260, at *8 (requiring "probability" that CW "would possess the information alleged").

As a result, CW1's backlog allegations are a classic illustration of an attempt to plead scienter based on "making conclusory allegations . . . derived from a defendant's mere access to information." *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 602 (7th Cir. 2019). Generically alleging, as the Amended Complaint does here, that Defendants supposedly had access to contrary information at the time of their public statements does not suffice to survive a motion to dismiss, and the existence of an order tracking system does not convert every missed financial target into some securities law violation. *See Supreme Indus.*, 2018 WL 2364931, at *9 (dismissing on scienter grounds where plaintiff "fail[ed] to connect the dots" by alleging that defendants' knowledge of company's operations demonstrated that predictions were knowingly false). Instead, the complaint must allege "details as to the contents" of the reports or data allegedly available to the defendants, "as well as when and how reported." *Higginbotham v. Baxter Int'l, Inc.*, No. 04 C 4909, 04 C 7096, 2005 WL 1272271, at *6 (N.D. Ill. May 25, 2005)

(dismissing complaint on scienter grounds); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035–36 (9th Cir. 2002) (affirming dismissal where the complaint merely alleged that the company "could regularly track its sales data" and the data "indicated that patient demand was flat," but the plaintiff failed to "plead, in any detail, the contents of such report or the purported data"); *Oshkosh*, 2010 WL 1287058, at *19 (dismissing complaint because "general allegations are not substitutes for actual knowledge that the company's forecasts were unreasonable" and "[n]one of the confidential witnesses stated that any of the Defendants knew X was true while they said Y, or that internal projections showed something different from what was publicly disclosed").

The Amended Complaint does not supply any of these necessary details. Plaintiff does not allege which members of "senior management" supposedly checked the backlog, including whether either of the Individual Defendants did so; when they supposedly did so; what information, if any, they supposedly gleaned; or how any such information supposedly showed the Company could not meet its FY2018 earnings guidance. Accordingly, the Amended Complaint's "conclusory and ambiguous characterizations rendered by ex-employees . . . are entirely insufficient under the PSLRA" to plead a strong inference of actual knowledge. *City of New Orleans Emps.' Ret. Sys. v. PrivateBankcorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *6 (N.D. Ill. Nov. 3, 2011). Indeed, another district court in this Circuit has rejected similarly vague backlog allegations—that because one executive allegedly had a "hands-on" management style, he "would have kept tabs on orders being placed in the backlog"—as failing to create a strong inference of scienter. *Schultz v. Tomotherapy Inc.*, No. 08-cv-314-slc, 2009 WL 2032372, at *20 (W.D. Wis. July 9, 2009); *see also In re Supreme Indus., Inc. Sec. Litig.*, No. 3:17-cv-143-PPS/MGG, 2019 WL 1436022, at *3 (N.D. Ind. Mar. 29, 2019) (rejecting CW's backlog-based scienter allegations because the court "[did not] know how the confidential witness would know the numbers of the

company" and because "nothing in the [] complaint shows the [challenged backlog] prediction could not happen").

Beyond the completely conclusory nature of CW1's alleged statements, the Amended Complaint's backlog allegations fail for a wholly separate reason. Plaintiff repeatedly alleges that REV Group stated publicly that its backlog (*i.e.*, the length of time between a customer order and delivery of the finished vehicle) ranged from two to nineteen months, and that the backlog provided the Company with visibility into future revenues. (¶¶ 11, 13, 45–55.) But the Amended Complaint purports to challenge only the Company's FY2018 *earnings* guidance, not its *revenue* guidance. (*E.g.*, ¶¶ 6, 15, 19, 80, 82, 85–86.) The Amended Complaint does not allege any facts that would explain how the Company's backlog—which, Plaintiff acknowledges, relates to top-line, future *revenues*—would have somehow allowed the Company also to predict with crystal-ball accuracy its bottom-line *earnings*—either in terms of what those future earnings would be or when they would be booked. (*E.g.*, ¶ 82.) Importantly, the Amended Complaint does not provide any factual basis for Plaintiff's leap in logic that the backlog's indications about future revenues would allow the Company to predict its bottom-line earnings with precision—particularly given the unknown impact that the recent and unprecedented tariffs would have on the Company's future commodity costs and chassis availability, and therefore on its future profits. (*See* ¶ 67.) As REV Group described in announcing its Q2 FY2018 results on June 7, 2018—in public statements that the Amended Complaint nowhere challenges as false—the Company also faced "extension of lead times on almost everything" it needed to complete its vehicles in Q2 FY2018, to the point that the Company "decided to build some products on racks while we wait for chassis deliveries." (Lovern Decl. Ex. M at 3, 9.) Plaintiff's own allegations give rise to a far more compelling nonfraudulent inference that intervening and unprecedented supply chain interruptions brought about by the steel

and aluminum tariffs—supply chain risks that the Company had repeatedly and explicitly cautioned the market about (*see* Background Parts A, C, *supra*)—became a reality and interfered with the Company's ability to predict even its revenues, let alone the timing and amount of its profits. For all of these reasons, Plaintiff's backlog allegations bring the Amended Complaint nowhere close to pleading a strong inference that Defendants knowingly provided earnings guidance that was false at the time it was issued or re-affirmed.

