**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| |
|---|
| IN RE REV GROUP, INC. SECURITIES LITIGATION |

Lead Case No. 2:18-cv-1268-LA

**LEAD PLAINTIFF'S MEMORANDUM OF**
**LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

00441373;V3

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF FACTS ...................................................................... 3

ARGUMENT ....................................................................................... 10

I.    STANDARDS .......................................................................... 10

II.    PLAINTIFF ADEQUATELY PLEADS MISREPRESENTATIONS OR OMISSIONS BY DEFENDANTS ............................................... 11

    A.    Plaintiff Sufficiently Pleads that Defendants Issued Materially False and Misleading Guidance ....................................... 11

    B.    Plaintiff Sufficiently Alleges that Sullivan Made Material Misrepresentations about Chassis ................................... 15

    C.    REVG's Vague and Meaningless Cautionary Language Does Not Protect Defendants' False and Misleading Statements.................. 20

III.    PLAINTIFF PLEADS FACTS DEMONSTRATING A STRONG INFERENCE OF SCIENTER ................................................... 23

    A.    Defendants Knew the Guidance Was Misleading and Lacked A Reasonable Basis........................................... 23

        1.    Sullivan Knew That the Long High Margin Vehicle Backlog – Which He Repeatedly Acknowledged – Made the Guidance Unachievable.............................23

        2.    CW1 Provides Detailed Allegations Showing Defendants Knew the Guidance Was Unachievable Because They Used OneStream Reports When Making Projections....................24

            a.    CW1's Allegations Are Specific and Reliable .........................24

            b.    Defendants' Legal and Factual Attacks on CW1 Ignore the Specificity of CW1's Allegations.............................26

        3.    Defendants Knew the Guidance Was Misleading Because Unachievable Projections Were A Prevalent Problem Internally at REVG...............................................30

        4.    As of March 1, 2018, Defendants Also Knew the Guidance Was Misleading Because the Tariffs Would Increase REVG's 2Q18 Costs ............................................32

B. Sullivan Knew or Recklessly Disregarded That His Statements About Tariffs Were Misleading ................................................................. 32

C. Collectively, the Inference of Scienter Is At Least As Strong As the Competing Inference of Non-Culpable Conduct ............................................. 33

IV. PLAINTIFF SUFFICIENTLY PLEADS THAT SULLIVAN AND NOLDEN VIOLATED SECTION 20(a) ....................................................................... 35

CONCLUSION ................................................................................................................. 37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abuhamdan v. Blyth Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ........................................................................... 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................... 10, 29

*Asher v. Baxter Int'l Inc.*,
  377 F.3d 727 (7th Cir. 2004) ......................................................... 13, 14, 22, 23

*Bank of Am., N.A. v. Knight*,
  725 F.3d 815 (7th Cir. 2013) ................................................................................ 11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................. 10

*Bldg. Trades United Pension Fund v. Kenexa*,
  No. 09-2642, 2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) .................................. 20

*Boucher v. Fin. Sys. of Green Bay, Inc.*,
  880 F.3d 362 (7th Cir. 2018) ............................................................................ 10, 32

*Brody v. Zix Corp.*,
  No. 3:04-CV-1931, 2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ...................... 26

*Campo v. Sears Holdings Corp.*,
  635 F. Supp. 2d 323 (S.D.N.Y. 2009) ), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) .................. 31

*Carpenters Pension Trust Fund for N. Cal. v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ................................................... 35, 36

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*,
  388 F. Supp. 2d 932 (S.D. Ind. 2005) ............................................................. 29, 32

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) .................................................................... 14

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*,
  No. 10 C 6016, 2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ................................... 27

*City of New Orleans* v. *Privatebancorp, Inc.*,
  No. 10 C 6826, 2011 WL 5374095 (N.D. Ill. Nov. 3, 2011) .................................. 29

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
No. 11 C 8332, 2013 WL 566805 (N.D. Ill. Feb. 3, 2013).......................................27

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) .................................................................................26

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) .................................................................................35

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
No. 09-CV-5641, 2011 WL 1303387 (N.D. Ill. Mar. 31, 2011)..............................15

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2018) ...............................................................17, 18

*In re Allscripts, Inc. Sec. Litig.*,
No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ..................................13

*In re Brightpoint Securities Litigation*,
No. IP99-0870-C-H/G, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001).......................19

*In re EveryWare Global Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016),  *aff'd sub nom. IBEW Local
No. 58 Annuity Fund v. EveryWare Global, Inc.*, 849 F.3d 325 (6th Cir. 2017)...............29, 30

*In re Harley-Davidson Inc., Sec. Litig.*,
660 F. Supp. 2d 969 (E.D. Wis. 2009).....................................................................21

*In re Next Level Sys., Inc.*,
No. 97 C 7362, 1999 WL 387446 (N.D. Ill. Mar. 31, 1999) ..................................14

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .........................................................................25, 26

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)......................................................................................31

*In re Supreme Indus. Inc. Sec. Litig.*,
No. 3:17CV143PPS-MGG, 2019 WL 1436022 (N.D. Ind. Mar. 29, 2019) ............30

*In re Supreme Indus., Inc. Sec. Litig.*,
No. 3:17CV143PPS-MGG, 2018 WL 2364931 (N.D. Ind. May 23, 2018) ......15, 27

*In re Trex Co. Sec. Litig.*,
454 F. Supp. 2d 560 (W.D. Va. 2006) .....................................................................31

iv

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*,
 665 F.3d 930 (7th Cir. 2012) ................................................................. 10

*Int'l bhd. of Elec. Workers Pension Fund Local No. 38 v. Am. Express*,
 724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)......................... 30

*Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*,
 No. 08-C-797, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) ................................ 15

*Levy v. Gutierrez*,
 No. 14-cv-443-JL, 2017 WL 2191592 (D.N.H. May 4, 2017) ................................ 35

*Lewis v. Straka*,
 No. 05-C-10081, 2006 WL 2927658 (E.D. Wis. Oct. 12, 2006)............................ 21, 22, 25, 26

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
 437 F.3d 588 (7th Cir. 2006), *vacated and remanded on other grounds*,
 551 U.S. 308 (2007)..................................................................... 13, 14, 22

*Makor Issues & Rights, Ltd, v. Tellabs, Inc.*,
 513 F.3d 702 (7th Cir. 2008) ............................................................. 17, 27

*MicroCapital Fund LP v. Conn's Inc.*,
 No. 4:18-CV-1020, 2019 WL 3451153 (S.D. Tex. July 24, 2019) ......................... 26

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
 135 S. Ct. 1318 (2015)..................................................................... 18, 19

*Pension Trust Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
 No. 16 C 5198, 2018 WL 6714326 (N.D. Ill. Dec. 20, 2018) ........................... 27, 34

*Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*,
 895 F.3d 933 (7th Cir. 2018) ............................................................. 11, 33

*Plumbers & Pipefitters Local Union 719 Pension Plan v. Zimmer Holdings Inc.*,
 673 F. Supp. 2d 718 (S.D. Ind. 2009), *aff'd*, 679 F.3d 952 (7th Cir. 2012) ........... 30

*Puskala v. Koss Corp.*,
 799 F. Supp. 2d 941 (E.D. Wis. 2011).................................................. 23, 24

*Reina v. Tropical Sportwsear Int'l*,
 No. 8:03-CV-1958-T-23TGW, 2005 WL 846170 (M.D. Fla. Apr. 4, 2005) ......................... 14

*Rossy v. Merge Healthcare Inc.*,
 169 F. Supp. 3d 774 (N.D. Ill. 2015) ...................................................... 30

*Scholz v. United States*,
   No. 16-CV-1052, 2017 WL 375651 (E.D. Wis. Jan. 25, 2017) .............................................. 13

*Schultz v. Tomotherapy*,
   No. 08-cv-314-slc, 2009 WL 2032372 (W.D. Wisc. 2009)...................................................... 30

*Searls v. Glasser*,
   64 F.3d 1061 (7th Cir. 1995) .................................................................................................. 13

*Shah v. Zimmer Biomet Holdings, Inc.*,
   348 F. Supp. 3d 821 (N.D. Ind. 2018), *motion to certify appeal denied*,
   No. 3:16-cv-815-PPS-MGG, 2019 WL 762510 (N.D. Ind. Feb. 20, 2019) ...................... *passim*

*Shenk v. Mallinckrodt plc*,
   No. 17-cv-00145 (DLF), 2019 WL 3491485 (D.D.C. July 30, 2019) ...................................... 14

*Société Générale Sec. Serv., GbmH v. Caterpillar, Inc.*,
   No. 17 CV 1713, 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018).............................................. 23

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................... 23, 33, 34

*Tobey v. Chibucos*,
   890 F.3d 634 (7th Cir. 2018) .................................................................................................. 10

*Trahan v. Interactive Intelligence Grp., Inc.*,
   308 F. Supp. 3d 977 (S.D. Ind. 2018)..................................................................................... 18

*United States Sec. & Exch. Comm'n v. Ustian*,
   229 F. Supp. 3d 739 (N.D. Ill. 2017) ..................................................................................... 17

*Vallabhaneni v. Endocyte, Inc.*,
   No. 1:14-CV-01048-TWP-MJD, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016) ...................... 28, 29

W. *Pa. Elec. Emps. Pension Trust v. Plexus Corp.*,
   No. 07C0582, 2009 WL 604276 (E.D. Wis. Mar. 6, 2009).................................................... 30

*Weiss v. Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ...................................................................................... 28

*Wielgos v. Commonwealth Edison Co.*,
   892 F. 2d 509 (7th Cir. 1989) ................................................................................................. 17

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
   536 F.3d 663 (7th Cir. 2008) .................................................................................................. 11

vi

*Yellen v. Hake*,
  437 F. Supp. 2d 954 (S.D. Iowa 2006) ................................................... 17