### 2. No Inference That Mr. Sullivan Knew His Statements on the Q1 FY2018 Earnings Call Were False When Made

The Amended Complaint likewise lacks facts giving rise to a strong inference that Mr. Sullivan somehow knew his statements on the Q1 FY2018 earnings call were false. The Q1 FY2018 earnings call was held on March 8, 2018, a few hours before President Trump instituted tariffs on steel and aluminum, and only a week after it was reported in the press that tariffs could be on the horizon. (¶ 62.) The Amended Complaint's impossible standard—requiring Mr. Sullivan to immediately foresee, on the same day tariffs were instituted, that they would trigger numerous severe problems for REV Group (including a shortage of chassis and key components) and cause it to not achieve its FY2018 earnings guidance—stretches far beyond what the federal securities laws mandate. To the contrary, as courts have repeatedly held, a "lack of clairvoyance simply does not constitute securities fraud." *Oshkosh*, 2010 WL 1287058, at *18; *accord Acito v. IMCERA Grp.*, 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud"). In fact, the law recognizes that a company faced with a new development such as a supply shortage needs "a reasonable opportunity to investigate the scope of the problem and to make a reasonably certain estimate of its bottom-line impact." *In re Brightpoint, Inc. Sec. Litig.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *22 (S.D. Ind. Mar. 29, 2001); *Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 Fed. Appx. 713, 718 (11th Cir.

2014) (rejecting claim of scienter where company reaffirmed earnings guidance three weeks after learning of revenue headwind because defendants were "uncertain about [its] potential impact").

The Amended Complaint simply does not allege any facts to suggest Mr. Sullivan somehow knew on March 8 that REV Group would not to meet its FY2018 guidance. Plaintiff does not allege any internal meetings involving Mr. Sullivan, any data or internal documents, any CW statements, or any other facts to suggest that the mere announcement of tariffs somehow immediately and irrevocably revealed that REV Group could not meet its FY2018 projections. *See Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 205 (D. Conn. 2014) (rejecting claim that company misled investors by not reporting supply chain problems because complaint "provide[d] no quantitative information" about the issue). Indeed, the sole confidential witness in the Amended Complaint (CW1) was not even at REV Group at the time of the March 8 earnings call, having left the Company four months earlier. (¶ 57); *see Campo*, 635 F. Supp. 2d at 335–36 (rejecting scienter allegations where confidential witnesses departed company prior to class period).

The Amended Complaint instead looks to distort Mr. Sullivan's comments a full quarter later, on the June 7, 2018 earnings call for Q2 FY2018, into some "admission" that he knew his prior statements to be false. On June 7, 2018, Mr. Sullivan stated:

> ***In the past two months alone, we have seen almost $19 million in cost increases on an annualized basis***. . . . Clearly, this is disturbing, particularly when ***a large portion of the price increases are not related to steel and aluminum*** which are the current targets of the tariffs. ***The tariffs have also created unpredicted consequences.*** As soon as tariffs were suggested, there was a run on many of the commercial chassis we purchase and convert. We are paying extra freight charges to get the chassis we need for second half shipments. Over the last 60 days alone, this has resulted in approximately $1 million additional cost.

(Lovern Decl. Ex. M at 3; ¶ 106.) This statement in no way supports Plaintiff's contention that Mr. Sullivan "knew" 90 days earlier, on March 8, what impact the tariffs would have. In fact, Mr. Sullivan said the opposite: that the tariffs ultimately had produced "unpredicted" consequences.

And Mr. Sullivan defined the timeframe for one of the key impacts of the tariffs (increased shipping costs) as the "last 60 days," meaning they began roughly a month *after* the statements Plaintiff challenges from the Q1 FY2018 earnings call.