*Zaghian v. Farrell*,
  675 F. App'x 718 (9th Cir. 2017) ................................................ 14, 26

**Statutes**

15 U.S.C. § 77z-2(c)(1) ................................................................. 20

15 U.S.C. § 78u–4(b)(1) ................................................................ 11

15 U.S.C. § 78u-4(b)(2)(A) ............................................................ 33

15 U.S.C. § 78u-5(c)(1)(B) ............................................................ 23

**Rules**

Fed. R. Civ. P. 8 ..................................................................... 10

Fed. R. Civ. P. 9(b) .................................................................. 10

Lead Plaintiff Houston Municipal Employees Pension System ("Plaintiff") submits this memorandum of law in opposition to Defendants' motions to dismiss the SAC.[1]

## PRELIMINARY STATEMENT

Defendants knowingly misled REVG investors by issuing guidance for FY2018 Net Income and Adjusted EBITDA (the "Guidance") that they knew could not be met. This was because REVG needed at least 12 months of lead time before it could recognize the profit from High Margin Vehicles it sold. Therefore, Defendants knew at the start of the Class Period that REVG had not sold enough High Margin Vehicles in advance of FY2018 to support the Guidance. Accordingly, it surprised investors when Defendants abandoned the Guidance after 2Q18 due to a "poor sales mix" with "lower-than-expected sales" of High Margin Vehicles because Defendants represented they knew the sales mix at least a year in advance. This was especially the case since Defendants repeatedly highlighted the Company's backlog of in-process vehicles as "high quality" and claimed it provided "strong visibility" into revenues and, thus, support for the Guidance.

Facts demonstrating that Defendants knew they issued false Guidance derive mainly from Defendants' own statements. Defendants' public statements revealed that they closely monitored backlog for high and low margin vehicles, that the backlog gave them strong visibility into the next fiscal year's financial results, and that the backlog showed the sales mix of how many High Margin Vehicles sold in FY2017 would convert to FY2018 earnings. In fact, REVG CEO Sullivan repeatedly acknowledged that REVG's High Margin Vehicles in Fire, Recreation, and Bus had long backlogs well before, during, and at the end of, the Class Period. The Complaint also cites information from a former senior REVG finance employee (CW1), who stated that Defendants

---

[1] "SAC" refers to the Second Amended Complaint. ¶ _ refers to paragraphs in the SAC and otherwise undefined terms are defined in the SAC. "Br. _" refers to Defendants' memorandum of law in support of their motion to dismiss.

reviewed reports on the "Onestream" system that reported the amount of High Margin Vehicles that would be completed, when they would be completed, and the amount of profit for each – and utilized these reports when crafting Company guidance.

In addition to knowingly issuing false and misleading Guidance, Sullivan also made misstatements about the effect of steel tariffs on REVG's business. On March 1, 2018, *The New York Times* reported that President Trump would impose a 25% steel tariff and 10% aluminum tariff. On March 8, 2018, President Trump officially signed proclamations for the new tariffs. Then – one week after the tariffs were first announced – Sullivan told analysts that the tariffs would not harm REVG in 2Q18 (which ran from February 1, 2018 to April 30, 2018).[2] Significantly, Sullivan stated that REVG "was fine" in 2Q18 even though news outlets had reported one week earlier (on March 1, 2018) that U.S. steel prices would rise. Sullivan knew or recklessly disregarded that the tariffs would immediately harm REVG in 2Q18. At the end of the Class Period, the Company admitted that the tariffs caused increased costs for steel chassis in 2Q18, which would negatively affect earnings in FY2018.

Defendants argue that the SAC fails to state an actionable false statement because Defendants should be allowed to mislead investors if the statements are forward-looking. The law, however, does not permit that result when a complaint, such as here, alleges false and misleading statements supported by facts showing that Defendants knew they were false when made. No amount of warning is meaningful if Defendants know with near certainty the statement is false. Additionally, Defendants challenge whether the SAC alleges scienter. But Defendants' scienter is largely demonstrated by Defendants' own statements showing they knew the sales mix prior to and throughout the Class Period – not merely from the revelations at the end of the Class Period.

---

[2] REVG's fiscal year runs from November 1st to October 31st.

The SAC also alleges facts from former employee CW1 showing scienter. Defendants spend almost a third of their brief attacking CW1, but they fail to meaningfully dispute CW1's statement that Defendants used OneStream to monitor backlog and create REVG projections. Finally, Defendants try to exculpate themselves with numerous unalleged factual hypotheses that have no place in this motion. Accordingly, the SAC provides a cogent and compelling inference that Defendants knew their statements were materially false and misleading when made.

For all these reasons, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### REVG's Business

REVG designs, manufactures, and distributes specialty vehicles. REVG operates three Divisions: Commercial, which manufactures transit and shuttle buses, school buses, mobility vans, sweepers, and terminal trucks; Recreation, which manufactures motorized RV products; and Fire & Emergency ("F&E"), which makes fire trucks and ambulance-related products. ¶ 4. REVG's Commercial, Recreational, and F&E segments provided approximately 27%, 29%, and 44% of the Company's revenues in 2017. ¶¶ 34, 37, 39.

### Earnings Growth Was Central to REVG's Value

From FY2015 through FY2017, REVG's earnings grew by leaps and bounds. REVG's Adjusted Net Income was $34 million, $53 million, and $76 million for fiscal years 2015, 2016 and 2017, respectively – a compound annual growth rate (CAGR) of 49%. REVG's Adjusted EBITDA for these periods was $90 million, $123 million, and $163 million (34% CAGR). ¶ 40.

Analysts paid close attention to REVG's strong growth. *See ¶* 44 (December 2017 report stating REVG "realized significant growth yr/yr. Looking forward, management expects growth

3

to continue"); *id*. (December 2017 report stated that "[f]actoring in guidance for next year,… REVG has [had] 3 years in a row of revenue growth >15% and adj. EBITDA growth >30%").

**REVG's Backlog Showed When It Could Recognize Profit on In-Process Vehicles**

REVG's manufacturing facilities record a vehicle's sale price in backlog at the date of sale. As the vehicle moves through production, the backlog period decreases to a period of zero days when the vehicle is shipped. ¶ 45. Only upon shipment can REVG recognize revenue and any profit/net income generated from the sale can be counted toward meeting the Company's expected earnings guidance. ¶ 11.

A vehicle's time in backlog was a function of the size and complexity of the vehicle. Many of REVG's High Margin Vehicles have long lead times, which the Company claimed gave it strong visibility into future financial results. ¶ 55. REVG's large and customized vehicles, such as custom fire apparatus, large commercial buses, and certain RVs, bus and ambulance products, took over 12 months to build, and, thus, remain in backlog for a long period of time. ¶ 47; *see also* ¶¶ 13, 56. These were also the Company's profitable High Margin Vehicles.

**Sullivan Repeatedly Stated That REVG's High Margin Vehicles Had Long Backlogs**

Before, during, and just after the Class Period, Sullivan represented that REVG's High Margin Vehicles had long backlogs. In a pre-Class Period March 8, 2017 conference call, Sullivan stated that "[i]f you look at our backlog on fire right now, both KME and E1 [2 of REVG's fire companies] are out almost 12 months." ¶ 48. In a December 10, 2017 conference call, Sullivan stated:

> We're really managing that well, because…there is a lot of pent-up demand in Fire, and we don't like our backlogs out that far. When we're running backlogs out to August, September [*i.e., 8-9 months*], that's not healthy, and they got to be less than that. ¶ 50.

In a December 20, 2017 conference call, Sullivan stated that "our Fire backlog is significantly higher at this time than it was last year even at this time." ¶ 87.

During a January 16, 2018 REVG Investor Day, Sullivan stated that "[o]ur backlogs are all out about *9 to 10 months now on all of Fire*,…" ¶ 53. This meant that REVG could not recognize revenue on current or future sales of *any* fire vehicles until October to November 2018 (nine to ten months from this statement). The Guidance period ended on October 31, 2018.

Sullivan then mentioned a 12-month backlog in the Recreation segment:

We just completed the acquisition of Lance [Lance Camper Manufacturing Corporation, part of Recreation segment] on Friday…. They flew…back to California…to work off their 12-month backlog,… They have an adjacent building…. So we can double the capacity of what we're building, start whittling down that 12-month backlog. ¶ 54.

On a June 7, 2018 conference call (the day after the Class Period ended) Sullivan again stated that REVG had "long[] lead times" on fire and bus vehicles – 8 months for fire and 17-19[3] for buses:

Fire is actually sold out through the end of the calendar year into – literally, we're starting to sell into the first part of the second quarter of fiscal 2019 [February 2019]. So Fire is set. We know very well what we have in Fire for the rest of the year. It's locked and loaded…. [W]e already know what our backlog in transit buses looks like for '19 and the latter part of this year. So where we've got the longer lead times, we've got great visibility,…" ¶ 55.

REVG's fire engines, buses, and RVs – the High Margin Vehicles Sullivan admitted had long lead times before, during, and just after the Class Period – are "value-added units" that generate the most net income and earnings for REVG. *See* ¶ 56 ("[o]ur units represent a wide

---

[3] Sullivan made his statement in June 2018. REVG's fiscal year ends October 31st. If Sullivan was referring to REVG's fiscal year, then he stated that the lead time for buses was 17 months. If Sullivan was referring to a calendar year, then he stated that the lead time for buses was 19 months.

range of products at various price points, with higher value-added units at higher price points typically resulting in higher gross margins").