Significantly, the Amended Complaint's other allegations undermine rather than support Plaintiff's theory. On the June 7, 2018 earnings call, Mr. Sullivan identified several other factors that affected REV Group's Q2 FY2018 results and led it to adjust its projections. These statements—which the Amended Complaint nowhere challenges as false—all describe events *after* March 8, 2018. These include: (1) the relocation of an important Mercedes-Benz chassis factory, which impaired delivery of chassis; (2) a plant fire at a key supplier to multiple chassis producers, which caused extensive chassis production delays and shutdowns; (3) additional steel and aluminum tariffs for Canada, Mexico, and the EU announced on May 31, 2018; and (4) substantial commodity price increases, as multiple suppliers took advantage of rising steel and aluminum prices by raising prices for commodities not even subject to the tariffs. (Lovern Decl. Ex. M at 3–5, 8–9.) In short, the Amended Complaint lacks any specific allegations that demonstrate Mr. Sullivan's March 8 statements were even false, much less that establish a cogent and compelling inference that they were made with actual knowledge of their falsity. *See Harley-Davidson*, 660 F. Supp. 2d at 999.

### 3. Mr. Sullivan's Purchase of Shares During the Class Period Negates Any Inference of Actual Knowledge

Tellingly, in its most recent Amended Complaint, Plaintiff abandons its earlier allegations about purported insider stock sales and does not even attempt to allege scienter on the basis of any trading by Company officers and directors. Indeed, Plaintiff makes no effort to establish a motive of any kind to commit securities fraud—a fact that further exposes Plaintiff's failure to allege facts giving rise to a cogent and compelling inference of scienter. "Without a motive to commit

securities fraud, businessmen are unlikely to commit it." *City of Livonia*, 711 F.3d at 758.

Far from any stock sales supporting some motive to defraud, none of the Defendants sold a single share of stock during the Class Period. As the Seventh Circuit has held, there is a strong inference *opposing* scienter where defendants do not sell, which "implies that nothing was thought to be out of the ordinary." *Higginbotham*, 495 F.3d at 759. Indeed, Mr. Sullivan and the Company (through a stock buyback) actually *purchased* stock—and in Mr. Sullivan's case, he personally purchased 100,000 shares only five days after the March 8 earnings call.[7] Where, as here, an individual defendant who made the alleged misstatements "actually increased personal holdings during the class period," any inference of scienter is negated and most certainly is not so cogent and compelling as to sustain a complaint. *Harley-Davidson*, 660 F. Supp. 2d at 1001.

### B. The Competing Innocent Inference Is Far More Compelling

Finally, the Supreme Court's opinion in *Tellabs* mandates that an inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. This heightened standard imposes a unique obligation, where the Court, at the motion to dismiss stage, "*must*" engage in a "comparative evaluation" in which it considers "competing inferences rationally drawn from the facts alleged." *Id.* at 314.

REV Group performed strongly for many quarters after the IPO, growing its revenues year-over-year for each of its first six quarters as a public company—including during Q2 FY2018, the very quarter that gave rise to this lawsuit. REV Group also grew its earnings for five of those quarters. The Amended Complaint does not challenge any of these results. Critically, each time

---

[7] 3/13/18 Sullivan Form 4, Lovern Decl. Ex. P, at 1; *id.* Ex. O at 47. At the beginning of the Class Period, Sullivan was already one of the Company's most substantial shareholders, beneficially owning 1,240,000 shares of stock. (*Id.* Ex. F at 136–137.) Sullivan then increased his holdings during the Class Period by purchasing 100,000 shares at a price of $22.525 per share on March 13, 2018. (*Id.* Ex. P at 1.) Courts may consider on motions to dismiss SEC filings reflecting trades. *See Harley-Davidson*, 660 F. Supp. 2d at 1000–01.

that REV Group issued (and reiterated) its FY2018 guidance, it warned about risks that could cause it to fail to meet its projections, including chassis availability and volatility in commodity prices. Those risks ultimately materialized early in Q2 FY2018 when the U.S. Government—on March 8, 2018, the very same day as the Company's earnings call reporting on Q1 results—implemented brand new tariffs on foreign steel and aluminum. And the March 8 tariffs were just the beginning, as other undisputed events took place during Q2 FY2018 that drove up costs and hurt the Company's performance, especially its profits. As revealed by the very documents that the Amended Complaint cites and incorporates, there was a plant fire at a key supplier to multiple chassis producers, the U.S. Government announced further tariffs, and suppliers extracted price increases for commodities other than steel and aluminum, taking advantage of the global turmoil. Even so, in Q2 FY2018, REV Group still grew its revenues year-over-year and remained profitable. The Company, however, lowered its guidance for the full fiscal year to account for the new headwinds that had just impacted its bottom line.