**Defendants Stated That the Company's Backlog Provided Financial Visibility**

Defendants continually represented that REVG's backlog provided visibility into its future financial results. In a prospectus filed in connection with REVG's October 12, 2017 secondary public offering (the "SPO Prospectus"), REVG stated that its "business carries a high-quality backlog which enables strong visibility into future net sales which ranges from *two to twelve months* depending on the product and market. This visibility into future production needs and net sales enables us to more effectively plan and predict our business." ¶ 49. In a December 21, 2017, FY 2017 Form 10-K, REVG made a similar claim. ¶ 51. By touting visibility from "two to twelve months" in the SPO Prospectus and the FY 2017 Form 10-K, Defendants represented they had clear visibility into revenues and, by extension, earnings – particularly for High Margin Vehicles – to October 2018 and December 2018, respectively. ¶ 52. *See also* ¶ 55 ("*where we've got the longer lead times*, we've got great visibility").

**A Former Senior REVG Finance Employee Reported That When Making Projections, Senior Management Used a Company-Wide System That Carefully Tracked Backlog**

CW1 worked as a finance manager at REVG's ElDorado subsidiary.[4] ElDorado is one of REVG's eight Recreation brands. CW1 supervised the controller, two accounts payable clerks, one accounts receivable clerk, one cost accountant, and the IT department. ¶ 57. CW1 stated that

---

[4] Defendants claim that Plaintiff "abandoned" its allegations from the original CW1 (made in the First Amended Complaint). This is false. While the SAC no longer relies on the statements made by the original CW1, the SAC's allegations fully comport with those statements. Indeed, Plaintiff anticipates taking full document and deposition discovery from the original CW1 to ascertain exactly what he knew while employed at REVG. Plaintiff removed the original CW3 and CW4 allegations because that information solely related to the Securities Act claims, which Plaintiff removed from the SAC.

6

at REVG's ElDorado subsidiary, backlog was tracked on a monthly basis through a program called OneStream. ¶ 58. CW1 described OneStream as similar to Microsoft Excel, with various fields in which to enter data. CW1 inputted data each month into OneStream, including into fields such as "work in progress," "backlog," "finished goods," and "inventory." CW1 had to input such data by the 10th of every month. When a vehicle was finished, it would go from "work in progress" to "finished goods." "Work in progress" provided a total showing how far along towards completion the vehicles in the manufacturing facility were. *Id.*

CW1 stated that senior management in Milwaukee used the OneStream data from the various REVG manufacturing facilities when making projections. ¶ 59. Senior management could tell what vehicles were being built, and how far along they were, because each manufacturing facility built only certain vehicles. In other words, when OneStream listed a certain number of vehicles from each REVG manufacturing facility, it was clear that those vehicles were of a certain kind, *e.g.*, low or high margin. ¶ 58.

CW1 also reported that every three months, senior REVG management would give specific projections to REVG's manufacturing facilities that were regularly unreachable. ¶¶ 60-61. CW1 stated that senior management's FY2018 projections for CW1's manufacturing facility were unrealistic because they demanded growth in production – and simultaneous cost-cutting – while the facility was already operating at maximum production level and large overtime. ¶ 61.

**Defendants Issue and Reaffirm the Unachievable Guidance**

On October 10, 2017, REVG first issued the Guidance. REVG stated that FY2018 net income would be in the range of $85 million to $100 million and FY2018 adjusted EBITDA would be in the range of $200 million to $220 million. ¶ 41. The release also stated that "REV group is *forecasting growth* in all three of its reportable segments in fiscal 2018 …." ¶ 42. On December

19, 2017, Sullivan reaffirmed the Guidance and stated that he was "pleased to report that all three of our segments continue to have strong outlooks." ¶ 43.

**Defendants Begin to Reveal that REVG's Growth Story**
**Was Ending – But Misleadingly Increase Net Income Guidance**

On March 7, 2018, REVG announced 1Q18 financial results. ¶ 73. Although REVG hit its expected revenue figures, REVG surprised the market by revealing that, for the first time since its IPO five quarters prior, its margins and growth rates had contracted. *Id*. REVG stated that the margin contraction was a result of poor product mix in its Commercial and F&E segments, and poor timing of shipments. By this disclosure, REVG began to reveal that its prior growth assertions were coming undone. REVG also increased its FY2018 net income outlook to a range of $90-$110 million (from a range of $85-$100 million). ¶ 93.

Though REVG increased its net income guidance, the market penalized the stock price because REVG's year over year earnings growth did not appear to be materializing. As a result, the stock price of REVG dropped 12% on March 8, 2018 to $23.85 per share. ¶ 92.

**Tariffs Are Announced on March 1, 2018**

On March 1, 2018, it was reported that President Trump would impose tariffs of 25% on steel and 10% on aluminum. ¶ 62. That same day, news outlets reported that in addition to causing an increase in foreign steel, the tariffs would also cause an increase in demand for U.S. steel (and thus, U.S. steel prices) because U.S. steelmakers would seize the pricing opportunity created by foreign steel makers' prices rising. ¶¶ 63-66. Thus, it was clear the tariffs would immediately harm REVG because it needed steel chassis to build its vehicles and increased steel prices would increase REVG's steel costs, cause delays in procuring chassis, and hurt earnings. *Id*. It was also reported that the tariffs would cause other commodities' prices to rise. ¶ 67.

**Sullivan Falsely Tells the Market That the Tariffs Would Not Hurt REVG in 2Q18**

On its 1Q18 conference call on March 8, 2018, Sullivan stated that although "[w]e do work off a backlog of chassis[,]…*in the near term, by near term I mean, our second quarter, we're fine*….right now, we don't see that that's going to negatively impact our fiscal year." ¶ 97. After an analyst raised more concerns over increased steel prices and their effects on chassis purchases, Sullivan dismissed them, claiming that REVG had "warnings of any cost adjustments on chassis well in advance of what's happening." *Id.* at 98.

**REVG Slashes the Guidance Because of Lower Sales**
**of High Margin Vehicles and Increased Chassis Costs Due to Tariffs**

On June 6, 2018, after market close, REVG substantially cut the Guidance and reported 2Q18 earnings well below analysts' consensus. REVG reduced Adjusted EBITDA for 2Q18 to $34.1 million – 25% below analysts' $45 million estimates. The Company also reduced FY2018 Net Income guidance by about 20%, from $90-$110 million down to $72-$87 million, and Adjusted EBITDA guidance by about 15%, from $200-220 million down to $175-$185 million. ¶ 19.

REVG reported that it missed its 2Q18 earnings and cut the Guidance because (i) REVG had lower profit margins from "lower-than-expected sales of certain higher-content product categories" including the High Margin Vehicle categories Sullivan had discussed before, during, and just after the Class Period, "custom fire apparatus, large commercial buses, and Class A RVs" (¶ 20); (ii) REVG had accrued higher costs resulting from the steel tariffs; and (iii) REVG had problems procuring chassis. ¶ 20. Sullivan also stated that "due to the length of our backlogs we were not able to mitigate [cost] increases." ¶ 102.

On June 7, 2018, REVG shares fell $3.39 or nearly 20% to close at $14.52 per share. REVG stock has not recovered and traded around $8.90 per share as of February 2019. ¶ 21.

9

**REVG Issues Final FY18 EBITDA 30% Below the Guidance**

On December 19, 2018, the bad news continued. On that date, REVG issued its FY2018 results, including adjusted EBITDA of only $148 million – over 30% below the 2018 Adjusted EBITDA projection of $200 to $220 million contained in the Guidance. ¶ 78. After reporting Net Income of $34 million, $53 million and $76 million for fiscal years 2015, 2016, and 2017, respectively, as well as Adjusted EBITDA of $90 million, $123 million, and $163 million for the same periods, REVG's Net Income and Adjusted EBITDA for FY 2018 were only $73 million and $148 million, respectively. Thus, FY2018 was REVG's first year without growth in four years. ¶ 79.

**ARGUMENT**

**I.      STANDARDS**

A complaint will state a claim for securities fraud if the alleged misstatements satisfy Rules 8 and 9 of the Federal Rules of Civil Procedure and the PSLRA. In order to satisfy Rule 8, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible….'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a claim to be plausible, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Boucher v. Fin. Sys. of Green Bay, Inc*., 880 F.3d 362, 366 (7th Cir. 2018). In addition, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable[.]" *Indep. Trust Corp. v. Stewart Info. Servs. Corp*., 665 F.3d 930, 935 (7th Cir. 2012). In applying this standard, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018).

Rule 9(b) requires a plaintiff to describe the "circumstances" of the alleged fraudulent activity with "particularity" by including such information as "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated," *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 (7th Cir. 2008), or, to put it differently, by providing the "who, what, where, when and how" of the alleged fraudulent conduct. *See Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). Also, when pleading on information and belief, "the complaint shall state with particularity all facts" forming the basis for the belief that the statement was misleading. 15 U.S.C. § 78u–4(b)(1).

The elements of a 10(b) claim are "(1) a material misrepresentation or omission by the defendant; (2) *scienter*; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018). Defendants contest only the first two elements – materiality and scienter. As discussed below, Plaintiff satisfies both elements.

## II.     PLAINTIFF ADEQUATELY PLEADS MISREPRESENTATIONS OR OMISSIONS BY DEFENDANTS

### A.     Plaintiff Sufficiently Pleads that Defendants Issued Materially False and Misleading Guidance

On October 10, 2017, the first day of the Class Period, REVG issued the Guidance for FY2018 Net Income and Adjusted EBITDA. ¶ 41. On December 19, 2017, Sullivan reaffirmed the Guidance. ¶ 43. On March 7, 2018, REVG reaffirmed its FY2018 Adjusted EBITDA guidance and increased REVG's FY2018 net income outlook. ¶ 93. On June 6, 2018, Defendants revealed that the FY2018 Net Income and Adjusted EBITDA Guidance were unachievable.