Just as the Company increased its full-year guidance over the course of the prior year (when positive developments took place during FY2017), REV Group lowered its guidance at the end of Q2 FY2018 for the 2018 fiscal year based on the adverse events that arose during that quarter. Such periodic updates of forward-looking guidance to the market, as real world events (good or bad) occur and evolve, are just what the federal securities laws contemplate, encourage, and protect. Those laws certainly do not treat such efforts to inform and guide as fraud.

Moreover, the Amended Complaint pleads no facts to explain why, if REV Group somehow had a crystal ball that enabled it to predict its earnings with perfect precision months in advance, the Company and its most senior officers would nonetheless choose instead to knowingly issue guidance they knew they could never meet, inviting a later drop in the Company's stock

price.  Such a course of action makes no sense, and Plaintiff fails to allege that Defendants had any pecuniary motive for doing so.  This only further undercuts the Amended Complaint's attempt to allege an inference of scienter.  *See, e.g.*, *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("[I]ndulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud.  One who believes that another has behaved irrationally has to make a strong case.").

Assessing Plaintiff's allegations holistically, and applying *Tellabs*' mandate that the Court *must* consider competing inferences arising from Plaintiff's own allegations and matters subject to judicial notice, the Amended Complaint requires an "inferential leap" that is "untenable given the heightened pleading standards."  *See Harley-Davidson*, 660 F. Supp. 2d at 999.  Here the non-culpable inference—that intervening factors beyond the Company's control or ability to forecast caused it to adjust its guidance—is far more cogent and compelling.  *See Bldg. Trades United Pension Trust Fund v. Kenexa Corp.*, No. 09–2642, 2010 WL 3749459, at *15 (E.D. Pa. Sept. 27, 2010) (non-culpable inference was stronger where "all Plaintiffs have shown is [the] stock price fell after Defendants announced the company's 2007 earnings would be lower than expected" due to unforeseen developments).

## III.  PLAINTIFF DOES NOT STATE A CONTROL PERSON LIABILITY CLAIM UNDER THE 1934 ACT

A claim for secondary, "control person" liability under Section 20(a) fails where there has been no primary violation by any controlled person.  *Pugh*, 521 F.3d at 693, 698; *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 266 F. Supp. 3d 1154, 1164 (E.D. Wis. 2017).  For all of the above reasons, there has been no primary violation, so the Section 20(a) claim necessarily fails. *See id.*

## CONCLUSION

Rather than oppose Defendants' initial motion to dismiss, which advanced many of the arguments made above, Plaintiff filed the Amended Complaint. Far from expanding Plaintiff's allegations, the Amended Complaint in fact abandoned much of the First Complaint's content, including almost all of its confidential witness allegations. The Amended Complaint represents the third attempt to allege the 1934 Act claims in this litigation, after the initial complaints that began this action and then Plaintiff's filing of two consolidated complaints. Because Plaintiff has still failed, despite the pendency of this action for over a year and four months, and despite multiple opportunities to state a claim, "to craft a complaint that complie[s] with the standards of the PSLRA" and the 1934 Act, Defendants respectfully request that the Court dismiss the Amended Complaint with prejudice. *Fannon v. Guidant Corp.*, 583 F.3d 995, 1002 (7th Cir. 2009); *see Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1033 (E.D. Wis. 2010) ("[I]n light of the more than one year and eight month pendency as well as two amended complaints, the court finds that the wiser exercise of its discretion is to dismiss with prejudice.").

[<em>signature page follows</em>]

Dated: October 9, 2019

Respectfully submitted,

*Attorneys for Defendants REV GROUP, INC., TIMOTHY W. SULLIVAN, AND DEAN J. NOLDEN*

*s/ Susan E. Lovern*

Randall W. Bodner
Mark A. Cianci
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts  02199-3600
Tel.: (617) 951-7000
Fax: (617) 951-7050
*randall.bodner@ropesgray.com*
*mark.cianci@ropesgray.com*

Anne Johnson Palmer
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, California  94111-4006
Tel.: (415) 315-6300
Fax: (415) 315-6350
*anne.johnsonpalmer@ropesgray.com*

Susan E. Lovern, SBN 1025632
Kelly J. Noyes, SBN 1064809
Derek J. Waterstreet, SBN 1090730
von BRIESEN & ROPER, S.C.
411 E. Wisconsin Avenue, Suite 1000
Milwaukee, Wisconsin  53202
Tel.: (414) 276-1122
Fax: (414) 276-6281
*slovern@vonbriesen.com*
*knoyes@vonbriesen.com*
*dwaterstreet@vonbriesen.com*