Plaintiff pleads detailed facts demonstrating that the Guidance was known to be materially false, misleading, and unachievable when issued to investors. Support for these allegations comes largely from public admissions by Defendants. Sullivan repeatedly stated before, during, and just after the Class Period that High Margin Vehicles, including "all" fire vehicles, as well as certain Recreation and Commercial vehicles, had 12 month or longer backlogs before any net income could be recognized on a sale. *See* ¶¶ 48, 50, 53, 54, 55, 87.[5] Accordingly, Defendants knew the shortfalls of FY18 Net Income and adjusted EBITDA were locked-in at least a year in advance. This is because after the sale of High Margin Vehicles, it took at least 12 months to build and ship the vehicles, and the Company's accounting policy delayed recognizing any revenue and earnings from the sale until the vehicle shipped. The long backlog for High Margin Vehicles showed Defendants that the Guidance was false and misleading at the time it was made because (as they also admit) they had strong visibility into REVG's financials as a result of monitoring the backlog – particularly for High Margin Vehicles. ¶ 55.

In addition to Sullivan's admissions that he and the Company carefully tracked the backlog for the high margin and low margin vehicles, CW1 provides details into how that was done. CW1 stated that REVG's senior management used the OneStream program when making projections – and OneStream's reports showed the backlogs for REVG's vehicles, making it clear how many

---

[5] In March 2017, Sullivan stated that Fire's backlog was 12 months (until March 2018) (¶ 48). On December 20, 2017, Sullivan stated that Fire's backlog was 8 to 9 months (until August or September 2018) (¶ 50). On January 16, 2018, Sullivan stated that Fire's backlog was 9 to 10 months (until October or November 2018). ¶ 53. On the same date, Sullivan stated that Lance Camper Recreation vehicles had a 12-month backlog. ¶ 54. On June 7, 2018 conference call, Sullivan stated that bus backlog was 17-19 months. ¶ 55. Reading these three statements collectively, REVG could not recognize revenue for almost the entirety of FY2018 (November 1, 2017 through October 31, 2018) on any Fire, RV or Bus vehicle sold during the Class Period (October 10, 2017 through June 7, 2018).

High Margin Vehicles were being built and when REVG could recognize profit on them.  ¶¶ 58-59.

As FY 2018 progressed, OneStream continued to show that backlogged High Margin Vehicles would not be shipped within FY 2018 – making the Guidance unachievable.  After 1Q18, Defendants had even more indicia of this.  REVG met 1Q18 revenue expectations, which meant that Defendants knew they started the year shipping low margin vehicles with insufficient earnings to meet the Guidance.  *See* ¶¶ 73, 58.  As of March 1, 2018, Defendants also knew the Guidance was unachievable because the steel tariffs would increase REVG's chassis costs for 2Q18, further cutting into earnings.  ¶¶ 62-72.[6]

Contrary to Defendants contentions, the false, forward-looking Guidance is actionable under Section 10(b).  In *Makor Issues & Rights, Ltd. v. Tellabs, Inc*., 437 F.3d 588 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007), the Seventh Circuit held that the plaintiffs adequately alleged that defendants' projections were unachievable because Tellabs' faced lower demand and production was far behind schedule.  *Id*. at 597, 599.  Similarly, in *Asher v. Baxter Int'l Inc*., 377 F.3d 727 (7th Cir. 2004), the Seventh Circuit found the plaintiffs stated a 10(b) claim because "the projections were too rosy, and…Baxter knew it….  When the sterility failure occurred in spring 2002, Baxter left both its forecasts and cautions as is….  This raises the

---

[6] Defendants claim several alleged misstatements are immaterial puffery.  Br. 15.  These statements, however, affirmed the false Guidance and would be relied on by a reasonable investor when investing.  *See*, *e.g.* ¶ 87 (all three REVG segments were "up,…reflecting the type of guidance we gave"); ¶ 94 ("strong backlog" causing Defendants to "expect earnings growth to exceed sales growth in fiscal year 2018").  Such factual issues cannot be resolved through this Rule 12(b)(6) motion.  *Scholz v. United States*, No. 16-CV-1052, 2017 WL 375651, at *5 (E.D. Wis. Jan. 25, 2017).  Defendants' authorities relating to puffery are also distinguishable.  *See In re Allscripts, Inc. Sec. Litig*., No. 00 C 6796, 2001 WL 743411, at *6 (N.D. Ill. June 29, 2001) (general statements about "quality" puffery); *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (representing that a company was "recession-resistant" too vague to be actionable).

possibility…that Baxter…made projections more certain than its internal estimates at the time warranted." *Id.* at 728, 734.

Here too, the Guidance was "more certain than [] warranted" – both in light of Sullivan's statements of REVG's long backlog for High Margin Vehicles and because of "internal estimates" from OneStream. *Id.* at 734. *See also In re Next Level Sys., Inc.*, No. 97 C 7362, 1999 WL 387446, at *7 (N.D. Ill. Mar. 31, 1999) (finding the plaintiffs alleged sufficient facts to show that defendants "ignored facts seriously undermining the accuracy of [its] forecast" and forecast had no reasonable basis); *Tellabs*, 437 F.3d. at 600 ("internal reports [like those from OneStream] revealed" that the Guidance was unachievable).[7] Additionally, REVG "left…its forecasts…as is" even after President Trump announced the tariffs, which made the Guidance even more outlandish because REVG's margins were sure to decrease. *See Asher*, 377 F.3d at 734.[8] Thus, Plaintiff's allegations show that REVG's "projections were too rosy…rais[ing] the possibility that [REVG]…made projections more certain than…internal estimates…warranted." *Id.* at 728, 734.[9]

---

[7] Other courts have also upheld allegations that forward-looking projections were misleading. *See, e.g.*, *Shenk v. Mallinckrodt plc*, No. 17-cv-00145 (DLF), 2019 WL 3491485, at *7 (D.D.C. July 30, 2019) ("forward-looking statements such as opinions or projections are misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made"); *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017) (forecasts misleading where they were built to accommodate "a desired but unachievable financial outcome"); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 294 (S.D.N.Y. 2013) (forward-looking statements about a project's development schedule "gave investors the false impression that Defendants could still meet the aggressive schedule…which in fact Defendants knew was not possible"); *Reina v. Tropical Sportswear Int'l*, No. 8:03-CV-1958-T-23TGW, 2005 WL 846170, at *7 (M.D. Fla. Apr. 4, 2005) ("complaint sufficiently alleges that no reasonable basis existed for the forward-looking statements…the complaint alleges actual knowledge of…falsity").

[8] Indeed, REVG stated in its March 7, 2018 Form 10-Q that "[*t*]*here were no material changes in risk factors* for the Company in the period covered by this report. See the discussion of risk factors in the Company's Form S-1 filed in connection with its IPO." (Emphasis added).

[9] The Complaint's allegation that the Guidance was unachievable is further vindicated by REVG's final FY2018 Adjusted EBITDA, issued on December 17, 2018, of only $148 million – 30% less than that in the Guidance ($200 million to $220 million). ¶ 78.

14

Defendants repeatedly protest that Plaintiff is trying to hold Defendants liable for failing to have "crystal ball" accuracy into the future. *See* Br. 17, 19, 30, 35. *See also* Br. 12-13 (chiding Plaintiff for "Monday-morning quarterbacking" and pleading "fraud-by-hindsight"). But Plaintiff alleges that Sullivan acknowledged before, during, and just after the Class Period that High Margin Vehicle backlogs were long, and this was confirmed by OneStream, the Company-wide tracking system senior management used when making projections. Simply put, Defendants knew there would never be enough High Margin Vehicles in the pipeline to meet the Guidance because the long backlogs delayed recognizing a sufficient profit on these vehicles in FY18. There was no need for a crystal ball because Defendants knew the Guidance was a sham.[10]

### B. Plaintiff Sufficiently Alleges that Sullivan Made Material Misrepresentations about Chassis

On March 8, 2018, over a month into the REVG's second quarter, REVG held its 1Q18 conference call. ¶ 97. An analyst asked Sullivan whether issues with chassis would affect REVG's guidance and Sullivan stated that for the second quarter 2018, everything was "fine" for 2Q18: "We do work off a backlog of chassis. So in the near term, *by near term I mean, our second quarter, we're fine*…. But right now, we don't see that that's going to negatively impact our fiscal year." *Id*. Sullivan also stated that REVG had "warnings of any cost adjustments on chassis well in advance of what's happening". *Id*.

Sullivan's statements were false and misleading because the tariffs were announced one week prior on March 1, 2018 and it was clear the tariffs would cause increased costs and chassis

---

[10] Thus, Defendants' case citations analogizing this case to fraud-by-hindsight and a demand that defendants predict the future are all inapplicable. *See Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *20 (N.D. Ill. Mar. 31, 2011); *In re Supreme Indus., Inc. Sec. Litig*., No. 3:17CV143PPS-MGG, 2018 WL 2364931, at *8 (N.D. Ind. May 23, 2018); *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, No. 08-C-797, 2010 WL 1287058, at *18 (E.D. Wis. Mar. 30, 2010).

unavailability for 2Q18, which would also further cause REVG to miss the Guidance. ¶¶ 63-67, 99.[11] Thus, everything was not "fine" with chassis for the second quarter of 2018. Indeed, Sullivan admitted on a June 7, 2018 conference call that *"[a]s soon as tariffs were suggested* [at least by March 1, 2018], there was a run on many of the commercial chassis we purchase and convert." ¶ 106.

Defendants argue that these statements were not misleading because Sullivan surrounded his "we're fine [in]" "our second quarter" statement with numerous caveats. But Sullivan's caveats concerned Q3 and Q4 – not Q2:

> We do work off a backlog of chassis, so in the near term, by near term I mean our second quarter, we're fine. But as you can imagine, with our backend-loaded plan, we need a lot of chassis in here in Q3 and Q4. So we have time to react to it. But there's noise with GM also. There's a little bit noise with Ford. It's something that we manage on a regular basis. But we've got some time to react, and we plan to. But right now, we don't see that that's going to negatively impact our fiscal year.

¶ 97. Defendants also argue that "Sullivan warned that chassis would present issues in FY2018." Br. 19. But Defendants slashed the Guidance – and reported 2Q18 EBITDA 25% below analysts' estimates (¶ 100) – because of developments in the second quarter. In other words, REVG was not "fine" in its "second quarter" and Sullivan knew it when he made his statements. Significantly, it was the truth about various issues that arose in 2Q18, including the tariff-related problems, that caused the stock drop at the end of the Class Period.[12]

---

[11] Defendants also knew they would miss the Guidance because, as discussed above, the long backlogs for High Margin Vehicles made it impossible to complete enough of these vehicles on time so as to recognize profit on them. *See Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 841 (N.D. Ind. 2018), *motion to certify appeal denied*, No. 3:16-cv-815-PPS-MGG, 2019 WL 762510 (N.D. Ind. Feb. 20, 2019) (finding statement actionable where omitted information was one of several causes of stock drop).

[12] Defendants' citation to *Yellen v. Hake*, 437 F. Supp. 2d 954, 967 (S.D. Iowa 2006) is without merit. *See* Br. 19. There, the defendants tempered their statement with a warning that costs were "to be an ongoing challenge." Here, as noted, Sullivan might have warned of an "ongoing challenge" (*see id.*) for Q3 and Q4, but not for Q2. Defendants' reliance on *Wielgos v.*

Defendants claim that Plaintiff is holding Sullivan to an "impossible standard[,]" expecting him to "immediately foresee [the tariffs] a few hours before the President instituted [them]." Br. 31. *See also id.* at 7, 8 ("U.S. Government *likely* would impose tariffs" and describing tariffs as "*threatened*") (emphasis added). Defendants' narrative is wrong. Plaintiff alleges that the tariffs were announced on March 1, 2018 – *one week earlier.* ¶ 62. Thus, the tariffs were not merely possible or "threatened" (Br. 8); they were imminent. Tellingly, steel prices and the share prices of U.S. steel companies rose *immediately* on March 1, 2018. ¶¶ 63-66.

Defendants also claim the statements about tariffs were forward-looking. First, Sullivan's statement that "we're fine" in the second quarter (*see* ¶ 97) was not forward-looking because it is a present-tense statement. *See United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 767 (N.D. Ill. 2017) ("[m]isrepresentations 'framed in the present tense' are not 'forward looking.'"). Even if Sullivan's statements were a mix of forward-looking and present tense statements, "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Makor Issues & Rights, Ltd, v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008). *See also In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 818 (N.D. Ill. 2018). The false and misleading statement that "we *have* warnings of any cost adjustments on chassis well in advance of what's happening" (¶ 98, emphasis added) was also present tense and failed to advise that chassis costs were unmanageable.

Additionally, as to any forward-looking statements about tariffs, Plaintiff adequately alleges actual knowledge. When executives make forward-looking statements with actual

---

*Commonwealth Edison Co.*, 892 F. 2d 509 (7th Cir. 1989), is also misplaced. In *Wielgos*, the Court of Appeals found that defendants had used "the best available information" for its projections. *Id.* at 513. Here, Plaintiff alleges that Defendants ignored the "best available information"; namely, the March 1, 2018 announcement that President Trump was passing the steel tariff. *See id.*

knowledge that they were misleading, they can be held liable. *See also infra* at III(D). Sullivan knew his statements were misleading because he made them a week after tariffs were announced; thus, he knew they would cause a hike in domestic and foreign steel prices and, in turn, a chassis shortage. ¶ 130.

Defendants also argue that Sullivan's statements about chassis are opinions protected by *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015). Br. 16-17. In that case, the Supreme Court found that statements of opinion, "though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.* The Seventh Circuit applies the same test of objective and subjective falsity, that is, whether 'the statements [were] made in good faith and with a reasonable basis[,]' to forward-looking projections of future conditions or events." *Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 987 (S.D. Ind. 2018). *See also id.* ("a statement of opinion, no matter whether sincerely held, may ground false-statement liability if it "omits material facts about the [speaker's] inquiry into or knowledge concerning [the] statement of opinion,…").

*Omnicare* does not help Defendants. First, Sullivan's statement that REVG was "fine" in the "second quarter" was not an opinion. Sullivan did not say he "believed" or "thought" REVG was fine in the quarter, he said REVG *was* fine. The difference is significant. *See Omnicare*, 135 S. Ct. at 1327-28 (investors "recognize[] the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content").[13] Second, even if Sullivan's statements were deemed opinions, the Supreme Court held in *Omnicare* that if a defendant "made

---

[13] Defendants claim that Sullivan said he "believed" REVG "had sufficient chassis for Q2 FY2018" (Br. 8), but that is wrong. Sullivan said that "in the near term, by near term I mean, our second quarter, we're fine." ¶ 98.

[a] statement in the face of…contrary advice…the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id.* at 1329. Here, Sullivan claimed REVG was fine when he knew the steel tariffs that were announced one week earlier would immediately harm REVG by adding to the Company's 2Q18 costs.[14] Thus, Sullivan's statements about chassis and tariffs did not "align with the information in [his] possession." *Id.*[15]

Defendants' other responses to Plaintiff's allegations are not persuasive. For example, Defendants argue that REVG cut its Guidance in June 2018 because of "intervening factors beyond the Company's control or ability to forecast." Br. 36. But the tariff hike was not "intervening" – it was announced *one week prior* to Defendants' statements about tariffs. *See* ¶ 16. *See also* ¶¶ 62-71. Indeed, Sullivan later admitted on a June 7, 2018 conference call that "[a]s soon as tariffs were suggested [at least by March 1, 2018], there was a run on many of the commercial chassis we purchase and convert." ¶ 72. Sullivan said "suggested" not "officially announced" or "implemented." Thus, Sullivan knew by March 1, 2018 that the tariffs would materially, and

---

[14] Thus, Defendants' reliance on *In re Brightpoint Securities Litigation*, No. IP99-0870-C-H/G, 2001 WL 395752, at *22 (S.D. Ind. Mar. 29, 2001) is of no moment because there was no need to "investigate the scope of the problem" (Br. 31) – March 1, 2018 articles reported an immediate rise in steel prices. ¶ 63. Defendants' citation to *Abuhamdan v. Blyth Inc.*, 9 F. Supp. 3d 175, 205 (D. Conn. 2014) fares no better as the plaintiffs there failed to provide specificity; namely, "quantitative information" about how many customers had product issues. Here, Plaintiff provides ample specificity supporting their claims – Defendants acknowledged the long High Margin Backlogs and OneStream confirmed this in detail. Finally, Defendants' claim that one of the problems caused by the increased tariff developed in the "60 days" prior to June 7, 2018, *i.e.*, since April 7, 2018, which was a month after Sullivan's March 8, 2018 statements. Br. 33. That is irrelevant as that time frame relates to only *one* facet – and a very small one ($1 million of $20 million of cost increases, *see* Br. 32) – of the problems the tariffs caused.

[15] Defendants also claim – citing no supporting law – that the Guidance is an opinion. Br. 15. Although financial projections are not opinions, this argument is a red herring because Plaintiff sufficiently alleges that Defendants knew the Guidance was misleading. *Omnicare* does not insulate defendants from knowing misstatements.

adversely, affect REVG. Likewise, Sullivan repeatedly stated that REVG had long backlogs on High Margin Vehicles before, during, and just after the Class Period – which long backlogs, in part, caused the Guidance to be unachievable. Thus, "intervening events" did not force Defendants to slash the Guidance.[16] Accordingly, the statements that REVG was fine in 2Q18 and that chassis costs were under control and accounted for in the Guidance were materially false, misleading, and actionable.

### C. REVG's Vague and Meaningless Cautionary Language Does Not Protect Defendants' False and Misleading Statements

The safe harbor protects forward-looking statements (such as guidance) from liability under the securities laws only if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z-2(c)(1). "Cautionary language is meaningful 'if it puts an investor on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.'" *Shah*, 348 F. Supp. 3d at 841. But "cautionary statements about the future do not render misrepresentations immaterial if defendants misrepresented…matters…against known risks in light of the *then-current…conditions*." *Lewis v. Straka*, No. 05-C-10081, 2006 WL 2927658, at *5 (E.D. Wis. Oct. 12, 2006) (emphasis added);[17]

---

[16] Defendants' case citation on purportedly intervening events does not apply here. *See Bldg. Trades United Pension Fund v. Kenexa*, No. 09-2642, 2010 WL 3749459, at *15 (E.D. Pa. Sept. 27, 2010) (stock fell after defendants announced *unexpected* loss of a client; here, cutting Guidance was not unexpected because long backlogs and problems caused by tariffs were more than expected – they were certain).

[17] Defendants claim that the safe harbor is a disjunctive test (Br. 14), but no cautionary language is meaningful when defendants have knowledge they are making a false statement. The safe harbor is not a license to lie to investors. Defendants' one cited case on this point, *In re Harley-Davidson Inc., Sec. Litig.*, 660 F. Supp. 2d 969, 994 (E.D. Wis. 2009), did not hold that cautionary language can still be meaningful even if defendants know it is misleading (which is what Defendants claim); rather, it simply found the purported cautionary language too general without facts alleging knowledge of a false statement. *See id.*

*see also Shah*, 348 F. Supp. 3d at 842 (cautionary language "cannot inoculate…misleading statements,… [defendant] was alleged to have known the specific facts" that would cause a regulatory disaster).

REVG's purported cautionary language was not meaningful as Defendants knew the Guidance was false and misleading when it was made. REVG warned that "its demand estimates had not been verified by external sources" and "there is a risk that some amount of our backlog may not be fully realized in the future" (Br. 6). But Sullivan knew (and stated) that the backlogs on High Margin Vehicles were at least 12 months long, which undermined any claim that "demand estimates" and realization of backlog was not baked into the Guidance. Sullivan's acknowledgement of long backlogs on High Margin Vehicles was also reinforced by REVG's internal OneStream program, which contained extensive data on backlog and when vehicles would be completed. Thus, this supposed warning "is 'akin to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *Shah*, 348 F. Supp. 3d at 842.

REVG's warnings related to tariffs and chassis were also insufficient. REVG warned of "interruptions in the supply of chassis and components as well as price volatility for commodities like steel and aluminum could dampen its results." Br. 5. REVG also noted other specific risks, including that "its ability to meet customer delivery schedules depended on access to components and raw materials; that any cancellations, reductions, or delays in customer orders could harm its results; and that its backlog was comprised of vehicles to be sold at a fixed price, which could weaken the Company's profitability if the Company were to face rising input costs." Br. 6.[18]

---

[18] *See also id.* at 14 ("In particular, from its very beginning as a public company, REV Group warned that a "disruption . . . of the supply of vehicle chassis or other critical components from third-party suppliers" could harm sales; that "[d]isruptions in the supply of vehicle chassis" could

As in *Lewis*, Defendants' tariff and chassis-related risk language was insufficient because Defendants "misrepresented…matters…against known risks in light of the *then-current…conditions*"; namely, the imminent, adverse effects of the tariffs. 2006 WL 2927658, at *5. Defendants' cautionary language also did not inform investors of the "principal or important risk" of imminent tariffs as of March 1, 2018 (*Tellabs*, 437 F.3d at 599). In addition, as of March 1, 2018, REVG's purported cautionary language relating to tariffs was insufficient because it characterized problems stemming from the increased tariffs as possible whereas, with the tariffs announced, the problems were imminent and certain. As in *Asher*, "the cautionary language remained fixed even as the risks changed…. This raises the possibility—no greater confidence is possible before discovery—that Baxter omitted important variables from the cautionary language and so made projections more certain than its internal estimates at the time warranted."[19]

Finally, most of Defendants' cautionary language pertained to chassis supply, price volatility of commodities, and access to raw materials – none of which relate to the backlog of High Margin Vehicles that rendered Defendants unable to recognize enough revenue to meet the Guidance during the Class Period. The chassis and tariff-related risk language pertain only to Defendants' chassis and tariff statements – which were all made after the tariffs were announced on March 1, 2018. *See Asher*, 377 F.3d at 734 (risk language that did not warn of the "principal or important risks" "at the time of the projection" was insufficient). None of these purported warnings was "sufficiently related in subject matter" to the Guidance to insulate Defendants from liability. *Société Générale*, 2018 WL 4616356, at *6.[20]

_____

limit its ability to successfully execute its strategy; and that "[i]ncreases in the price of commodities" could impact earnings.").

[19] *See supra* 15 n. 8.

[20] Defendants also cite to *Société Générale*, 2018 WL 4616356, at *5-6 (*see* Br. 14), but that case only supports Plaintiff's argument. In *Société Générale*, the plaintiffs alleged that defendant

## III. PLAINTIFF PLEADS FACTS DEMONSTRATING A STRONG INFERENCE OF SCIENTER

To allege scienter for a forward-looking statement such as financial guidance, a plaintiff must plead particular facts providing a strong inference that executives issued them "with actual knowledge" that it was misleading. 15 U.S.C. § 78u-5(c)(1)(B). *See, e.g., Shah*, 348 F. Supp. 3d at 841 ("[s]tatements made with actual knowledge of their falsity are not protected by the safe harbor, or otherwise the statute would legalize knowing intentional misconduct").

When determining scienter, courts must weigh "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]" *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). While the inference of scienter "must be cogent and compelling," it "need not be irrefutable…or even the 'most plausible of competing inference[s],'" but "at least as likely as any plausible opposing inference." *Id.*, 551 U.S. at 308, 324, 328.[21]

### A. Defendants Knew the Guidance Was Misleading and Lacked A Reasonable Basis

#### 1. Sullivan Knew That the Long High Margin Vehicle Backlog – Which He Repeatedly Acknowledged – Made the Guidance Unachievable

Sullivan stated numerous times before, during, and just after the Class Period that the backlog for High Margin Vehicles, including all of Fire and Bus, as well as certain Recreation vehicles, was 12 months long. *See* ¶¶ 48, 53-55. As a result, Sullivan knew REVG would not be

---

Caterpillar created a Swiss subsidiary ("CSARL") through which it paid a 4-6% tax rate, when CSARL allegedly lacked a proper business purpose and, thus, was not a legitimate tax reduction plan. *Id.* at *1. The court dismissed the case because the cautionary language, unlike here, warned investors of an ongoing investigation into CSARL tax issues and that they may incur additional tax expenses. *See id.* at *6.

[21] Pleading scienter against controlling senior officers is sufficient to plead scienter against the corporate defendant. *See*, *e.g.*, *Puskala v. Koss Corp.*, 799 F. Supp. 2d 941, 948 (E.D. Wis. 2011). Thus, because Plaintiff sufficiently alleges scienter against Nolden and Sullivan, it sufficiently alleges scienter against REVG.

able to recognize profit on enough High Margin Vehicles to meet the Guidance. ¶ 56. Because of the long High Margin Vehicle backlog, these sales had occurred before the Class Period. Thus, Defendants cannot claim to have been surprised about lower-than-expected sales of these vehicles. In addition, Defendants repeatedly claimed REVG's "high-quality" backlog gave them financial visibility (¶ 51) – particularly for High Margin Vehicles (¶ 55). Finally, REVG met its 1Q18 revenue projections, further showing Defendants knew what vehicles were sold and, thus, knew the profit margins on those vehicles. *See* ¶¶ 73, 58.

On June 6, 2018, the last day of the Class Period, REVG disclosed what Defendants knew throughout the Class Period – the Company's growth narrative had stalled due to lower sales of High Margin Vehicles, *i.e.*, "certain higher-content product categories including custom fire apparatus, large commercial buses, and Class A RVs". ¶ 20. These "[c]ustom fire apparatus, large commercial buses, and Class A RVs" were examples of the High Margin Vehicles that Sullivan acknowledged before, during, and just after the Class Period had long backlogs. ¶¶ 48-55.

Thus, Sullivan and Defendants had "actual knowledge" that the Guidance was misleading, which satisfies scienter pleading requirements for projections. *Shah*, 348 F. Supp. 3d at 841.

### 2. CW1 Provides Detailed Allegations Showing Defendants Knew the Guidance Was Unachievable Because They Used OneStream Reports When Making Projections

#### a. CW1's Allegations Are Specific and Reliable

CW1 alleges that senior management "used" OneStream in making projections. ¶ 59. This is a significant allegation. *See*, *e.g.*, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1135 (9th Cir. 2017) (reversing, finding CW statements that "management…had access to and used reports documenting…[sales] decline" supported scienter) (Emphasis added). The reports REVG management used showed backlog level and the timeline for finishing vehicles. ¶ 58. With these

reports, Defendants could tell what vehicles were being built and how far along they were, because each manufacturing facility built only certain vehicles. *Id.* Thus, Plaintiff alleges more than access to information about backlog – which itself can be sufficient to plead scienter (*Lewis*, 2006 WL 2927658, at *50) – it alleges that REVG senior management ***used*** such information.

Allegations by a well-informed senior CW like CW1 weigh in Plaintiff's favor in the scienter calculus. *See Shah*, 348 F. Supp. 3d at 845 ("Defendants' proffered inference – effectively, that ZBH was doing the best it could under the circumstances and sought to address issues on a reasonable basis – is certainly not implausible. But the inference in plaintiffs' favor, bolstered by allegations from two reasonably well-described and seemingly-knowledgeable confidential witnesses, strikes me as at least equally strong. And a tie goes to the plaintiff at this stage in the litigation").

This Court noted in *Lewis* that "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." 2006 WL 2927658, at *6. Indeed, courts routinely find that regular reports containing information undercutting public statements is probative of scienter. *See*, *e.g.*, *Shah*, 348 F. Supp. 3d at 842 ("[t]he plaintiffs allege…ZBH Management learned of…problems…via its internal audit reports that *would inevitably derail ZBH's financial forecasts*…"); *MicroCapital Fund LP v. Conn's Inc.*, No. 4:18-CV-1020, 2019 WL 3451153, at *15 (S.D. Tex. July 24, 2019) (regular reports probative of scienter); *Zaghian*, 675 F. App'x at 720 (forecasts were built to accommodate "a desired but unachievable financial outcome"; defendants knew of "reliable information indicating that [forecasts were] unlikely to succeed"); *Quality Systems*, 865 F.3d at 1145; *see also Brody v. Zix*

*Corp.*, No. 3:04-CV-1931, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (CW allegations that defendants regularly received tracking reports probative of scienter).

Defendants rely on the inapposite case of *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589 (7th Cir. 2019), to downplay the importance of access to information allegations. In *Cornielsen*, the court held that "allegations…derived from a defendant's mere access to information" were "conclusory". *Id.* at 602. But here, Plaintiff alleges senior REVG management "used" OneStream (¶ 59), not simply that they had access to it. And Plaintiff's allegations about OneStream are not conclusory, they are detailed. CW1 authored the OneStream reports – not viewed them at a deposition as in *Cornielsen* – and provided significant detail about the reports' contents.

Accordingly, allegations that Sullivan and Nolden used the regular OneStream reports that showed REVG's backlog – including backlog on High Margin Vehicles – support an inference of Defendants' scienter.

## b. Defendants' Legal and Factual Attacks on CW1 Ignore the Specificity of CW1's Allegations

Defendants try to write off CW1's allegations wholesale but "[t]he Seventh Circuit has approved of [CWs] as providing an inference of scienter and has identified… factors which strengthen the inference, including…descriptions of their jobs that indicate they had first-hand knowledge of the facts to which they are testifying[.]" *In re Supreme*, 2018 WL 2364931, at *9. *See also City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, No. 10 C 6016, 2012 WL 607578, at *5 (N.D. Ill. Jan. 23, 2012) (allegations from CWs "set forth with specificity how informed the…defendants were about the [company's] operations and financial state…while it is

plausible, that Baxter simply miscalled its projections,…[the] inference of scienter [is] at least as compelling as the opposing inference").[22]

Defendants also attack the foundation of CW1's statements, but a fair analysis shows them to be well-founded. CW1, a senior finance manager at a REVG facility, stated that REVG tracked backlog on a monthly basis through OneStream. ¶¶ 57, 58. CW1 inputted data each month into OneStream, and described in great detail the various fields – including backlog – in OneStream reports. More importantly, CW1 stated that senior management in Milwaukee used the OneStream data from the various REVG manufacturing facilities when making projections. ¶ 59. Using OneStream, senior management could tell what vehicles were being built, and how far along they were, because each manufacturing facility built only certain vehicles. CW1 also explained that senior management's projections for CW1's ElDorado facility were unachievable. ¶¶ 59-61.

CW1's allegations are significant because they demonstrate that Defendants had access to – *and utilized* – OneStream, which contained detailed and timely data about backlog, including

---

[22] Many other courts in this Circuit agree that CW information can be probative of scienter. *See Pension Trust Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2018 WL 6714326, at *3 n.2 (N.D. Ill. Dec. 20, 2018) (acknowledging *Higginbotham*'s warning to analyze CW allegations carefully but crediting CWs when their "accounts…are set forth in 'convincing detail' and the [CWs] provide enough information about their jobs to demonstrate that they 'were in a position to know at first hand the facts to which they are prepared to testify'"); *see also Tellabs*, 513 F.3d at 711-12 (contrasting CWs in *Higginbotham*, who claimed parent knew about fraud at far-flung Brazilian subsidiary, with CWs "who from the description of their jobs were in a position to know [facts] first hand…the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions"); *Shah*, 348 F. Supp. 3d at 844 ("presumption to disregard [CW] allegations was squarely rejected by the Seventh Circuit in *Tellabs III*, and district courts…have credited [CWs] when [there is] sufficient detail as to the basis for their knowledge"); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2013 WL 566805, at *17 (N.D. Ill. Feb. 3, 2013) (CW allegations "are more believable when the complaint provides their "job title, duration of employment...and a description of employee responsibilities"). Thus, Defendants' attempt to dismiss CW1's allegations is legally mistaken.

data showing when a vehicle would be completed and, thus, when REVG could recognize revenue on that vehicle.

Defendants also enlist an army of straw man arguments to attack CW1. For example, Defendants argue that CW1 would not have had knowledge about corporate-level projections. *See* Br. 24 (not possible for CW1 to have had "insight into REV Group's enterprise-level financial projections as announced in its public statements to the market"). *See also* Br. 22-25. But Plaintiff does not allege otherwise. Plaintiff alleges that CW1 had insight into what information OneStream contained and into the fact that Defendants utilized OneStream when making projections – not into whether the Guidance was unachievable.[23]

Defendants raise other unavailing arguments about CW1. Defendants claim CW1 was not in a position to know the information he provided, characterizing CW1 as a "low-level" employee. Br. 26. But CW1 did not work in the mail room. CW1 was a finance manager (who supervised the controller), and it is a reasonable inference that CW1 would know about a REVG finance program that monitored the status of vehicle production – a program CW1 regularly used – and who else utilized the system. *See* ¶ 57. Relatedly, the inference that senior management used OneStream when making projections for REVG's facilities but not when making the all-important Company-wide projections issued to the market is not plausible. *See Iqbal*, 556 U.S. at 678. *Compare* Br. 27.[24]

---

[23] As a result, none of Defendants' case citations in support of this argument apply. *See Vallabhaneni v. Endocyte, Inc.*, No. 1:14-CV-01048-TWP-MJD, 2016 WL 51260, at *8 (S.D. Ind. Jan. 4, 2016), *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 955 (D. Ariz. 2007), and *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 942–45, 949 (S.D. Ind. 2005)).

[24] Defendants' other citations on CWs do not bear scrutiny. In *Vallabhaneni*, the court found that "[t]he problem with [the CW] testimony, which lays the foundation for all of the Plaintiff's claims, is that it is wholly uncorroborated by other evidence." 2016 WL 51260, at *8-9. Here, CW1's allegation that OneStream provided detailed information about backlog is corroborated by

Defendants' reliance on *EveryWare* is also misplaced because the allegations about projections in that case centered upon a different type of CW allegation. *In re EveryWare Global Sec. Litig.*, 175 F. Supp. 3d 837, 852-53 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Global, Inc.*, 849 F.3d 325 (6th Cir. 2017). In *EveryWare*, the plaintiffs alleged that defendants knowingly made misleading 2013 projections based on statements by a CW who was allegedly told by another employee that EveryWare's CEO had rejected the projections made by the CW and two others. *Id.* at 853. The court dismissed these allegations – which were the only scienter allegations relating to the misleading projections – largely because there was no first-hand contact with the CEO. *Id.* 853-54. But first-hand contact with a named defendant is not a requirement for pleading scienter. Here, Plaintiff alleges different types of scienter allegations; namely; senior management's use of OneStream and Sullivan's repeated acknowledgement that High Margin Vehicles had long backlogs before, during, and just after the Class Period.[25]

Defendants also state that CW1 only worked for REVG for six months, and for only one month of the Class Period. Defendants miss the point. CW1's allegations show that senior

---

Sullivan's repeated statements about long backlog for High Margin Vehicles, suggesting that Sullivan learned of backlogs through OneStream, as well as by REVG's statements that backlog provided financial visibility. Likewise, in *City of New Orleans* v. *Privatebancorp, Inc.,* No. 10 C 6826, 2011 WL 5374095, at *3 (N.D. Ill. Nov. 3, 2011), the chief CW attended a meeting discussing problem loans – but never described the problems. Here, CW1 describes in detail the OneStream program and its backlog data.

[25] Defendants' other CW case authorities do not apply because, like *EveryWare*, these cases concerned vague CW allegations about first-hand contact. *See Plumbers & Pipefitters Local Union 719 Pension Plan v. Zimmer Holdings Inc.*, 673 F. Supp. 2d 718, 747 (S.D. Ind. 2009), *aff'd*, 679 F.3d 952 (7th Cir. 2012); *Int'l bhd. of Elec. Workers Pension Fund Local No. 38 v. Am. Express*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (no contact); *W. Pa. Elec. Emps. Pension Trust v. Plexus Corp.*, No. 07C0582, 2009 WL 604276, at *4 (E.D. Wis. Mar. 6, 2009); *see also Rossy v. Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 782 (N.D. Ill. 2015) (defendants never learned of issues).

management used OneStream during the Class Period, and that OneStream included detailed data on backlog and vehicle completion schedules. Indeed, Defendants argue that a complaint must allege "details as to the contents of the reports as well as when and how reported." Br. 28. *See also id*. at 29. That is precisely what CW1 alleges. ¶¶ 57-61.[26] Moreover, pre-Class Period OneStream reports are also relevant since those reports informed Defendants when the vehicles sold before the Class Period would be completed and, thus, revenue recognized on those sales. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("[p]re-class data [was] relevant". . . to establish that at the start of the class period, defendants had a basis for knowing [of a problem]").[27]

### 3. Defendants Knew the Guidance Was Misleading Because Unachievable Projections Were A Prevalent Problem Internally at REVG

---

[26] Defendants' citations to *Schultz v. Tomotherapy*, No. 08-cv-314-slc, 2009 WL 2032372, at *20 (W.D. Wisc. 2009) and *In re Supreme Indus. Inc. Sec. Litig.*, 2019 WL 1436022, at *3 (N.D. Ind. Mar. 29, 2019) on this point are of no avail. In *Tomotherapy*, the "allegedly 'hands-on' nature of defendant Robertson suggests that [he] would have kept tabs on orders being placed in the backlog" but it was "something of a stretch to infer that defendants knew enough about how multi-unit orders worked to understand that their conversion rate could be significantly slower than 9 to 12 month." *Id.*, 2009 WL 2032372, at *20. Plaintiff alleges no such vague allegations – CW1 reports that Defendants used OneStream and OneStream contained detailed backlog data making crystal clear when vehicles would be completed. Likewise, in *Supreme Industries*, the CW provided no basis for how he would have "known the [sales] numbers"; here, CW1 provides ample basis for why *Defendants* knew REVG's backlog and when the vehicles (particularly the High Margin Vehicles) would be completed.

[27] Defendants' reliance on *In re Trex Co. Sec. Litig.*, 454 F. Supp. 2d 560, 570 (W.D. Va. 2006) on this issue is misplaced. In *Trex*, the court rejected allegations from two CWs who did not work for the defendant company during the class period at all – whereas CW1 worked for REVG for the first month of the Class Period. *See id*. Further, the *Trex* court held that CW allegations must show "a probability that a person in the position occupied by the source would possess the information alleged." *Id*. Here, CW1 was a finance manager – precisely the kind of person who would know about a financial program like OneStream, the data it contained, and whether senior management would use it. Similarly, *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) does not help Defendants because in that case the key CW, who left before the class period, stated that certain reports "implicit[ly]" tracked Kmart's real estate holdings. *Id*. at 335. The court noted that the department that generated the reports in question "was discontinued in 2001, more than two years before the start of the Class Period." *Id*. at 335-36. Here, CW1 described reports that were issued during the Class Period.

Unachievable projections were not only an issue at REVG's parent level. CW1 stated that every three months, senior REVG management would give specific projections to each of REVG's manufacturing facilities. ¶ 59. CW1 stated that the projections which CW1's facility received from corporate headquarters in Milwaukee were *regularly unreachable*. ¶ 61. For example, senior management's FY2018 projections for CW1's manufacturing facility demanded that it grow its production by 5-10% while reducing its costs by the same amount, which CW1 stated was impossible because CW1's facility was already operating at maximum production level – and with serious inefficiencies such as large overtime and mushrooming costs. *Id.*

Defendants write off CW1's allegations of unachievable projections at CW1's facility as a one-off occurrence with no relevance towards Plaintiff's allegations about REVG's unachievable corporate-level projections. *See* Br. 25. But the most reasonable and plausible inference – to which Plaintiff is entitled[28] – is that it is no coincidence that REVG was forced to slash its Company-wide Guidance because it was unreachable ***and*** a former senior finance employee (CW1) reported that the projections for CW1's facility were also unreachable. Plaintiff's allegations demonstrate that there was a deep problem at REVG about realistic projections.[29]

Finally, Defendants argue that CW1's claim that projections for CW1's facility were unachievable is belied by the fact that REVG's revenues grew for six quarters, including the quarter (2Q18) during which Defendants state problems arose causing them to slash the Guidance.

---

[28] *See Boucher*, 880 F.3d at 366.

[29] Defendants cite to *City of Austin*, 388 F. Supp. 2d at 949 in support of their argument that "local" problems "do not support an inference of scienter on the part of senior management and the corporation itself". Br. 25. But in *City of Austin*, the plaintiffs alleged problems at a handful of "local institutes" were based on search warrants – many of which came up dry. *Id.*, 388 F. Supp. 2d at 949. Here, Plaintiff pleads particular facts showing unachievable projections at the parent level, as well as at one local facility.

Br. 26.  But CW1's facility could have had unreachable projections while REVG still grew in revenues – the two are not mutually exclusive because even vehicles with no or low margins will still have revenue booked.  Moreover, whether revenues grew is irrelevant; this case is about REVG's net income and earnings projections, not revenue projections.

> **4.  As of March 1, 2018, Defendants Also Knew the Guidance Was Misleading Because the Tariffs Would Increase REVG's 2Q18 Costs**

After tariffs were announced on March 1, 2018, Defendants knew that REVG would have increased costs during 2Q18.  *See* Section B, *infra* at 33.

> **B.  Sullivan Knew or Recklessly Disregarded That His Statements about Tariffs Were Misleading**

Because Sullivan's statements about tariffs were not forward-looking, Plaintiff need not plead facts amounting to actual knowledge.  Instead, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (15 U.S.C. § 78u-4(b)(2)(A)), namely, "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false."  *Kohl's Corp.*, 895 F.3d at 936.

Sullivan knew or recklessly disregarded that his chassis statements were misleading. Sullivan made his statements on March 8, 2018.  At that time, Sullivan knew that the tariffs had been announced one week earlier, and knew (as the press reported) that would immediately cause foreign and domestic steel prices to rise, in turn causing inevitable chassis availability issues for REVG.  ¶ 99.  *See also id.* (Sullivan admitted on June 7, 2018 that ***"[a]s soon as tariffs were suggested*** [on March 1, 2018], there was a run on many of the commercial chassis we purchase and convert…").

Defendants argue that Plaintiff has not sufficiently alleged scienter for the misstatements about tariffs because it "does not allege any internal meetings involving Mr. Sullivan [or] any CW statements[.]" Br. 32. First, there is no need for CW allegations or internal meetings to plead scienter – those are simply *some* of the ways to show scienter. Second, Plaintiff sufficiently pleads scienter as to Sullivan's chassis statements because the culpable inference provided by the timeline – a March 1, 2018 announcement of tariffs and Sullivan's March 8, 2008 claim that REVG was "fine" in the second quarter – is at least as compelling as the inference that Sullivan did not know of the tariffs' imminent ill effects. *Tellabs*, 551 U.S. at 324.

### C. Collectively, the Inference of Scienter Is At Least As Strong As the Competing Inference of Non-Culpable Conduct

Plaintiff alleges detailed allegations that, when viewed, together, support an inference of scienter. Plaintiff alleges that (i) Sullivan repeatedly represented that High Margin Vehicle backlogs were long before, during, and just after the Class Period; (ii) Sullivan and Nolden used monthly OneStream Reports – which detailed backlogs – when making projections; (iii) unachievable projections were not an isolated problem at REVG; (iv) REVG met its 1Q18 revenue projections, showing Defendants knew what vehicles were sold and, thus, knew the profit margins on those vehicles; and (v) as of March 1, 2018, Sullivan knew or recklessly disregarded that REVG would suffer material adverse effects from the steel tariffs during 2Q18. *See* ¶¶ 73, 58. These particularized facts collectively show that the inference that Defendants knew the Guidance was misleading and lacked a reasonable basis is at least as strong as the competing inference (*see Tellabs*, 551 U.S. at 308). Likewise, the inference that Sullivan knew or recklessly disregarded that his statements about chassis and tariffs were misleading is at least as strong as the competing inference. *See Devry*, 2018 WL 6714326, at *3-4 ("inference that defendants had no knowledge

of any serious risk that…[s]tatement was inaccurate because they knew only of the possibility of a few diffuse, isolated cases of low-level employees massaging data—smacks of what the Seventh Circuit called…'ostrich tactics'").

Defendants claim that the most compelling scienter inference is that REVG "adjusted [the Guidance] only after facing various industry-wide headwinds and economic changes resulting from the tariffs". Br. 3. But Plaintiff alleges detailed facts providing a strong inference that Defendants knew the Guidance was unachievable and misleading because of *existing conditions* – not yet-to-come "headwinds and economic changes" (*see id.*). *See also id.* 35 (claiming later plant fire was a factor in slashing the Guidance).

Defendants also argue that it would make no sense for them to issue Guidance they knew they could never meet, inviting a drop in REVG's stock. Br. 35-36. But Defendants could have had any one of a number of reasons to issue misleading Guidance. These issues are for discovery and do not bear on whether Plaintiff has adequately pled a claim. *Cf. Levy v. Gutierrez*, No. 14-cv-443-JL, 2017 WL 2191592, at *13 (D.N.H. May 4, 2017) ("securities laws prohibit foolish frauds along with clever ones" including "invest[ing] significant resources into an effort they knew was doomed to failure").[30]

Defendants also argue that Plaintiff is not specific enough in alleging that REVG's backlog (which stretched as far as 17-19 months), coupled with REVG executives' knowledge of the Company's sales margins, provided information about future sales. On the contrary, Plaintiff provides enough specificity to plead a strong inference of scienter; in particular, that Defendants

---

[30] Defendants cite to *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) on this point but the Seventh Circuit there found it was irrational to infer that E&Y covered up a company's fraud for no benefit to itself. In contrast, it is rational to infer that Defendants committed fraud – not covered up a third party's fraud – to keep their growth narrative alive and save face with analysts as long as possible.

knew when sales would be consummated and profit recognized, and that they used OneStream, which contained detailed data about backlog and production schedules, when making REVG projections.

Finally, Defendants claim that it is significant that Sullivan bought REVG stock during the Class Period. Br. 36. Sullivan bought his stock after the March 8, 2018 partial disclosure that caused REVG stock to fall 12%. *See* ¶¶ 73-74. Thus, he may have bought REVG stock then because he thought REVG was undervalued and would ultimately turn around; he may have done so for tax purposes, etc. These are all factual questions inappropriate for adjudication now. *Cf. Carpenters Pension Trust Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *5 (N.D. Ill. Feb. 27, 2018) (finding defendants' claim that plaintiffs had not alleged scienter against defendant because he "continued to beneficially own millions of additional shares … raises a factual issue that is also not properly decided at this stage of the litigation"). Sullivan's motivation (which may be complex) in buying some REVG stock after issuing the misleading Guidance is an issue that must wait for discovery.

Therefore, individually, and as a whole, the SAC adequately alleges scienter.

## IV. PLAINTIFF SUFFICIENTLY PLEADS THAT SULLIVAN AND NOLDEN VIOLATED SECTION 20(a)

There are three elements to such a Section 20(a) control person claim: (1) a primary violation of the securities laws; (2) the exercising of general control over the operations of the company; and (3) possession of "the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Shah*, 348 F. Supp. 3d at 850.

Plaintiff adequately alleges that Sullivan and Nolden violated Section 20(a). First, as argued above, REVG (as well as Sullivan and Nolden) violated Section 10(b). Second, as REVG's

CEO and CFO, respectively, Sullivan and Nolden indisputably "exercis[e]…general control over the operations of [REVG]." *Id*. at 850; *see also ¶¶* 151-152. Third, Sullivan and Nolden had the "power or ability to control the…activity upon which the primary violation was predicated[,]" *i.e.*, issuing the alleged misstatements. *Id*. Thus, Plaintiff has sufficiently alleged that Sullivan and Nolden violated Section 20(a).

**CONCLUSION**

For all these reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: October 30, 2019

        **ADEMI & O'REILLY, LLP**

        /s/ John D. Blythin

        Shpetim Ademi (SBN 1026973)
        John D. Blythin (SBN 1046105)
        3620 East Layton Avenue
        Cudahy, WI 53110
        (414) 482-8000
        (414) 482-8001 (fax)
        sademi@ademilaw.com
        jblythin@ademilaw.com

        *Liaison Counsel for Lead Plaintiff Houston Municipal Employees Pension System and the Proposed Class*

        **BERNSTEIN LIEBHARD LLP**
        Stanley D. Bernstein
        Michael S. Bigin
        Joseph R. Seidman, Jr.
        10 East 40th Street
        New York, NY 10016
        Telephone: (212) 779-1414
        Facsimile: (212) 779-3218
        bernstein@bernlieb.com
        bigin@bernlieb.com
        seidman@bernlieb.com

        *Lead Counsel for Lead Plaintiff Houston Municipal Employees Pension System and the Proposed Class*